## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

Alex Gonzales, Sr., and §
Elizabeth Herrera, §
   *Plaintiffs*, §
v. §    Case No. ___1:22-cv-655___
§
City of Austin, §
   *Defendant*. §

## PLAINTIFFS' ORIGINAL COMPLAINT AND REQUEST FOR JURY TRIAL

To the Honorable Court:

1.      This is a lawsuit about Austin police officers Luis Serrato and Gabriel Gutierrez who fatally shot Alex Gonzales, Jr. ("Alex") on January 5, 2021, and about the policies and practices of the City of Austin that caused Alex's tragic and untimely death.

2.      Alex's parents, Alex Gonzales, Sr., and Elizabeth Herrera (collectively the "Plaintiffs") bring this lawsuit to vindicate their son's civil rights, hold the Austin Police Department accountable for their son's senseless killing, and recover for their own harm and damage from losing their only son to excessive, unjustified police violence.

### I.      Parties

3.      Alex Gonzales, Sr. is a citizen of Texas and a resident of Bastrop County, Texas. His son, Alex Gonzales, Jr, also was from Bastrop County, Texas. As Alex Gonzales, Jr.'s biological father, Plaintiff Alex Gonzales, Sr. is a wrongful death beneficiary and, as such, brings this wrongful death action in his individual capacity pursuant to Texas Civil Practice and Remedies Code section 71.004(b) and 42 U.S.C. §§1983, 1988.

4.      Elizabeth Herrera (also known as Elizabeth Gonzales) is a citizen of Texas and a resident of Bastrop County, Texas. Her son, Alex Gonzales, Jr, was also from Bastrop County, Texas. As Alex Gonzales, Jr.'s biological mother, Plaintiff Elizabeth Herrera is a wrongful death

beneficiary and, as such, brings this wrongful death action in her individual capacity pursuant to Texas Civil Practice and Remedies Code section 71.004(b) and 42 U.S.C. §§1983, 1988.

5.     Defendant City of Austin (herein the "City" or "Austin") is a Texas municipal corporation in the Western District of Texas which funds and operates the Austin Police Department ("APD") and the APD Training Academy.

## II.     Jurisdiction

6.     This Court has federal question subject matter jurisdiction over this 42 U.S.C. §1983 lawsuit under 28 U.S.C. §§1331, 1343.

7.     The City is subject to general personal jurisdiction because it is a Texas municipality.

8.     This Court has specific personal jurisdiction over the City because this case involves its conduct that occurred in Austin, Texas.

## III.     Venue

9.     Under 28 U.S.C. §1391(b), the Western District of Texas is the correct venue for this lawsuit because the events occurred in Austin, Texas.

## IV.     Factual Allegations

**A.     Officers Gutierrez and Serrato shot and killed Alex Gonzales, Jr. without provocation or justification.**

10.     In the early morning hours of January 5, 2021, Alex Gonzales, Jr. ("Alex") was driving with his girlfriend, Jessica Arellano ("Arellano"), in the passenger seat and with their two-month-old baby, Zayne Alexander Gonzales, in the backseat. They encountered Gabriel Gutierrez ("Gutierrez"), an off-duty Austin Police Officer, on the road in his personal vehicle.

11.     Gutierrez used his car to cut-off Alex's car. Gutierrez's aggressive driving initiated a confrontation with Alex. Gutierrez then turned from E. Oltorf Street and headed southwest on

Wickersham Lane, a two-lane residential road. Gutierrez stopped in the right lane of Wickersham, baiting Alex and escalating the events.

12.    Alex pulled his vehicle next to Gutierrez's vehicle and stopped to the left of the vehicle. Unprovoked and without any warning, Gutierrez, at close range, rapidly fired multiple shots into the passenger side of Alex's vehicle, where the young mother and her baby sat. Upon information and belief, Gutierrez fired at least six (6) shots into Alex's vehicle. Gutierrez shot Alex in the head and Arellano in the torso. Alex, now severely wounded and in a state of shock and fear, maneuvered the vehicle to get away from the gun fire and crashed on the right-hand curb a short distance ahead.

13.    At no point during this series of events did Alex flash a gun or take any other aggressive action that would justify Gutierrez's use of lethal force.

14.    Gutierrez was not in a police vehicle. He was not wearing police clothes. Alex had no reason to know or suspect that Gutierrez was an off-duty APD police officer. Alex had not harmed or threatened anyone. There was no objectively reasonable basis for Gutierrez to be afraid for himself or others. No reasonable police officer would have used deadly force against Alex in these circumstances.

15.    Gutierrez was the aggressor in his encounter with Alex. Gutierrez's actions created the initial confrontation and escalated the events that ensued.

16.    After firing at least six shots into Alex's vehicle, shooting Alex and his passenger, Officer Gutierrez called 911 at approximately 12:33 AM. Gutierrez told the 911 dispatch that: (1) Alex had cut him off, (2) that he (Gutierrez) had been involved in a "road rage" incident, and (3) Alex had pointed a gun at him. Each of these statements was untrue.

17.    The transcript of the first part of the 911 call reads as follows:

**911 Operator**: Austin 911,

do you need police, fire, or ambulance?

**Officer Gutierrez**: Hey, off duty – off duty APD AP 8063.

I have shots fired.

2400 Wickersham Lane.

**911 Operator:** 2400 Wickersham Lane?

**Officer Gutierrez**: Yes, sir.

**911 Operator**: Okay, how many did you hear?

**Officer Gutierrez**: Uh, what's that?

**911 Operator**: How many was there?

**Officer Gutierrez:** I have a – a victim – the driver –

The, uh, other vehicle, he has a gun.

I'm not – I'm not shot. I need EMS over here.

**911 Operator:** I'm bringing them on.

Ambulance, what's the address of your emergency?

2400 Wickersham Lane.

Ambulance, what's the address of your emergency?

**911 Operator:** EMS, it's an off-duty officer,

he is at 2400 Wickersham Lane.

**Officer Gutierrez:** Police.

**Ambulance:** You said 2500 Wickersham?

**Officer Gutierrez:** Get the (unintelligible) down.

**911 Operator**: 2400 at the High Point Apartments.

**Officer Gutierrez**: And it – it – no – no, I'm sorry,

2500 Wickersham Lane – 2500 in the street.

Hey, drop your gun.

Austin Police. He's moving.

He's got a gun in his hand.

**911 Operator:** Okay, we're gonna – we're gonna stage for officers to…

**Officer Gutierrez**: No, don't stage.

I'm APD, I – he's got a gun in his hand.

I need officers now.

**911 Operator:** Yeah, okay.

**Officer Gutierrez:** I'm an Austin Police Officer.

**911 Operator**: APD is on the way.

Um, EMS is going to stage.

**Officer Gutierrez:** Yeah – yeah, EMS needs to stage.

**911 Operator:** Okay

**Officer Gutierrez:** Austin Police.

Put your gun down, man.

Let me see your hands.

Hands up, man. EMS is coming.

Put your hands up. Hey, hands up, man.

He's hanging out the door.

He had a gun in his hand.

There's a passenger.

She's lying on the ground – female passenger.

**911 Operator:** Okay, so tell me exactly what happened.

**Officer Gutierrez:** Um, it was a road rage incident.

I was driving and he cut me off,

and he pointed a gun at me.

**911 Operator:** Okay, is anybody injured?

**Officer Gutierrez**: Yes, the – the driver of the other vehicle.

He's shot. Put your gun down.

Austin Police, put your gun down.

Don't make me shoot you again, man.

It's the police.

I don't know if the – I don't know if the passenger's shot or not.

She's lying on the ground.

**Operator:** Okay, that – that's all right.

We do have APD Dispatch on the line

Did y'all want Fire [resources][sic] as well?

**Officer Gutierrez:** All right, my – my –

Yes, sir, my AP's 8063.

8063.

Hey, just keep your hands up, man.

Lie on the ground and keep your hands up.

**Woman:** (Unintelligible).

**Officer Gutierrez:** *Okay, the – the female passenger,*

*she's lying on the ground.*

*She's saying, "My baby – my baby – my baby."*

The driver, he's standing.

He's got blood all over his face.

He's standing.

I don't know if he's still got the gun in his hand or not.

**911 Operator***: Okay, is there a baby involved, or*

*Is she pregnant, do we not know?*

**Officer Gutierrez:** *I have no idea, I don't know –*

*I have no idea.*

**911 Operator:** Okay.

**Officer Gutierrez:** *She's just saying, "My baby."*

I'm – I'm not approaching the vehicle.

I'm standing by – behind my vehicle.

**911 Operator:** I – I totally understand. Um…

**Officer Gutierrez:** All right, there's units coming

Right now – there's units coming right now.

**911 Operator:** Do you know – do you know if he's awake and breathing?

**Officer Gutierrez:** Uh, yeah, he's standing up right now.

**911 Operator:** Okay.

**Officer Gutierrez:** All right, put your gun down, man.

It's the police.

Our units are here, can I – can I disconnect?

**911 Operator:** Um, yeah, I will let you go.

**Officer Gutierrez:** Don't reach in your pocket –

don't reach in your pocket.

Do not reach in your pocket.

18.    After Alex's vehicle landed partially on the curb, Gutierrez parked his vehicle behind Alex's vehicle. Gutierrez got out of his car and continued his conversation with 911 dispatch.

19.    Arellano, who had been shot in the torso, crawled out of the vehicle onto the ground. She repeatedly cried: "My baby! My baby!"

20.    Alex got out of his car, stayed by the driver's door, and tried to put his hands up. However, Alex's gunshot wound compromised his physical and mental functions, and his comprehension.

21.    Gutierrez knew there was an infant in the passenger side of the car. He knew the mother was crying out for the baby, and that she was concerned the baby was injured. Gutierrez knew two people were badly injured, with a baby who also might be injured.

22.    Defendant Gutierrez did not render aid. As time passed, Gutierrez simply stood by.

23.     In an instant, Alex went from driving along a city street with his girlfriend and baby to having the macabre experience of a stranger shooting repeatedly with an automatic handgun into his car. Alex knew only that he had been shot in the head and his girlfriend had been shot and was bleeding on the ground. At this time, Alex did not know whether his son had been shot or injured.

24.     Bystanders watched in horror from a nearby balcony, recording the events and calling 911. One bystander said: "Dude, that was like six shots right there."

25.     Additional officers arrived, including Officer Serrato ("Serrato"), and approached the scene. Serrato and another uniformed Austin Police Officer held Alex at gun point. None of the responding officers render aid to Alex or Arellano, both of whom were obviously severely injured. Instead, the officers began shouting multiple, conflicting commands at Alex and Arellano.

26.     Because Alex had been shot inside a vehicle at close range his hearing was impaired, making it difficult for him to hear the commands of the officers. Alex also was in shock, unable to comprehend or process what was happening and why officers were yelling at him when he was the victim of a shooting. Alex tried to speak to the officers, but his words were indecipherable given his impaired condition after being shot by Gutierrez.

27.     The officers yelled at Alex to put his hands up. Alex kept his hands up, resting against the open car door. There was no weapon in Alex's hands. Alex had difficulty standing.

28.     When no one came to his aid, Alex began stumbling toward the passenger side of the car, toward his girlfriend and child. Due to the gunshot wounds to the head, he had difficulty walking and had to use the car to hold himself up. Disoriented, Alex touched his head wound and then looked at the blood on his hands, as if trying to comprehend what had happened. Alex

followed the rear of the car towards the passenger side, wounded and needing to steady himself with his hands on the vehicle. Still, no one came to his aid.

29.     At all times, Alex's hands were in plain sight of officers. The officers could plainly see he had no weapon. The officers could see that Alex was attempting to check on the welfare of his baby son.

30.     Alex reached the passenger side of the vehicle. Arellano continued to beg him to help their child.

31.     Alex slowly turned to reach the rear passenger door. He made no sudden movements. He did not look at the officers or threaten them in any way. He did not confront the officers.

32.     Alex opened the rear passenger door and, with his back to the officers, bent down toward his son who was in the car seat, visible from the back of the vehicle.

33.     The officers knew two people had been shot and were seriously injured. The officers knew the mother was repeatedly begging for someone to help her baby. The officers knew there was a baby in the car. The officers could plainly see that Alex was attempting to check on the welfare of his child.

34.     Without any justification, Serrato opened fire. Serrato fired at least ten shots, killing Alex. As a result of the shots fired by Officer Serrato, Alex fell dead and slumped in a heap. Alex was unarmed, mere inches away from his infant son.

35.     At no point did Officer Serrato see a weapon in Alex's possession.

36.     At no point did Alex make any aggressive move towards Serrato or any of the other officers on the scene.

37.    At no point did Alex take any action that would have provided any indication that he posed a danger to any officer or any bystander at the scene.

38.    No objectively reasonable basis existed to believe that Alex had harmed or posed a threat to harm anyone. No reasonable police officer would have used deadly force against Alex, or any other citizen, in these circumstances.

**B.    Through its policies, practices, and customs, Austin trained its police officers to adopt a paramilitary culture that caused them to adopt a "warrior mindset" and an "us versus them" approach to policing that permitted, encouraged, and tolerated excessive force.**

39.    For many years prior to the fatal shooting of Alex Gonzales, Jr., the City of Austin trained its police officers in ways that expressly and implicitly encouraged and approved of the use of excessive force in policing encounters with Austin residents. The Austin Police Department Training Academy used a training curriculum centered upon "paramilitary" training techniques that taught and reinforced a "paramilitary culture" throughout the APD. The APD Training Academy taught the officers to adopt a "warrior mindset" that encouraged an "us versus them" approach to citizen encounters during policing.

40.    On May 22, 2020, Dr. Sara Villanueva delivered to then-Chief Brian Manley a Review Analysis and Strategic Plan of the Austin Police Department Training Academy (the "Villanueva Report"). At that time, Dr. Villanueva was the Organizational Development and Training Manager at the Austin Police Department. A copy of the Villanueva Report is attached to this complaint as Exhibit A, and it is incorporated herein by reference. On information and belief, Dr. Villanueva prepared and delivered her report within the scope of her authority as an employee and agent of the City of Austin.

41.     After conducting a thorough "SWOT analysis" (assessing strengths, weaknesses, opportunities, and threats) of the APD Training Academy, Dr. Villanueva reported the following findings:

   a.   "[The] APD Training Academy operates under a paramilitary training format . . . ." (Exhibit A, page 7 of 18);

   b.   "There is an apparent mismatch between a typical paramilitary format and effectively preparing cadets to work in a manner consistent with the community-police services model. A growing body of research has shown that paramilitary-structured academies do not align well with the principles of community policing and problem solving which are based on collaborations and partnerships." (Exhibit A, page 7 of 18);

   c.   "The existing culture promotes an adversarial approach to training, whereby police are prepared to be on the front lines fighting against crime." (Exhibit A, page 10 of 18); and

   d.   "The warrior mindset, and the fear that drives it, must change." (Exhibit A, page 10 of 18).

42.     Each of the above-quoted findings from the Villanueva Report was true.

43.     On December 29, 2020, Austin Chief Equity Officer Brion Oaks delivered a memorandum (herein the "Oaks Memorandum") to the Austin Mayor and City Council (via Nuria Rivera-Vandermyde) for the purpose of "provid[ing] a brief overview of two bodies of work documenting racial inequities within the Austin Police Department (APD)." (Exhibit B, page 1 of 152) The first body of work was a series of evaluations prepared by a third-party evaluator, The Peace Mill Research and Communications (herein the "Peace Mill Evaluations"). (Exhibit B,

pages 4-107 of 152) The second body of work was a report prepared third-party evaluator Joyce James Consulting (herein the "Joyce James Report"). (Exhibit B, pages 108-152 of 152) The Peace Mill Evaluations and the Joyce James Report each were prepared at the direction and authorization of the Austin City Council. The Oaks Memorandum was prepared and delivered within the scope of Brion Oaks authority as an employee of the City of Austin. A copy of the Oaks Memorandum, including copies of the Peace Mill Evaluations and the Joyce James Report, is attached to this complaint as Exhibit B, and they are incorporated herein by reference.

44.     The Peace Mill Evaluation of the APD Training and Recruiting Divisions reported the following findings:

a.  "Multiple former cadets expressed concerns that training division staff foster a culture of violence, embracing brutality over wisdom throughout the academy experience. . . . Multiple former cadets allege that *the academy is driven purely by brutality and that physical aggression is the primary quality that trainers seek when promoting cadets toward graduation*." (Exhibit B, pages 18–19 of 152, emphasis added);

b.  "The term *culture of violence* describes institutionally imposed conditions that 'can be used to justify or legitimize direct or structural violence.' . . . [T]he qualifications for the use of the term *culture of violence*, including the institutional use and justification of the use of force, appear to have been satisfied [for the APD Training Academy]." (Exhibit B, page 18 of 152, footnote 8, emphasis in original); and

c.  "According to interview respondents, many of the academy's trainers rely overwhelmingly on 'violent', 'brutal', 'traumatizing' practices designed to

'manufacture soldiers' rather than produce community-driven law enforcement professionals adept at de-escalation." (Exhibit B, page 20 of 152).

45.     Each of the above-quoted findings from the Peace Mill Evaluation was true.

46.     On January 18, 2021, a panel of Austin community members delivered a Community Report that provided a comprehensive assessment of training videos used in the training curriculum of the APD Training Academy. A copy of the report is attached to this complaint as Exhibit C, and it is incorporated herein by reference. The Community Report was prepared with the authorization of the Austin City Council pursuant to Council Resolution No. 20191205-066 dated December 5, 2019 (attached to this Complaint as Exhibit F).

47.     The Community Report provides an assessment of videos and training materials that had been in use within the APD Training Academy for many years prior to the shooting of Alex Gonzales, Jr. The Community Report states that "[t]he videos we reviewed were chosen by leadership from the Austin Police Department and the Office of Police Oversight." (Exhibit C, page 3 of 26).

48.     The Community Report stated the following findings:

a.     "Overall, the videos displayed a great deal of dehumanization and lack of respect or just common humanity, both in terms of the verbal and physical interactions and the way community members were portrayed." (Exhibit C, page 6 of 26);

b.     "One of the more pervasive biases we observed is the us-versus-them mindset. This bias existed at a fundamental, pervasive level, further informing other biases with respect to race, ethnicity, gender, and ability, and affected officers

of color and female officers in the same or similar ways as White male officers."
(Exhibit C, page 14 of 26);

c.   "The us-versus-them bias was explicit in some of the videos—i.e. police work
is 'the deadly game of cops and robbers'; however, much of it was implicit.
This bias was manifested in the following ways:

- An enhanced focus on officer safety over the safety of the community
  as a whole,

- A 'warrior' versus 'service' mentality in which officers see themselves
  as the 'good guys' and the public they interact with as 'bad guys,'

. . .

- Most importantly, a view of the profession as primarily concerned with
  exercising and maintaining control, where officers are the agents of
  control and the public stands in need of being controlled."

(Exhibit C, pages 14-15 of 26);

d.   "Primarily this bias manifested in a focus on police officers 'winning' by
overcoming resistance and threat from the community or by prevailing in court
or in grievance and complaint hearings. . . . The focus turns from compassion
to conquest as officers see community as a roadblock in their effort to control
and 'win.' In the end, communities will continue to suffer, as there is no viable
way to 'win' – not only against police officers, but also against the system that
continues to protect police officers in this us-versus-them framework." (Exhibit
C, page 15 of 26);

e.  "We also observed evidence of the growing militarization of policing in the videos. . . . Many police organizations actively propagate the idea that our cities are a kind of 'war zone' rather than communities in which (mostly diminishing rates of) crime takes place, and the public contains a significant number of 'bad actors' which must be treated as enemy combatants rather than citizens with shared rights. Such a dramatic and important shift only exacerbates the us/them dichotomy." (Exhibit C, page 15 of 26);

f.  "Connected to both increasing militarism and the us-versus-them dichotomy, which we believe is at the heart of the repeated instances of police overreactions to threat and use of excessive force, is what researchers have called the 'danger imperative'—a belief in a constant and prevalent danger for police officers. . . . Several of the descriptions of the training materials in use at the APD academy state this plainly." (Exhibit C, page 16 of 26);

g.  "[O]fficers are trained to view every encounter as potentially life-threatening." (Exhibit C, page 17 of 26);

h.  "One of the training officers acknowledged that there has been an overemphasis on an officer 'going home at the end of the shift' for some time in policing and police training. The training we viewed, particularly the training highlighting the danger imperative, definitely emphasized the safety of the officer above all else." (Exhibit C, page 17 of 26); and

i.  "From what we observed in videos and with conversations with instructors, we contend that the structure of policing as a whole, particularly the focus on control and the warrior mentality, reinforces the us-versus-them dichotomy in

ways that tend toward escalation and grievous mistakes in judgment." (Exhibit C, page 18 of 26).

49.   Each of the above-quoted findings from the Community Report was true.

50.   On February 26, 2021, third-party consultant Kroll Associates, Inc. delivered to the City of Austin (via Director of Austin Office of Police Oversight Farah Muscadin and Deputy City Manager Nuria Rivera-Vandermyde) a Memorandum regarding Kroll's Preliminary Assessment of the Austin Police Training Academy (herein the "Kroll Preliminary Assessment"). The Kroll Preliminary Assessment is attached to this complaint as Exhibit D and is incorporated herein by reference. The Kroll Preliminary Assessment was prepared pursuant to the authorization of the Austin City Council.

51.   Despite the dramatic findings by Dr. Villanueva and the Community Review panel, persons with the APD training academy have been resistant to changing the police training curriculum.  The Kroll Preliminary Assessment states:

a.   "The majority of APD and Academy leadership have questioned the assertion in Dr. Villanueva's report that paramilitary academies do not align well with the principles of community policing and problem solving and contribute to a 'warrior' mindset, which leads to an 'us vs. them' mentality of officers on the front lines fighting crime." (Exhibit D, page 5 of 22); and

b.   "When asked if the Academy is proactively revisiting the existing curriculum and lesson plans . . . the answer provided is that Academy instructors and supervisors are awaiting further guidance and input from the new ODTM, whenever that person is hired to replace Dr. Villanueva." (Exhibit D, page 8 of 22).

52.     Each of the above-quoted statements from the Kroll Preliminary Assessment was true.

53.     On April 23, 2021 third-party consultant Kroll Associates, Inc. delivered to the City of Austin, Office of Police Oversight / City Manager's Office their Final Report on the Austin Police Department: Review and Assessment of Training Academy (herein the "Kroll Final Report"). The Kroll Final Report is attached to this complaint as Exhibit E and is incorporated herein by reference. The Kroll Final Report prepared pursuant to the authorization of the Austin City Council.

54.     The Kroll Final Report states:

   a.   "The Academy at present remains a predominantly paramilitary training model." (Exhibit E, page 6 of 113);

   b.   "[I]n the greater context of police work, seeing oneself primarily as a 'warrior' is a precarious mindset. . . . [W]hen officers are taught to see citizens as potential threats to their life, they learn to fear them. Thus, interactions between police and the community often start with suspicion, vigilance and caution, and positive encounters become infrequent, if not impossible. Furthermore, since officers are taught to physically control their space and react forcefully to noncompliance, they sometimes escalate otherwise peaceful encounters, making situations more dangerous for both sides." (Exhibit E, page 16 of 113);

   c.   "Other components of the military model may also be inconsistent with the demands of modern policing. . . . [T]he use of recruiting videos and web content that routinely feature high-action sequences and appeals to strength and

violence over service can send the wrong message about the nature of policing in a progressive urban environment." (Exhibit E, page 16 of 113);

d.  "Using a different training approach, police academies can establish a guardian-centric culture that focuses on service to the community rather than fighting crime, while still preparing officers to effectively react and respond to crisis situations. . . . Experts contend that this training style—which emphasizes strengthening officers' critical decision-making skills, communication, and emotional intelligence skills—is better associated with the skills and tactics necessary to handle complex situations that officers are likely to face in the field." (Exhibit E, page 17 of 113); and

e.  "APD leadership has expressed its belief to Kroll that some aspects of a paramilitary structure are an essential component of police culture . . . . Indeed, the majority of APD and Academy leadership we spoke with questioned the suggestion in Dr. Villanueva's report that paramilitary academies do not align well with the principles of community policing and problem solving and contribute to a 'warrior' mindset, which leads to an 'us vs. them' mentality of officers on the front lines fighting crime." (Exhibit E, page 49 of 113).

55.  Each of the above-quoted statements from the Kroll Final Report was true.

56.  On information and belief, the City of Austin and the APD maintain other policies, practices, and customs that reinforce, encourage, and tolerate the paramilitary training of its police officers, the "warrior mindset," and the "us-versus-them" approach to policing. These policies and procedures include, without limitation, investigative approaches to incidents and complaints involving officer use of force and administrative / disciplinary approaches to incidents and

complaints involving officer use of force. On information and belief, these additional policies, practices, and customs reinforce and exacerbate the pervasive APD culture that permits, encourages and tolerates the use of excessive force by Austin police officers.

**C.  Through its policies, practices, and customs, Austin created, encouraged, and tolerated a racist policing culture that particularly directed excessive force toward Hispanic and Black persons.**

57.     For many years prior to the fatal shooting of Alex Gonzales, Jr., the City of Austin adopted policies, practices, and customs that encouraged and tolerated a disproportionate use of excessive force targeted towards Hispanic and Black persons. The encouragement and toleration of the use of excessive force in a racially discriminatory manner was particularly engrained in the training methods and training materials used at the Austin Police Department Training Academy.

58.     On December 5, 2019 the Austin City Counsel adopted Resolution No. 20191205-066 ("Resolution 66"). A copy of Resolution 66 is attached hereto as Exhibit F and is incorporated herein by reference. The Austin City Counsel duly adopted resolution 66 pursuant to its legal authority. Resolution 66 states in relevant part:

    a.  "[T]he City of Austin acknowledges that the history of bigotry and discrimination has contributed to racially disparate outcomes in policing and policy." (Exhibit F, page 1 of 12);

    b.  "[T]he Center for Policing Equity found in 2016 that the Austin Police Department (APD) was more likely to use force in communities where more African-Americans and Latinos live, and when force was used, APD was more likely to use more severe force in communities where African-Americans and Latinos live, even after controlling for factors such as community crime and poverty rates." (Exhibit F, page 1 of 12); and

c.  "[P]atterns and specific incidents of discrimination and bigotry in the Austin

Police Department erode the public trust . . . and so the Council finds it

imperative to understand the full extent of bigotry and systemic racism and

discrimination within APD, and consider reforms to APD's policies, protocols,

and training curriculum." (Exhibit F, page 4 of 12).

59.     Each of the above-quoted statements from Resolution 66 was true.

60.     Resolution 66 directed the Austin City Manager to "initiate a comprehensive, multi-

pronged investigation and evaluation of the extent to which forms of bigotry and discrimination

are present in the protocols, practices, and behaviors of the officers of the Austin Police

Department." (Exhibit F, page 4 of 12).

61.     Resolution 66 further directed the City Manager to "initiate an audit of the Austin

Police Department's training materials, course/section descriptions and duration, and description

of any other procedures (e.g. detailed descriptions of scenarios) administered to cadet classes and

to active officers related to training on communication strategies, cultural competency,

acknowledging and addressing bias, use of force, de-escalation, search, proactive policing, mental

health response, protocols for non-English speaking persons, protocols for disabled persons,

recognizing resistance and the rules and procedures that define resistance and their evaluation

protocols, as well as the course/section content and duration of all other coursework required at

the cadet academy and their evaluation protocols." (Exhibit F, page 9–10 of 12).

62.     On December 28, 2020, the Peace Mill Evaluation of APD Training and Recruiting

Divisions (described above) stated the following findings:

a.   "Recent reports from sources including the Office of Police Oversight and

APD's own internal investigator offer even further evidence that there are

serious gaps in the department's attempts to address racism and inequity in policing." (Exhibit B, page 20 of 152);

b. "The culture of the APD training academy, detailed firsthand by the courageous respondents who were interviewed for this research, conflicts directly with the department's recruiting and public relations campaigns, which proclaim a police department focused on diversity, equity and community engagement. APD's own data reveals repeated failures at achieving these goals." (Exhibit B, page 22 of 152);

c. "Further interviews with APD division leaders from multiple divisions indicate that the department's commitment to the equity assessment process has been similarly superficial." (Exhibit B, page 23 of 152); and

d. "In fact, it is hard to identify any meaningful, measurable commitments to equitable outcomes when assessing the division's responses [to the City's Equity Assessment Tool]. The division's staff is not diverse and there are no specific or measurable standards for ensuring equitable practices in day-to-day operations." (Exhibit B, page 34 of 152).

63. Each of the above-quoted findings from the Peace Mill Evaluation was true.

64. On December 28, 2020, the Peace Mill Evaluation of APD Internal Affairs and Professional Standards Division (described above) stated the following findings:

a. "APD's Internal Affairs and Professional Standards division has few strategies and protocols in place to ensure racial equity. From hiring to community engagement, the division's responses to the equity assessment tool highlight a

significant deficiency in the division leadership's ability to implement principles of diversity, equity and inclusion." (Exhibit B, page 52 of 152);

b.  "If the Training Division, which fails tremendously to implement principles of equity, does not graduate diverse classes from its academy, Internal Affairs is, by extension, prohibited from accessing a diverse candidate pool. Perhaps more than any other example, this highlights the need for deep and systemic changes at APD." (Exhibit B, page 52 of 152); and

c.  "Evidence from the Internal Affairs and Professional Standards division's self-assessment, coupled with evidence gathered during qualitative interviews, confirms the absence of clear strategies for ensuring equitable practices and outcomes." (Exhibit B, page 53 of 152).

65.     Each of the above-quoted findings from the Peace Mill Evaluation was true.

66.     On January 18, 2021, the Community Report (described above) offered the following findings with respect to its assessment of the videos and other training materials being used by the APD Training Academy:

a.  "*[B]y far the most alarming pattern we witnessed* [in the training videos] *was the harmful stereotypes perpetuated against Black and Brown communities*. The videos shed light on the disproportionate interactions police have with Black, Indigenous, and Brown communities that result in violence and death." (Exhibit C, page 4 of 26, emphasis in original);

b.  "Many of the videos showed People of Color, and in particular, Black people, being brutalized and/or their well-being utterly disregarded." (Exhibit C, page 6 of 26);

c.  "There was gross overrepresentation of the use of force and negative outcomes
    from mostly White male officers interacting with Black and Brown community
    members. *We witnessed again and again Black men dying within minutes,
    sometimes within seconds, of an interaction with police*." (Exhibit C, page 6 of
    26, emphasis added);

d.  "There were exceptionally few videos showing the police trying to de-escalate
    situations involving People of Color. In many of the videos showing encounters
    with community members over minor criminal infractions, *a strong emphasis
    on gaining compliance and control quickly led to rapid escalation with often
    violent and even deadly results.*" (Exhibit C, page 6-7 of 26, emphasis added);

e.  "Many of the videos . . . are so disturbing in gratuitous violence against Black
    and Brown people that we strongly recommend that they only be used as
    examples of why community members historically mistrust the police. . . . We
    fear that repeated exposure to needless violence normalizes such interactions
    with the public for the cadets and desensitizes them to their own and their
    communities' humanity." (Exhibit C, page 7 of 26);

f.  "There was a clear pattern, both explicit and implicit, of different communities
    being offered different degrees of understanding and grace by officers. Police
    interactions with upper-class, White communities were noticeably absent in the
    videos. White people were often given considerable grace and understanding
    even when they demonstrated dangerous behavior, while People of Color, in
    particular Black men, were given little to no grace or understanding even for
    minor and less threatening actions. For example, one video of an armed White

man showed an officer speaking calmly and reiterating the person's right to carry a firearm. *In contrast, in videos where People of Color were armed or even unarmed, police officers treated them as threats and moved towards use of force with great speed.* Such patterns echoed and reinforced popular narratives about, and attitudes toward, communities of color as more 'dangerous' in clear distinction to White people." (Exhibit C, page 8 of 26, emphasis added); and

g. "It was a very evident pattern in the videos that White male community members tended to receive empathy and the benefit of the doubt from police officers while communities of color were treated as threats. In one example, we watched a police officer give a White-presenting man seven minutes of grace and conversation despite his suspicious behavior, while in several other videos a Black man was shot within seconds of being approached by an officer. The pattern we witnessed was that White community members in crisis are allowed to be in crisis; whereas Black community members, whether in crisis or not, are perceived with suspicion as threats." (Exhibit C, page 10 of 26).

67.     Each of the above-quoted findings from the Community Report was true.

68.     On April 23, 2021, the Kroll Final Report (described above), provided the following findings from its assessments of APD Training Academy training practices:

a. "[S]ome Academy instructors implicitly taught their students to be biased in enforcing the law. . . .[S]ome of the cadets perceived that the bias was inherently a part of Academy culture and that instructors were indoctrinated into that culture." (Exhibit E, page 42 of 113); and

b.  "According to the cadets interviewed, while APD 'talked a good game' about being inclusive, in reality, they perpetuated exclusion." (Exhibit E, page 42 of 113).

69.     Each of the above-quoted findings from the Kroll Final Report was true.

70.     On information and belief, the City of Austin and the APD maintain other policies, practices and customs that reinforce, encourage, and tolerate the disproportionate use of excessive force against Hispanic and Black citizens and in predominantly Hispanic and Black neighborhoods. These policies and procedures include, without limitation, investigative approaches to incidents and complaints involving officer use of force and administrative / disciplinary approaches to incidents and complaints involving officer use of force. On information and belief, these additional policies, practices, and customs reinforce and exacerbate the pervasive APD culture that encourages and tolerates racially disproportionate use of excessive force by Austin police officers.

**D.     The City of Austin policies, practices, and customs demonstrably caused excessive force to be disproportionately directed at Black and Hispanic persons in Black and Hispanic communities.**

71.     For many years prior to the shooting of Alex Gonzales, the City of Austin has exhibited a demonstrable racial bias in its policing practices, particularly with respect to the use of lethal force and excessive force against Hispanic and Black individuals and/or in predominantly Hispanic or Black neighborhoods. The racial bias in policing outcomes is a direct result of the policies, practices, and customs of the City of Austin and APD, including but not limited to the training methods used to train officers at the APD Training Academy.

72.     In 2016, the Center for Policing Equity conducted an assessment of City of Austin policing data for the years 2014 and 2015, and released a research report entitled "The Science of

Policing Equity: Measuring Fairness in the Austin Police Department" (herein the "CPE Report").
A copy of the CPE Report as published in October 2016 and revised in May 2017 is attached as
Exhibit G and is incorporated herein by reference.

73.    The CPE Report found that Austin police officers used more force in the
neighborhoods where Black and Hispanic Austinites live as compared to use of force in
predominantly White neighborhoods. Even after adjusting for crime and poverty variables, the
CPE Report found that Austin police officers' use of force in Black and Hispanic neighborhoods
was disproportionate and unjustified. The CPE Report stated:

a.   "The raw data point to a disparity of treatment of Austin citizens based on race
and ethnicity in vehicle stops and in use of force. For use-of-force incidents,
black and Hispanic communities remain more likely to experience use of force
than white communities after adjusting for community-level differences in
crime and poverty." (Exhibit G, page 2 of 18);

b.   "Racial disparities are evident when comparing the racial/ethnic composition
of APD's use-of-force incidents to the racial/ethnic composition of the Austin
MSA [metropolitan statistical area]." (Exhibit G, page 11 of 18);

c.   "Both the model of use-of-force incidents and the model of use-of-force
severity suggested that Austin's neighborhoods with a higher percentage of
black or Hispanic residents experienced a disproportionate amount of police use
of force. The percentage of black and percentage of Hispanic residents in a
neighborhood *were statistically significant positive predictors of police use of
force*." (Exhibit G, page 12 of 18, emphasis added); and

d. "[A]nalyses of use-of-force data revealed a more consistent picture of disparity. Even when controlling for neighborhood levels of crime, education, homeownership, income, youth, and unemployment, **racial disparities in both use and severity of force remained.** In other words, community-level explanations of use of force were not sufficient to explain observed racial disparities in use of force. While crime, poverty, and other factors contributed to these disparities, controlling for these factors did not eliminate disproportionate use of force in communities with higher percentages of Hispanics and blacks." (Exhibit G, page 15 of 18, emphasis in original).

74.     Each of the above-quoted statements from the CPE Report was true.

75.     On December 5, 2019 Austin City Council Resolution 66 (described above) recognized racial biases in APD policing practices and policing outcomes:

a. "[T]he City of Austin acknowledges the history of bigotry and discrimination has contributed to racially disparate outcomes in policing and policy." (Exhibit F, page 1 of 12); and

b. "[T]he Center for Policing Equity found in 2016 that the Austin Police Department (APD) was more likely to use force in communities where more African-Americans and Latinos live, and when force was used, APD was more likely to cause severe force in communities where African-American and Latinos live, even after controlling for factors such as community crime and poverty rates." (Exhibit F, page 1 of 12).

76.     Each of the above-quoted statements from Resolution 66 was true.

77.     In November 2020, the Joyce James Report further documented the racial bias and disparities in the APDs use of lethal force and excessive force:

a.   "Findings showed that residents in Austin neighborhoods with a higher percentage of African American or Hispanic/Latinx residents, those in poverty, and neighborhoods with higher crime rates, had disproportionate force and severity of force used upon them. When these possibilities other than race were adjusted statistically, African American and Hispanic/Latinx residents still experienced higher rates of use of force." (Exhibit B, page 125 of 152); and

b.   "The Austin Police Departments Research and Planning Unit (2017) also produced data on use of force (along with other measures). In this case as well, when the use of force from 2014 to 2016 by race and ethnicity was compared to the population, African Americans and Hispanics/Latinxs had disproportionate force used upon them relative to Whites." (Exhibit B, page 125 of 152).

78.     Each of the above-quoted statements from the Joyce James Report was true.

### V.     Cause of Action – 42 U.S.C. §1983

79.     Plaintiffs assert this cause of action against the City of Austin pursuant to 42 U.S.C. §1983 and *Monell v. Dept. of Social Services of City of New York,* 436 U.S. 658 (1978). Plaintiffs incorporate by reference all allegations asserted in Sections I – IV, *supra.*

### A.     City of Austin employees who were acting under color of law violated the constitutional rights of Alex Gonzales, Jr.

80.     The City of Austin employed Officer Gabriel Gutierrez and Officer Luis Serrato as police officers at the time each of them respectively shot Alex Gonzales, Jr. ("Alex"). Gutierrez and Serrato each acted under color of law when each of them separately shot Alex.

81.      Even though Gutierrez was "off-duty" at the time he initially encountered Alex, all of his relevant interactions with Alex (including shooting Alex) were undertaken under color of law. The APD General Orders in effect on January 5, 2021[1] expressly permitted off-duty officers to take law enforcement actions while off-duty.[2] The APD General Orders at the time also expressly authorized any off-duty officers to carry a firearm while off-duty as "a law enforcement officer as authorized by this order . . . ."[3] The APD General Orders at the time required that, when an off-duty officer decides to intervene and take a law enforcement action, the officer "should clearly identify himself as a police officer to those involved in the situation, if practicable."[4] Under the authority granted to him by the APD General Orders as an off-duty officer, Gutierrez made a decision to intervene with respect to Alex and the other passengers in Alex's vehicle, and Gutierrez undertook law enforcement actions with respect to Alex, including but not limited to using lethal force and shooting Alex. After he shot Alex, Gutierrez can be heard on the 911 call recording shouting at Alex in an attempt to identify himself as an Austin police officer. Gutierrez also can be heard on the 911 call recording continuing to take law enforcement actions with respect to Alex by shouting verbal commands for compliance.

82.      Gutierrez shot Alex without provocation or justification. Gutierrez had no reasonable basis to perceive that Alex posed a threat of danger to Gutierrez or to anyone else. Gutierrez acted with indifference to the potential harm to bystanders such as the other passengers in Alex's car. Gutierrez was the aggressor in his encounter with Alex. Gutierrez's actions were

---

[1] On information and belief, the APD General Orders in effect on January 5, 2021 were the APD General Orders issued on June 1, 2020.

[2] *See generally*, Austin Police Department General Orders Issued June 1, 2020 at §364.

[3] *See id.* at §364.3(a).

[4] *See id.* at §364.1(b).

responsible for creating the initial confrontation and for escalating the events that ensued. No reasonable police officer would have used deadly force against Alex under these circumstances. Gutierrez's actions amounted to excessive force that was objectively unreasonable, in violation of Alex's rights under the Fourth Amendment and Fourteenth Amendment to the United States Constitution.

83.     Serrato was an on-duty Austin police officer at the time he responded on the scene of Alex's shooting after Gutierrez called 911. Serrato's actions with respect to Alex were undertaken under color of law.

84.     Serrato fatally shot Alex without provocation or justification. Serrato fatally shot Alex while Alex was struggling to render aid to the wounded passenger and check on the welfare of Alex's infant son who was in the back seat of the car. At the time Serrato fatally shot Alex, Alex did not have a gun in his hand and Alex did not point a gun at anyone. Alex made no aggressive move toward anyone that would indicate Alex posed a danger at all. Alex had already suffered a gunshot wound from being shot by Gutierrez, and Alex was visibly struggling with his bodily movements. Serrato acted with indifference to the potential harm to bystanders. No reasonable police officer would have used deadly force against Alex under these circumstances. The actions of Serrato amounted to excessive force that was objectively unreasonable, in violation of Alex's rights under the Fourth Amendment and Fourteenth Amendment to the United States Constitution.

85.     The violations of Alex's constitutional rights by Gutierrez and Serrato were a cause of Alex's death and the damages alleged below.

**B.     The City of Austin is liable for damages caused by the violation of Alex's federal constitutional rights.**

86.     Defendant City of Austin implemented the following policies, practices, and customs prior to and on January 5, 2021:

a.  As alleged above, Austin utilized the Austin Police Department Training Academy to train Austin police officers to adopt a paramilitary culture that emphasized and promoted a "warrior mindset" and an "us versus them" approach to policing that permitted, encouraged and tolerated the use of excessive force;

b.  As alleged above, the APD Training Academy used training materials and training techniques that created, encouraged, and tolerated a racist policing culture that particularly directed excessive force toward Hispanic and Black persons and/or in incidents occurring in predominantly Hispanic or Black neighborhoods;

c.  As alleged above, the Austin Police Department maintained a long history of racially discriminatory bias in its policing practices, including the disproportionate use of lethal force and excessive force toward Hispanic or Black persons and/or in incidents occurring in predominantly Hispanic or Black neighborhoods; and

d.  On information and belief, Austin has other policies, practices and customs that reinforced and exacerbated the above policies, practices and customs, including but not limited to investigative approaches to incidents and complaints involving officer use of force and administrative / disciplinary approaches to incidents and complaints involving officer use of force.

87.   Prior to and on January 5, 2021, each of the policies, practices, and customs alleged above was persistent and widespread throughout the policing practices of the Austin police department.

88.     Prior to and on January 5, 2021, each of the policies, practices, and customs alleged above was known to one or more City of Austin policymakers. One or more Austin policymakers ratified, adopted or approved of each of the alleged policies, practices and customs prior to and on January 5, 2021. One or more Austin policymakers acted with deliberate indifference to the known and obvious consequences of the identified policies, practices and customs, including the likely violations of the constitutional rights of people harmed by the identified policies, practices and customs.

89.     The identified Austin policies, practices, and customs were the moving force that caused the violation of Alex's constitutional rights and the injury and damages he suffered therefrom, including his death. Gutierrez and Serrato each received police training through the APD training academy, in which they were trained within a paramilitary culture that taught them a "warrior mindset" and an "us versus them mentality" that encouraged and promoted excessive force. Gutierrez and Serrato each were taught, through the APD Training Academy, to perceive Hispanic individuals in predominantly Hispanic neighborhoods as an inherent and imminent threat of danger. Gutierrez and Serrato each were taught, through the APD Training Academy, policing methods that encouraged acceleration of force and quick use of lethal force when responding to incidents involving Hispanic males in Hispanic neighborhoods. Alex was a Hispanic male. Gutierrez and Serrato shot Alex in an area of Austin that is an "overwhelming Hispanic population center."[5] Alex was shot in the same neighborhood in which Austin police officer Christopher

---

[5] "Maps of Hispanic household concentrations from Census 2000 reveal the emergence of three overwhelmingly Hispanic population centers in Austin: lower east Austin (which also serves as the political bedrock of Austin's Hispanic community), greater Dove Springs, and the St. Johns area." *Top Ten Demographic Trends in Austin, Texas*, austintexas.gov (https://www.austintexas.gov/page/top-ten-demographic-trends-austin-texas).

Taylor shot and killed Mike Ramos less than one year earlier, in a particularly high-profile officer-involved shooting.

90.     On information and belief, Gutierrez and Serrato each believed that his respective actions related to each officer's shooting of Alex would meet with the approval of supervisors and other Austin investigators of the events because each believed that his actions complied with the City of Austin's and the APD's policies, practices, and customs.

91.     On information and belief, the City of Austin has further ratified the policies, practices, and customs alleged above by failing to conduct an adequate internal investigation of the shooting of Alex, by failing to take appropriate disciplinary and/or administrative action with respect to Gutierrez and/or Serrato, and by failing to implement changes to its policies, practices and customs in response to the shooting of Alex and other similar incidents.

**C.     The violation of Alex's constitutional rights caused significant damages.**

92.     Alex was a happy, loving man, who adored his parents and cherished his newborn son and his new role as a father. His tragic and unnecessary death at the hands of police violence, acting in violation of Alex's constitutional rights, caused sever and permanent damages, including Alex's death.

93.      Plaintiffs seek recovery of the following categories of damages in their capacity as wrongful death beneficiaries of Alex, pursuant to Texas Civil Practice and Remedies Code section 71.004:

> a.  Mental anguish damages (past and future) for the emotional pain, torment and suffering Plaintiffs have experienced and will continue to experience because of the death of their son;

    b.   Loss of companionship and society damages (past and future) for the loss of positive benefits flowing from the love, comfort, companionship, and society that Plaintiffs would have received from Alex had he lived; and

    c.   Pecuniary loss damages (past and future) for the loss of care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value that Plaintiffs would have received from Alex had he lived.

94.    Plaintiffs further seek the following categories of damages:

    a.   Prejudgment and post-judgment interest;

    b.   Costs of court;

    c.   Reasonable and necessary attorneys' fees incurred by Plaintiffs through trial, along with reasonable and necessary attorneys' fees that may be incurred by Plaintiffs for any post-trial proceedings or appeal, pursuant to 42 U.S.C. §1988; and

    d.   Any further and additional relief to which Plaintiffs may be legally entitled.

## VI.    Request for a Jury Trial

95.    Plaintiffs request a jury trial on all issues that legally may be tried to a jury.

## VII.    Prayer

96.    Plaintiffs Alex Gonzales, Sr., and Elizabeth Herrera request that the City of Austin be summoned to appear and answer Plaintiffs' allegations. After a jury trial regarding their claims, Plaintiffs pray the court enter judgment in their favor on the asserted claim under 42 U.S.C. §1983, assess monetary damages for the injuries alleged above, and award any other relief to which Plaintiffs are legally entitled.

Respectfully submitted,

**HENDLER FLORES LAW, PLLC**

Scott M. Hendler - Texas Bar No. 0944550
shendler@hendlerlaw.com
Donald Pucket - Texas Bar No. 24013358
dpuckett@hendlerlaw.com
901 S. MoPac Expressway
Bldg. 1, Suite #300
Austin, Texas 78746
Telephone: 512-439-3200
Facsimile: 512-439-3201

***ATTORNEYS FOR PLAINTIFFS***