IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| ALEX GONZALES, SR., individually and as "Next Friend" to minor child Z.A. and ELIZABETH HERRERA, aka ELIZABETH GONZALES, individually and as "Next Friend" to minor child Z.A., <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF AUSTIN, <br><br> Defendants. | § § § § § § § § § § § § § § | 1:22-CV-655-RP |

| | | |
|---|---|---|
| JESSICA ARELLANO, individually, and as next friend of Z.A., a minor child, wrongful death beneficiary and heir to the Estate of Alex Gonzales, Jr., <br><br> Plaintiffs, <br><br> v. <br><br> THE CITY OF AUSTIN, GABRIEL GUTIERREZ, and LUIS SERRATO, <br><br> Defendants. | § § § § § § § § § § § § | 1:23-CV-8-RP |

| | | |
|---|---|---|
| ALEX GONZALES, SR., et al., <br><br> Plaintiffs, <br><br> v. <br><br> LUIS SERRATO and GABRIEL GUTIERREZ, <br><br> Defendants. | § § § § § § § § § § § | 1:23-CV-9-RP |

## ORDER

Before the Court are seven motions for summary judgment: Defendant City of Austin's
Motions for Summary Judgment, (Dkts. 167, 168); Defendant Luis Serrato's Motion for Summary
Judgment, (Dkts. 189, 192);[1] Defendant Gabriel Gutierrez' Motion for Partial Summary Judgment
and Motion to Dismiss, (Dkt. 171); and Plaintiffs Alex Gonzales, Sr. and Elizabeth Herrera's
Motions for Partial Summary Judgment, (Dkts. 175, 176, 177), and all responsive briefing. Also
before the Court is Defendant City of Austin's Motion to Strike the Gonzales Plaintiffs' Summary
Judgment Evidence, (Dkt. 266), and Plaintiffs Alex Gonzales, Sr. and Elizabeth Herrera's response
in opposition, (Dkt. 288). Having reviewed the parties' briefing, the record, and the relevant law, the
Court issues the following order.

## I. BACKGROUND

This is a Section 1983 case arising from two police officer involved shootings that took place
in the early morning of January 5, 2021. The first shooting stemmed from an alleged road rage
incident involving off-duty Austin Police Department ("APD") Officer Gabriel Gutierrez
("Gutierrez") and civilians Alex Gonzales, Jr. ("Gonzales") and Jessica Arellano ("Arellano"), which
led to Gutierrez shooting and injuring Gonzales and Arellano. This shooting then led to a second
confrontation which ended with on-duty APD Officer Luis Serrato ("Serrato") fatally shooting
Gonzales. The Court first recounts the factual background of the incidents at issue and the
subsequent APD investigations before turning to the procedural history of this consolidated action.

---

[1] The preceding docket entries refer to both redacted and previously sealed versions of the motion. The
Court will occasionally cite to both versions of various filings throughout this Order.

**A. Factual Background**

1. The First Shooting

Sometime after midnight on January 5, 2021, Gonzales and his longtime partner Arellano, along with Arellano's two-month-old child Z.A., were driving in a red sedan in the Riverside neighborhood of Austin. (Arellano Dep., Dkt. 321-1, at 119:22–120:24; Arellano Interview, Dkt. 276-5, at 5:23–25). Gonzales was driving the car, Arellano was riding in the passenger seat, and Z.A. was strapped into a covered infant car seat in the rear passenger's side seat. Arellano testified that earlier that day the family was at a property in Del Valle, fixing it up so the family could live there permanently. She testified that the couple left Del Valle late that evening to head back to Austin and decided to stop to purchase baby formula from a CVS pharmacy in Riverside. She stated that they traveled west on either Highway 71 or Burleson Road, before turning north onto Montopolis Drive, and then turning west on Oltorf Street. Their plan was to stay on Oltorf Street and then turn right onto South Pleasant Valley Road to head to the CVS. (Arellano Dep., Dkt. 321-1, at 98:11–25, 110:2–17, 119:22–124:3; Arellano Interview, Dkt. 276-5, 8:6–9:7, 11:23–16:14).

At the same time, off-duty APD Officer Gutierrez was driving home from the gym after a late-night workout. He was driving his personal, unmarked blue sedan, and wearing his civilian gym clothes. (Gutierrez Dep., Dkt. 235-10, at 44:23–48:6, 255:11–256:15). Gutierrez testified that, rather than encountering Gonzales' red sedan on Oltorf Street, he first saw Gonzales' car on a cross-street called Alvin Devane Boulevard.[2] Gutierrez stated that he turned onto Alvin Devane and drove behind Gonzales' car until both cars turned left onto Oltorf Street. (Id.). Gutierrez testified that the red sedan turned very quickly before slowing down significantly on Oltorf Street. (Id. at 48:13–22).

---

[2] Gutierrez' allegation that he first encountered Gonzales' car on Alvin Devane conflicts with a video obtained by APD. Surveillance video evidence obtained from a business on Alvin Devane shows that neither Gutierrez nor Gonzales' vehicle was on Alvin Devane between 12:00 a.m. and 12:40 a.m. on January 5, 2021. (Parker Rep., Dkt. 208-32).

He also stated that there was smoke and a light or spark underneath the red sedan. (*Id.* at 48:24–49:14). Once the red sedan turned left onto Oltorf, Gutierrez remained at the intersection of Alvin Devane and Oltorf for ten to fifteen seconds while he adjusted his music playlist on his phone. Gutierrez then turned left and headed west on Oltorf. (*Id.* at 268:14–269:3).

Arellano testified that she did not notice anything unusual as she and Gonzales drove down Oltorf Road—she did not notice the car veer to the left or right and she did not notice if the car sped up or sped down. (Arellano Dep., Dkt. 321-1, at 126:19–127:4). She stated that suddenly Gonzales pointed to a blue sedan and remarked, "Did you see that? He cut me off." (*Id.* at 125:22–126:2, 128:18–20, 131:9–10). Arellano stated that she did not see the car cut them off but did suddenly notice the blue sedan appear in front of them in the left lane. (*Id.* at 128:21–131–12). Gonzales then decided to follow the blue sedan when it turned left on Wickersham Road. (*Id.* at 131:17–132:1). Arellano testified that she was confused by Gonzales' decision to turn left because the couple was supposed to be headed straight to go to the pharmacy. She asked Gonzales, "What are you doing?" Gonzales did not respond, but she testified that he seemed concerned. (*Id.* at 132:2–21).

Gutierrez has a different account of the parties' interaction on Oltorf Road. He stated that when the cars turned left onto Oltorf, Gonzales went into the right lane and Gutierrez went into the left lane, behind Gonzales. (Gutierrez Dep., Dkt. 235-10, at 48:1–10). Gutierrez testified that because of the alleged issues with the red sedan's driving, he wanted to pass it. (*Id.* at 51:3–11). He stated that he passed the red sedan, moved into the left turning lane, and stopped at a traffic light at the intersection of Oltorf and Wickersham. By the time he had turned left onto Oltorf until he reached the right light at the intersection of Oltorf and Wickersham, Gutierrez had traveled approximately half-a-mile and had managed to catch and pass Gonzales—which suggests that Gutierrez may have been driving quite fast during that half mile stretch. (*Id.* at 261:16–265:11,

269:23–270:2). At the traffic light, Gutierrez stated that the red sedan swerved into the turning lane behind him and pulled up extremely close to his rear bumper, so close that he could not see its headlights. (*Id.* at 56:10–58:11).

Despite Arellano and Gutierrez' different accounts of the parties' interaction on Oltorf, they both agree that Gutierrez ultimately passed in front of Gonzales' vehicle on Oltorf before both cars turned left onto Wickersham. The next part of the parties' interaction is captured on video from a nearby security camera at the Treehouse Apartments, the apartment complex where Gutierrez lived at the time. (*See* Ex. 6, Dkt. 189-6). The video shows three cars turning onto Wickersham: an uninvolved white car first, followed by Gutierrez' blue sedan, and Gonzales' red sedan behind. All three cars approach the entrance to the apartment complex on the left of each driver. The white car drives on, but Gonzales drives from behind Gutierrez to come up alongside him on Gutierrez' left side. As this happens, Gutierrez slows and then stops his blue sedan in a spot at which the vehicles are roughly aligned. Within a few seconds of the cars coming to a stop, gunshot flashes can be seen coming from Gutierrez' blue sedan toward Gonzales' red sedan. The video does not show any return fire directed at Gutierrez. A moment after the shooting stops, Gonzales' red sedan then pulls forward, continuing south on Wickersham and out of the video frame. Gutierrez remains still for several seconds before following in his car. (*Id.*). The parties have very different accounts of what transpired in those few seconds that the cars were alongside one another.

According to Arellano, after the cars turned onto Wickersham, Gutierrez' car slowed down, and Gonzales pulled up alongside him on Gutierrez' driver side of his car. (Arellano Dep., Dkt. 321-1, at 134:21–135:19). When the cars were next to each other, Arellano looked out her open passenger window and made eye contact with Gutierrez. Gonzales spoke directly to Gutierrez through the two open windows saying, "Hey, dude, you got a fucking problem?" (*Id.* at 135:18–136:9, 139:3–14). At this time, Arellano testified that Gutierrez was "doing something with his hands."

Arellano then turned in her seat to face Gonzales and began to say something to the effect of, "Alex, let's just go, this is stupid." (*Id.* at 139:11–140:19). Before she finished her sentence, Gutierrez fired his gun into the family's car seven or eight times. (*See* Lab Report, Dkt. 276-9, at 1, 6; *but see* Gutierrez Dep., Dkt. 235-10, at 286:10–21). One of Gutierrez' shots struck Gonzales across the top of his head, while three others struck Arellano—in her back, right shoulder blade, and her right bicep. (*See* Gutierrez Dep., Dkt. 235-10, at 13:7–14:5; Autopsy Report, Dkt. 273-4, at 9; Ex. 12, Dkt. 273-5; Howse Report, Dkt. 276-13, at 4). Gutierrez' shot to Gonzales' head knocked him temporarily unconscious. (*See* Arellano Dep., Dkt. 321-1, at 136:1–4; Gutierrez Dep., Dkt. 235-10, at 136:13–14).

According to Gutierrez, when he turned onto Wickersham and noticed that Gonzales was following him, he rolled down his driver's side window. He testified that he does not know why he rolled down the window, and that he may have done it "automatically." (Gutierrez Dep., Dkt. 235-10, at 35:18–36:11, 477:2–25). He stated that he began to slow down so that he could make a left turn into his apartment complex. At that point, Gutierrez alleges that Gonzales not only pulled up alongside him but cut him off such that Gutierrez could not turn left into his complex and had to stop his car. (*Id.* at 36:16–37:5). Gutierrez testified that Gonzales pulled so close to his car that he did not know if Gonzales had struck Gutierrez' bumper. He stated that he felt like he was impeded from pulling forward. (*Id.* at 39:9–13, 280:22–281:16). Once the cars were aligned, Gutierrez testified that he did not hear anyone speak but saw Gonzales pointing a gun directly at him. He stated that he feared for his life, so he then ducked to his right—away from his open driver's side window—grabbed his weapon which he kept holstered in his car, pointed the gun at Gonzales, and fired multiple times. (*Id.* at 84:3–85:1, 86:19–87:10, 89:4–10). Gutierrez testified that his only target was Gonzales and that he did not intend to shoot Arellano because he was not aware that she was there. (*Id.* at 9:17–10:3).

There are several pieces of evidence in the record that conflict with Gutierrez' account of the incident. First, Gutierrez alleges that he could not escape the confrontation with Gonzales because Gonzales' car blocked Gutierrez from moving forward or turning into his apartment complex. However, from the video, it appears that Gutierrez was not blocked from moving his car forward, although it is unclear exactly how close the two vehicles are. (*See* Ex. 6, Dkt. 189-6; *see also* Howse Report, Dkt. 276-13, at 11). Second, Gutierrez denies that any words were spoken between the two men, but two other witnesses also stated that they heard voices from the vehicles before the shooting. (*Compare* Gutierrez Dep., Dkt. 273-15, 84:20–86:2 *with* Verrell Tr., Dkt. 273-15, at 22:492–494, *and* Briegel Report, Dkt. 276-29, at 6). Third, he claims to have not seen Arellano at all during this exchange. But Gutierrez also alleges that he could see Gonzales' whole body and that Gonzales was pointing his gun with his right hand outstretched, in front of where Arellano was sitting in the passenger seat, between Gonzales and Gutierrez. (*See* Gutierrez Dep., Dkt. 235-10, at 23:23–24:22, 29:4–31:15). Fourth, Gutierrez stated that he did not rack a round before firing his weapon. (*Id.* at 60:18–62:5, 472:25–474:6). But a live round was found in his front seat, (Dkt. 273-18), suggesting that he may have racked the slide before opening fire, (*see* Chancellor Report, Dkt. 143-1, at 84–85). Last, Gutierrez stated that he ducked into his car, leaning away from his driver's side window to fire his weapon. However, six empty bullet cartridge cases were found outside his window, suggesting that Gutierrez may have instead reached outside his vehicle to fire his weapon. (*See* Ex. 31, Dkt. 276-31 (noting tents 1–6 mark fired cartridge cases and one fired cartridge found inside Gutierrez' car); Ex. 9, Dkt. 276-9, at 1, 6 (matching those seven cases to Gutierrez' weapon); Ex. 32, Dkt. 273-16 (photos of casings); Ex. 33, Dkt. 273-17 (same); *see also* Howse Report, Dkt. 276-13, at 9).

Importantly, it is also unclear from the record whether Gonzales was pointing a gun at Gutierrez when Gutierrez opened fire into the red sedan. Arellano testified that when Gonzales pulled up next to Gutierrez' car, he did not have a gun pointed at anyone. (Arellano Dep., Dkt. 321-

1, at 214:13–16). She testified that she never knew Gonzales had a gun in the car at any point. (*Id.* at 116:11–117:11). However, Arellano admitted that she was not looking at Gonzales when he spoke to Gutierrez and therefore could not know for certain whether Gonzales brandished a weapon at that exact moment. (*See id.* at 141:14–142:2). And a firearm was found on the floor beneath Gonzales' seat, but it was not ready to fire because there was no round in the chamber. (*See* Bernal Report, Dkt. 276-14, at 5; APD Briefing, Dkt. 276-15, at 32; Howse Report, Dkt. 276-13, at 10).

After the shooting, Gonzales' vehicle idled forward down Wickersham until it stopped near a curb. (Arellano Dep., Dkt. 321-1, at 150:17–25). Arellano managed to exit the vehicle and opened the rear passenger door to check on baby Z.A. but then collapsed near the curb. (*Id.* at 151:4–152:4). Gonzales was momentarily unconscious until at some point he too got out of the car to stand near the driver's side door. Meanwhile, Gutierrez reloaded his gun, called 911, and drove his blue sedan away from the initial scene to follow the red sedan to where it stopped down the road. (Gutierrez Dep., Dkt. 235-10, at 116:2–6).

## 2. The Second Shooting

Moments after the first shooting, Gutierrez called 911 to report the incident and request dispatch of on-duty APD officers and EMS. On the phone with a 911 dispatcher, Gutierrez identified himself as an off-duty APD officer, stated he was involved in a "road rage" shooting incident, and stated that Gonzales had pointed a gun at him. (Gutierrez Dep., Dkt. 235-10, at 117:6–9, 264:19–22; *see also* 911 Recording, Dkt. 273-8, at 0:00–0:08, 1:38–1:42). Gutierrez reported to 911 that the driver of the other vehicle was "shot" with "blood all over his face." (911 Recording, Dkt. 273-8, at 1:45–1:50, 2:42–2:47). At no point in the call did Gutierrez tell the dispatcher that he himself had shot Gonzales or that he was the only person who had shot anyone. (*See id.*). When he was not speaking to the dispatcher, Gutierrez could be heard in the background yelling, "Drop your gun." Gutierrez told the dispatcher that Gonzales was "moving and he's got a gun in his hand." (*Id.*

at 0:27–0:54). However, Gutierrez later testified that at this time he did not know whether Gonzales had a gun in his hand because Gonzales had his hands concealed. Gutierrez simply assumed Gonzales was still armed because the last he had seen Gonzales, Gonzales was allegedly armed. (*See* Gutierez Dep., Dkt. 235-10, at 131:6–10; 133:17–134:4, 162:11–163:16; *see also* OPO Rec., Dkt. 276-7, at 3). The dispatcher put the 911 call out as a "Hot Shot" to the Mobile Data Terminals ("MDT") in the "Henry" sector of the APD. (*See* Ex. 8, Dkt. 192-3, at 4). "Hot Shots" are high priority calls that involve incidents that pose an immediate threat to life and the public's safety. (Serrato Decl., Dkt. 192-3, ¶ 6).

Meanwhile, APD Officer Serrato, and the second individual defendant in this suit, was on-duty and parked nearby in a parking lot in the "Henry" sector of Austin—an area that he did not normally patrol and with which he was unfamiliar. He was in his police uniform sitting inside his APD-issued patrol vehicle. (Serrato Decl., Dkt. 192-3, ¶¶ 3–4). At approximately 12:34 a.m., Serrato observed Gutierrez' call coming in on his MDT computer system. The call comments made by the dispatcher stated, "shots fired" and that an off-duty APD officer was involved. Within the same minute, the call was then upgraded to a "Shoot/Stab" Hot Shot call and then to a "Officer Needs Assistance" Hot Shot call. (*See id.* ¶ 5; Ex. 8, Dkt. 192-3, at 7). Because the MDT system noted that the address of the incident was associated with an apartment complex, Serrato later stated that he assumed that there had been some sort of altercation between a suspect and an apartment complex "courtesy officer." (Serrato Decl., Dkt. 192-3, ¶ 5).

Because "Hot Shot" calls are the highest priority calls for assistance at APD, Serrato immediately assigned himself to the call. (*See id.* ¶¶ 6–7). Serrato stated that because he was unfamiliar with the area and needed to arrive to the incident as quickly as possible, he switched his MDT computer from the call screen to the map screen, preventing him from seeing the call comments on the call page. He also quickly used his cellphone's GPS function to give him directions

to 2500 Wickersham Lane. Serrato stated that after he marked himself as assigned to the call and

began to drive to the scene, he never saw any additional call notes made by the dispatcher, (*id.* ¶ 7),

even though the MDT call comments continued to update with additional information about the

incident, (*see* Ex. 8, Dkt. 192-3, at 7). Serrato's patrol vehicle's dash-camera recording confirms that

Serrato drove out of the parking lot approximately thirty seconds after he assigned himself to the

call. (*See* Dash-Cam, Ex. 11, Dkt. 192-4, at 0:00–0:35). Serrato's body-worn camera ("BWC")

footage also confirms that as Serrato drove to the scene, the MDT computer only displayed the

"map" function and not the call notes. Further, Serrato's phone can be seen in his hand displaying a

GPS route. (*See* Serrato BWC, Ex. 12, Dkt. 192-4, at 0:00–0:30).

    The next series of events were all captured on several videos. Serrato's APD patrol car was

equipped with a dashcam that recorded the events. (*See* Serrato Dash-Cam, Ex. 11, Dkt. 192-4).

Both Serrato and APD Officer Brian Nenno ("Nenno") also each wore body-worn cameras that

recorded the incident. (*See* Serrato BWC, Ex. 12, Dkt. 192-4; Nenno BWC, Ex. 13, Dkt. 192-4). The

events below all transpire over the course of about one minute and twenty seconds. (*See* Dash-Cam,

Ex. 11, Dkt. 192-4, at 1:59–3:17).

    Serrato arrived at the scene approximately two minutes after he left the parking lot. (*Id.* at

1:59). The videos show that as he arrived, a man in a tank top—Gutierrez—can be seen holding a

position of cover behind his blue sedan, which was parked at a diagonal angle behind and to the left

of the red sedan. Gutierrez was pointing his handgun at a man—Gonzales—who was standing

outside the open driver's side door of the red sedan. As Serrato ran out of his car, Gutierrez flashed

Serrato his APD police badge. Serrato then joined Gutierrez in a position of cover behind the blue

sedan and aimed his handgun at Gonzales. (*Id.*). Seconds later, a second APD on-duty officer—

Nenno—also arrived on the scene, joining Gutierrez and Serrato in a position of cover behind the

blue sedan and aiming his handgun at Gonzales. (*Id.* at 2:05).

Serrato and Nenno immediately began to yell commands at Gonzales, such as "Put your hands up," in both English and Spanish. (Serrato BWC, Ex. 12, Dkt. 192-4, at 0:35–0:55; Nenno BWC, Ex. 13, Dkt. 192-4, at 0:33–1:00). At this time, words were exchanged briefly between Gutierrez and the on-duty officers. Gutierrez can be heard saying, "He's got a gun. Just to let you guys . . . he's got a gun in the driver's side. Driver's side . . . He had pointed it at me." Gutierrez then asked, "Want me to get back or no?" and is told by the on-duty officers that he should. Gutierrez then turned and walked away from the position of the on-duty officers to allow Serrato and Nenno to take over the scene. (Nenno BWC, Ex. 13, Dkt. 192-4, at 0:33–1:00; Dash-Cam, Ex. 11, Dkt. 192-4, at 2:05–2:25). Serrato later stated that he heard Gutierrez tell him and Nenno that Gonzales had a gun but at no point did Gutierrez tell the on-duty officers that Gutierrez was the one that had shot Gonzales, nor did he disclose any other details about how the incident had arisen. (Serrato Decl., Dkt. 192-3, ¶¶ 12, 13).

After Gutierrez fell back, Gonzales remained standing outside the open driver's door of the red sedan. Serrato and Nenno continued to yell commands to Gonzales in both English and Spanish. At one point, Gonzales put his hands up, seemingly in response to officer commands. However, Gonzales then put his hands back down. (Serrato BWC, Ex. 12, Dkt. 192-4, at 0:47–1:07; Dash-Cam, Ex. 11, Dkt. 192-4, at 2:11–2:31). Serrato later stated that he understood Gonzales' hand-raising to be compliance with his orders and therefore concluded that Gonzales could understand his orders and could comply with them. (Serrato Decl., Dkt. 192-3, ¶ 14). He also stated that at the time of the incident, he did not see any sign of injury on Gonzales, but he admitted that after reviewing the video footage after the incident, he can see some blood on Gonzales' head. (*Id.* ¶ 18).

Shortly after putting his hands down, Gonzales reached his hand and a portion of his torso back into the open driver's door. In response, the on-duty officers yelled at Gonzales, "Don't reach!

Do not reach!" Gutierrez then—speaking from behind the officers—can be heard saying, "He's got a gun in there on the driver's side" to which Nenno replied, "Ok." Despite Gonzales' first reach into the car, neither Serrato nor Nenno fired shots at Gonzales while he remained near the driver's door. (Serrato BWC, Ex. 12, Dkt. 192-4, at 1:07–1:19; Dash-Cam, Ex. 11, Dkt. 192-4, at 2:31–2:43). Serrato later stated that although he perceived Gonzales' first reach into the car to be a threat of imminent harm, he did not fire his weapon because he was still in a position of cover behind the blue sedan. (Serrato Decl., Dkt. 192-3, ¶¶ 16–17).

After Gonzales' first reach into the car, Serrato and Nenno commanded Gonzales to walk towards them. Gonzales began to walk around the back of the red sedan towards the rear passenger side door. The front passenger door of the red sedan was open, and Arellano was lying on the ground near the open passenger door. As Gonzales walked around the red sedan, Serrato and Nenno continued to shout commands, such as "Put your hands up," "Walk away from the car," "Stop," and "Turn around." (Serrato BWC, Ex. 12, Dkt. 192-4, at 1:20–1:35; Dash-Cam, Ex. 11, Dkt. 192-4, at 2:43–2:58). Serrato later stated that as his eyes tracked Gonzales around the car, he first noticed Arellano lying on the ground. (Serrato Decl., Dkt. 192-3, ¶ 20). Simultaneously, Serrato started to abandon his position of cover behind the blue sedan by taking several steps to his right. Both he and Nenno continued to have their weapons pointed at Gonzales, and they each continued to shout commands at him. Specifically, Serrato yelled for Gonzales to "Get away from her," seemingly in reference to Arellano. (Serrato BWC, Ex. 12, Dkt. 192-4, at 1:35–1:36; Dash-Cam, Ex. 11, Dkt. 192-4, at 2:58–3:02). Serrato later stated that he shouted this command because he assumed Gonzales had harmed her. (Serrato Decl., Dkt. 192-3, ¶ 20). Serrato testified that this assumption stemmed from the fact that the incident was near an apartment complex, and he had assumed that there may have been a domestic violence situation. (*Id.*).

Once he was at the passenger side of the car next to Arellano, Gonzales closed the front passenger door to the red sedan. He then made a quick, reaching movement toward the rear passenger side door of the car. At this point, Serrato simultaneously had completely abandoned his position of cover and was commanding Gonzales, "Do not reach!" (Serrato BWC, Ex. 12, Dkt. 192-4, at 1:35–1:42; Dash-Cam, Ex. 11, Dkt. 192-4, at 3:02–3:07). Serrato later explained that he decided to abandon his position of cover so he could maintain a clear line of sight on Gonzales and protect Arellano from any sudden violence. He stated that he believed Gonzales may have been trying to reach for a gun inside the car. (Serrato Decl., Dkt. 192-3, ¶ 21).

Gonzales then opened the rear passenger door of the red sedan. Nenno and Serrato continued to shout commands at Gonzales, including "Don't reach." Almost immediately after he opened the rear passenger car door, Gonzales began to reach his hand inside. At that moment, Serrato rapidly fired ten shots at Gonzales, hitting him multiple times. As a result of Serrato's gunfire, Alex's body immediately slumped and fell to the ground. (Serrato BWC, Ex. 12, Dkt. 192-4, at 1:45–1:55; Dash-Cam, Ex. 11, Dkt. 192-4, at 3:08–3:20). In hindsight, it appears that Gonzales was attempting to check on baby Z.A. who was still in his car seat on the rear passenger side of the car. (*See* OPO Rec., Dkt. 276-7, at 2). However, at the time, Serrato did not know about the baby or the nature of Gonzales and Arellano's relationship. (*See* Serrato Decl., Dkt. 192-3. ¶ 29). Serrato attested that he fired his gun because Gonzales' "continued decisions to disobey [his] numerous commands" led him to believe that Gonzales was a threat to his or Arellano's safety. Serrato stated that when Gonzales reached into the car, he believed that Gonzales was reaching for a firearm— either the one that Gutierrez had previously warned him about or another firearm. Serrato attested that he decided to shoot Gonzales in a split-second decision to protect himself and Arellano. (*Id.* ¶¶ 22–24). Indeed, from the time that Serrato arrived on the scene to the time that he used force

against Gonzales, less than a minute and a half had transpired. (*See* Serrato BWC, Ex. 12, Dkt. 192-4, at 0:34–1:52).

Gonzales died at the scene from his multiple gunshot wounds. (*See* Autopsy Report, Dkt. 273-4, at 3; EMS Run Sheet, Dkt. 273-12, at 2). Arellano was rushed to the hospital but survived the incidents with permanent injuries. (Arellano Dep., Dkt. 321-1, at 179:22–180:24, 188:24–189:19); Arellano Interview, Dkt. 276-5, at 34:1–16). Her child Z.A. was not physically injured in the incidents. (OPO Rec., Dkt. 276-7, at 2).

### 3. Subsequent Investigation of the Shootings

Pursuant to their policies, APD conducted two investigations of these shootings, as is typical in cases involving the use of deadly force. For all "Level 1" uses of force, the APD's Special Investigations Unit ("SIU") performs a criminal investigation into the police officer's actions. At the conclusion of the investigation, SIU turns over its materials to the Travis County District Attorney who makes the determination about whether to present cases involving an APD police officer to a grand jury to consider whether to indict. (Henderson Decl., Dkt. 168-1, ¶ 12). Here, SIU conducted a criminal investigation into the incidents, and on December 27, 2022, a Travis County Grand Jury returned a "No Bill" decision as to both Gutierrez and Serrato after considering evidence presented by the Travis County District Attorney. (*Id.* ¶ 19).

Concurrent with a SIU criminal investigation, APD's Internal Affairs Unit ("IA") also conducts a separate review to determine whether a police officer violated any APD policies. IA is responsible for investigating the incident, collecting evidence, and producing a report. IA ultimately presents its evidence to the involved officer's chain-of-command, including the chief of police. The chief of police then makes the final decision whether to discipline the officer. (*Id.* ¶¶ 13–14).

Here, IA investigated the two shootings and produced a lengthy case file, including a twenty-six-page case summary. (IA Case Summary, Dkt. 273-2, at 1). The IA investigation was led by then-

Sergeant David Shand. (*Id.* at 1). Shand testified that he received only on-the-job training for the role and by the time he took on this assignment, he had never investigated a homicide and had no prior experience as a criminal detective; this case was his first time leading an officer-involved shooting investigation. (Shand Dep., Dkt. 276-38, at 28:6–12, 31:3–15, 37:18–22, 39:23–40:8). Shand also testified that as part of his role leading the IA investigation, "it wasn't my job to cross-examine" officers or "challenge them"; instead, he "just asked them to tell me what happened." (*Id.* at 21:4–22:2). Shand testified that it was not his job to establish witness credibility in the investigation or to question an officer's honesty if the chain of command had not made a specific honesty complaint. (*Id.* at 221:1–6, 224:21–24). He further testified that it was not his job at IA to evaluate whether an officer's use of force complied with standards or APD policy; that decision was left for others up the chain-of-command. (*Id.* at 47:6–17).

Shand stated that discrepancies in the evidence were supposed to be highlighted in the IA case summary by an "investigator's note," (*id.* at 87:8–15), but a review of the IA case summary reveals that it is devoid of almost all the above evidence that conflicts with Gutierrez' version of the events. The report extensively quotes from the involved officers' statements. (*See* IA Case Summary, Dkt. 273-2). It does not, however, mention: the video showing Gutierrez was not on the route he described, the unspent round in Gutierrez' vehicle, nor the location where Gutierrez' spent cartridge cases were found contrary to his description of how he fired his weapon. It also does not acknowledge that Gutierrez said he saw Gonzales with his right arm fully extended across the passenger seat before Gutierrez opened fire, but also claimed he never saw Arellano despite opening fire while she sat in the passenger seat. The case summary also entirely omits Arellano's account of the incident. It notes that Arellano "declined to speak with SIU at the hospital" and "would not be providing a statement to" IA directly. (*Id.* at 6–7). However, the report fails to mention that Arellano provided a statement to the Travis County Attorney's Office on May 5, 2021, and that statement

was provided to APD on July 21, 2021. (*See* McCormick Report, Dkt. 276-25; Acosta Report, Dkt. 276-26). The only discrepancy mentioned in the IA case summary was an investigator's note that acknowledged the dispute about whether any words were spoken between the two vehicles before the first shooting. (IA Case Summary, Dkt. 273-2, at 12). This presentation of the case summary aligns with Shand's expectation that he was not expected to have an opinion about the plausibility of Gutierrez' story, even if some of the physical evidence could cast doubt on the truthfulness of Gutierrez' narrative. (*See* Shand Dep., Dkt. 276-38, at 104:4–15, 124:11–16). It also appears to have been in accordance with APD policies as Chief Joseph Chacon ("Chacon"), the police chief at the time the investigation was concluded, testified that the IA case summary did not contain any deficiencies and "appropriately handled disputed fact issues." (Chacon Dep., Dkt. 276-36, at 10:18–25, 75:14–20, 103:23–104:3).

The IA investigation concluded on December 29, 2022. (IA Case Summary, Dkt. 273-2, at 26). Two City of Austin police oversight offices also provided recommendations to the Chief of Police. On January 25, 2023, the Office of Police Oversight ("OPO") recommended that Gutierrez be indefinitely suspended, finding that he "recklessly fired his weapon" into Gonzales' car and noting that there were several discrepancies in his story that affected the credibility of his version of the events. (OPO Rec., Dkt. 276-7, at 1, 3). However, the OPO only recommended counseling and guidance for Serrato, finding that the "firing of his weapon appears to be within policy" and thus was reasonable under the circumstances. (*Id.*). The following day, the Community Police Review Commission ("CPRC") found that both Gutierrez and Serrato violated APD use of force policies and recommended that both officers be indefinitely suspended. (CPRC Rec., Dkt. 276-8). However, on January 26, 2023, within one day of receiving the two oversight recommendations, Chief Chacon administratively closed the IA complaints against both Gutierrez and Serrato, choosing not to discipline either of them. (*See* IA Control Sheets, Dkt. 273-27). The same day, APD released a

statement stating that in its view, both Gutierrez and Serrato had "acted according to their training and APD policy." The statement said that neither officer would be disciplined, and both officers would remain in their full-time roles as APD officers. (Dkt. 244-9).

## B. Procedural History

The two shootings resulted in three lawsuits, which have been consolidated into this action. Gonzales' parents sued first. On July 6, 2022, Plaintiffs Alex Gonzales, Sr. and Elizabeth Herrera (collectively, the "Gonzales Plaintiffs") sued the City of Austin in Cause Number 1:22-cv-655. (Compl., Dkt. 1). On January 3, 2023, Arellano sued Gutierrez, Serrato, and the City of Austin in Cause Number 1:23-cv-8. (Compl., Dkt. 1, 1:23-cv-8). The same day, the Gonzales Plaintiffs filed their second lawsuit—the third suit overall—against all three defendants in Cause Number 1:23-cv-9. (Compl., Dkt. 1, 1:23-cv-9). On August 2, 2023, the Court consolidated all three cases into this action. (Order, Dkt. 54).

The Gonzales Plaintiffs assert claims under 42 U.S.C. § 1983 as wrongful death beneficiaries of Gonzales and heirs to the Estate of Gonzales.[3] The Gonzales Plaintiffs' live pleading against Gutierrez and Serrato is their Second Amended Complaint. (Dkt. 85). They allege that Gutierrez and Serrato used excessive force against Gonzales in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution. They allege that both officers' uses of force were causes of Gonzales' injuries and death. (*Id.* ¶¶ 80–96). They also allege that Gutierrez' actions, misstatements, and omissions caused and contributed to Serrato's use of force against Gonzales. (*Id.* ¶ 86). The Gonzales Plaintiffs allege that Gutierrez undertook all actions when he was acting under the color of

---

[3] In their live pleadings, the Gonzales Plaintiffs also assert claims as "Next Friend" to Z.A., who they believed may be a wrongful death beneficiary of Gonzales. (2d Am. Compl., Dkt. 85, ¶ 2; 3d Am. Compl., Dkt. 86, ¶ 2). The Gonzales Plaintiffs represented, however, that they did not purport to represent Z.A.'s interests in this lawsuit. (*See* 2d Am. Compl., Dkt. 85, at 1 n.2). The Gonzales Plaintiffs moved for the appointment of a guardian ad litem to represent Z.A. in this lawsuit. (Dkt. 30). The Court denied this motion, finding that Arellano, Z.A.'s mother, could sufficiently represent Z.A.'s interests in the suit. (Dkt. 96). Arellano then later dismissed Z.A.'s claims. *See infra* n.4.

law. However, they assert a claim for common law negligence only against Gutierrez, in the alternative, only if the Court determines that Gutierrez was not acting under the color of law. (*Id.* ¶¶ 97–105). As to the City of Austin, the Gonzales Plaintiffs' live pleading is their Third Amended Complaint, in which they allege a claim pursuant to *Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658 (1978). They allege that the City of Austin is liable for Gonzales' death because the City's official policies, practices, and customs were a cause of Gutierrez and Serrato's uses of excessive force. (3d Am. Compl., Dkt. 86, ¶¶ 138–162).

Arellano's live pleading against Gutierrez and the City of Austin is her First Amended Complaint. (Dkt. 87). Arellano brings a Section 1983 claim against Gutierrez alleging that he used excessive force when he shot her, violating her Fourth and Fourteenth Amendment rights. (*Id.* ¶¶ 139–147). She also alleges a *Monell* claim against the City of Austin, alleging that its policies, practices, and customs caused Gutierrez' use of excessive force against her. (*Id.* ¶¶ 148–158).[4]

Between July 1 and 3, 2024, the parties filed seven motions for summary judgment. Gutierrez filed his Motion for Partial Summary Judgment and Motion to Dismiss, arguing that the Court should dismiss the Gonzales Plaintiffs' supposedly asserted claim for failure to provide medical care and dismiss the Gonzales Plaintiffs' common law negligence claim. (Dkt. 171). The Gonzales Plaintiffs filed a response in partial opposition. (Dkts. 242, 249). Serrato also filed his Motion for Summary Judgment, arguing that Serrato's use of force against Gonzales was not a constitutional violation and that even if it were a violation, Serrato is entitled to qualified immunity.

---

[4] Arellano originally also asserted claims on behalf of her child Z.A. as a wrongful death beneficiary and heir of Gonzales. She brought claims against all three defendants due to Gutierrez and Serrato's alleged excessive force against Gonzales and the City's alleged *Monell* liability due to both shootings. (Am. Compl., Dkt. 87, ¶¶ 1–2, 139–158). On August 8, 2024, Arellano and all three defendants filed an agreed notice of voluntary dismissal in which the parties dismissed without prejudice the claims Arellano was bringing in her capacity as Next Friend of Z.A. and made on behalf of the Estate of Gonzales. (Dkt. 253). The following day, the Court dismissed these claims. (Order, Dkt. 254). As such, Arellano's remaining claims are her Section 1983 claim against Gutierrez and her *Monell* claim against the City. She has no live claims against Serrato.

(Dkts. 189, 192). The Gonzales Plaintiffs filed a response in opposition, (Dkts. 243, 248), and Serrato replied, (Dkt. 273).

The City filed two motions for summary judgment, against both the Gonzales Plaintiffs and Arellano (together, the "Plaintiffs"). (Dkts. 167, 168). The City argues that it is not liable for the death of Gonzales or the shooting of Arellano because neither Gutierrez nor Serrato used excessive force. Even if Plaintiffs could raise an issue of fact as to the officers' use of force, the City argues that Plaintiffs do not have sufficient evidence to raise an issue of material fact on various elements of their *Monell* claims. (*See id.* at 10). The Gonzales Plaintiffs and Arellano filed separate responses in opposition, (Dkts. 246, 276), and the City of Austin filed two replies, (Dkts. 265, 282). The City then filed a Motion to Strike Summary Judgment Evidence, requesting that the Court strike various pieces of evidence that the Gonzales Plaintiffs attached to their response to the City's Motion for Summary Judgment. (Dkt. 266). The Gonzales Plaintiffs oppose this motion. (Dkt. 288).

Last, the Gonzales Plaintiffs filed three motions for partial summary judgment. (Dkts. 175, 176, 177). They request summary judgment on each defendant's "undeveloped or inapplicable affirmative defenses," (*id.*), but they do not request summary judgment on the officers' defense of qualified immunity, (*see* Dkt. 175, at 3; Dkt. 176, at 3). Defendants filed responses, (Dkts. 233, 234, 238), and the Gonzales Plaintiffs replied, (Dkts. 261, 262, 263).

## II. LEGAL STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the movant shows there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). "A fact issue is 'material' if its resolution could affect the outcome of the action." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]he moving party may [also] meet its burden by simply pointing to an absence of evidence to support the nonmoving party's case." *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 544 (5th Cir. 2005). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Wise v. E.I. Dupont de Nemours & Co.*, 58 F.3d 193, 195 (5th Cir. 1995). After the nonmovant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted. *Miss. River Basin Alliance v. Westphal,* 230 F.3d 170, 175 (5th Cir. 2000).

"A qualified immunity defense alters the usual summary judgment burden of proof." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). "Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Id.*

Even when considering a qualified immunity defense, however, the Court must view the evidence in the light most favorable to the non-movant and draw all inferences in the non-movant's favor, *Rosado v. Deters*, 5 F.3d 119, 122–23 (5th Cir. 1993), and cannot make credibility determinations or weigh the evidence, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). That said, when one party's version of the facts "is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III. GUTIERREZ' MOTION FOR PARTIAL SUMMARY JUDGMENT

The Court begins with Gutierrez' Motion for Partial Summary Judgment and Motion to Dismiss. (Dkt. 171). To start, it is important to note that Gutierrez did not move for summary judgment on the Gonzales Plaintiffs and Arellano's § 1983 claims for excessive force. Those claims will proceed to trial. Instead, Gutierrez' motion concerns two ancillary matters related to the Gonzales Plaintiffs' suit against him.

First, Gutierrez alleges that the Gonzales Plaintiffs bring a claim against him for failure to render medical aid after he shot Gonzales and Arellano. (Dkt. 171, at 1).[5] The basis for this argument is several paragraphs in the Gonzales Plaintiffs' Second Amended Complaint which allege that "Gutierrez made no attempt to render medical aid or provide any emergency physical care to either Alex or Jessica." (*Id.* (citing 2d Am. Compl., Dkt. 85, ¶ 53)). Gutierrez argues that these allegations do not provide for a cause of action on which relief can be granted and even if it did, he would be entitled to qualified immunity on such a claim. He requests that the Court dismiss this claim under Federal Rule of Civil Procedure 12(c) or grant him summary judgment on this claim. (*Id.* at 5–11). In response, the Gonzales Plaintiffs state that "they do not allege a constitutional violation arising out of Gutierrez's failure to personally render medical care." (Dkt. 242, at 16). They do not oppose a Court order "making clear that [they] may not assert a constitutional violation on this basis at trial." (*Id.*). Gutierrez did not file a reply that responds to this representation.

Upon the Court's own review of the Gonzales Plaintiffs' Second Amended Complaint, it is clear the Gonzales Plaintiffs did not intend to bring a claim for failure to render medical aid. While they did plead facts regarding Gutierrez' alleged failure to provide medical aid, they did not expand this stray factual allegation into an enumerated, separate cause of action against Gutierrez, as they

---

[5] Arellano and Gutierrez filed a joint stipulation recognizing that Arellano did not bring a claim for failure to render medical aid, and as such, Gutierrez' motion does not seek summary judgment on any claims brought by Arellano. (Dkt. 206).

did with their three other causes of action. (*Compare* 2d Am. Compl., Dkt. 85, ¶ 53 *with* ¶¶ 80–105). In light of this review of the complaint and the Gonzales Plaintiffs' representation and confirmation that they did not bring a claim for failure to render medical aid, the Court will moot Gutierrez' motion as to that claim.

Second, Gutierrez moves to dismiss the Gonzales Plaintiffs' claim, brought in the alternative, for common law negligence. (Dkt. 171, at 11). He notes that he and the City of Austin have admitted that he was acting under the color of law during the incidents at issue in this case. Accordingly, he argues that the claim should be dismissed because under Texas law when a tort suit is filed against a governmental entity and any of its employees, then the employees may be dismissed. He also argues that the claim should be dismissed because it is an attempt to artfully plead an intentional tort as a negligent act. (*Id.* at 11–13). In response, the Gonzales Plaintiffs argue that issues of fact preclude summary judgment on the common law negligence claim. (Dkt. 242, at 16). They contend that although they and Gutierrez agree that Gutierrez was acting under the color of law at all relevant times, the City has taken inconsistent positions on this issue throughout the litigation. The Gonzales Plaintiffs ask that the claim be maintained in case the City changes its position on this issue at trial. (*Id.* at 16–17). The Gonzales Plaintiffs also do not agree that all aspects of their negligence claim pertain to intentional conduct. (*Id.* at 17).

All parties in this lawsuit have pled that although Gutierrez was off duty at the time he first encountered Gonzales and Arellano, he was in fact acting under the color of law during his relevant interactions with Gonzales and Arellano, including when he shot them. The Gonzales Plaintiffs pled so, (*see* 2d Am. Compl., Dkt. 85, ¶ 81; 3d Am. Compl., Dkt. 86, ¶¶ 139–140), and Gutierrez agreed, (Am. Answer, Dkt. 92, ¶¶ 2, 5). The City also admitted in its Answer to the Gonzales Plaintiffs' Third Amended Complaint, filed January 30, 2024, that Gutierrez was acting under the color of law during the incident. (*See* Answer, Dkt. 90, ¶¶ 139–140). In their response, the Gonzales Plaintiffs

point to the public statement that the City released on January 26, 2023, in which the City announced that it was not disciplining Gutierrez and Serrato due to this incident. (Dkt. 242, at 16 (citing Dkt. 244-9)). In this statement, the City said, "The investigation of the incident revealed that when Officer Gutierrez came into contact with Mr. Gonzales, he acted as a private citizen who defended himself in the face of a deadly threat." (*Id.*). The Gonzales Plaintiffs argue that this statement reveals how the City has taken inconsistent positions on this issue throughout the litigation and how the City could again change their position at trial. (*Id.* at 16–17).

This dispute does not render summary judgment on the negligence claim inappropriate. "Factual assertions in pleadings are judicial admissions conclusively binding on the party that made them." *Davis v. A.G. Edwards and Sons*, 823 F.2d 105, 108 (5th Cir. 1987) (cleaned up). "Facts that are admitted in the pleadings are no longer at issue." *Id.* (cleaned up). The fact that the City released a public statement labelling Gutierrez a private citizen at the time of the first shooting is irrelevant because the City later judicially admitted that Gutierrez acted under the color of law when he shot Gonzales and took other subsequent actions in reporting the shooting. The City is bound by this admission and cannot assert otherwise at trial.

Section 101.106(f) of the Texas Tort Claims Act ("TTCA") affords government employees immunity. *See Franka v. Velasquez*, 332 S.W.3d 367, 369 (Tex. 2011). The statute provides:

> If a suit is filed against an employee of a governmental unit based on conduct within the general scope of that employee's employment and if it could have been brought under this chapter against the governmental unit, the suit is considered to be against the employee in the employee's official capacity only. On the employee's motion, the suit against the employee shall be dismissed unless the plaintiff files amended pleadings dismissing the employee and naming the governmental unit as defendant on or before the 30th day after the date the motion is filed.

Tex. Civ. Prac. & Rem. Code § 101.106(f). The TTCA allows municipalities to be held liable "for damages arising from . . . police and fire protection and control." Tex. Civ. Prac. & Rem. Code §

101.0215(a)(1). When it applies, Section 101.106(f) "mandates plaintiffs to pursue lawsuits against governmental units rather than their employees," *Tex. Adjutant Gen.'s Office v. Ngakoue*, 408 S.W.3d 350, 352 (Tex. 2013), and entitles the employee "to dismissal" of the relevant tort claim, *Laverie v. Wetherbe*, 517 S.W.3d 748, 752 (Tex. 2017); *see also Wilkerson v. Univ. of N. Texas By & Through Bd. of Regents*, 878 F.3d 147, 158–59 (5th Cir. 2017). "That all means a plaintiff seeking to sue a police officer for conduct undertaken within the scope of that officer's employment must sue the municipality, not the officer individually." *Benfer v. City of Baytown, Texas*, 120 F.4th 1272 (5th Cir. 2024) (citing *Alexander v. Walker*, 435 S.W.3d 789, 792 (Tex. 2014) (per curiam)), *cert. denied sub nom. Benfer v. Baytown, TX*, No. 24-823, 2025 WL 663718 (U.S. Mar. 3, 2025).

Here, Gutierrez meets both elements of Section 101.106(f). His conduct was "within the general scope of [his] employment" with a governmental unit as all parties agree that his actions during this incident were taken under the color of law as an employee of the City. Second, the Gonzales Plaintiffs' negligence claim could have been brought against the City because "all common-law tort theories alleged against a governmental unit are assumed to be 'under the Tort Claims Act' for purposes of section 101.106." *Franka*, 332 S.W.3d at 369. Therefore, the Gonzales Plaintiffs' negligence claim against Gutierrez is "foreclose[d]," *id.* at 381, and can be pursued only against the City.

The TTCA also states: "If a suit is filed . . . against both a governmental unit and any of its employees, the employees shall immediately be dismissed on the filing of a motion by the governmental unit." Tex. Civ. Prac. & Rem. Code § 101.106(e). The Texas Supreme Court has clarified that this provision means that a government employee sued individually may be dismissed upon his motion or by plaintiff's amended pleading substituting the governmental unit as defendant. *Ngakoue*, 408 S.W.3d at 358. Here, the Gonzales Plaintiffs chose to sue both the City and Gutierrez

24

for the underlying incident but chose to sue only Gutierrez for common law negligence. Thus, Section 101.106(e) also mandates that the Gonzales Plaintiffs' negligence claim be dismissed.

In summary, Gutierrez' motion is moot in part because the Gonzales Plaintiffs have not brought a claim for failure to render medical aid against him. However, as for their common law negligence claim, because all parties have conceded that Gutierrez acted under the color of law during the incident, both Sections 101.106(e) and (f) of the TTCA mandate that this claim must be dismissed with prejudice. Accordingly, the Court will grant in part and moot in part Gutierrez' Motion for Partial Summary Judgment and Motion to Dismiss. The appropriate vehicle for the parties' claims against Gutierrez is their Section 1983 excessive force claims, which will proceed to trial.

## IV. SERRATO'S MOTION FOR SUMMARY JUDGMENT

The Court next turns to Serrato's Motion for Summary Judgement. (Dkts. 189, 192). Serrato argues that he is entitled to qualified immunity on the Gonzales Plaintiffs' Section 1983 claim against him. (*Id.*). Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). "To determine whether a government official is entitled to qualified immunity for an alleged constitutional violation, courts conduct the two-step analysis of *Saucier v. Katz,* 533 U.S. 194, (2001)." *Lytle v. Bexar Cty.,* 560 F.3d 404, 409 (5th Cir. 2009) (cleaned up). First, the Court must "ask the threshold constitutional violation question of whether, taking the facts in the light most favorable to the plaintiff, the officer's alleged conduct violated a constitutional right." *Id.* at 409–10. If the officer violated a constitutional right, the Court must then "ask the 'qualified immunity question' of whether the right was clearly established at the time of the conduct." *Id.* After the Supreme Court's

decision in *Pearson v. Callahan,* 555 U.S. 223 (2009), courts have discretion as to which of the two qualified immunity prongs to address first.

Serrato argues first that his use of force did not violate Gonzales' constitutional rights because it was a reasonable use of force under the Fourth Amendment. Serrato next argues that the Gonzales Plaintiffs have not demonstrated that his decision to use deadly force violates clearly established law as of January 5, 2021. (Dkt. 189 at 23, 27–29). The Gonzales Plaintiffs contend that disputed issues of material fact preclude summary judgment on Serrato's defense of qualified immunity. (Dkt. 243, at 21). The Court will first address whether Serrato violated Gonzales' constitutional rights, before turning, if necessary, to whether Serrato violated a clearly established right.

As a threshold issue, the Court notes that the events relevant to Serrato's motion, the second shooting, contain very few disputed facts—especially as compared to the first shooting by Gutierrez—because the incident was captured on multiple videos. *See Scott v. Harris*, 550 U.S. 372, 381 (2007) (a court reviewing a summary judgment denial based on qualified immunity "should . . . view[] the facts in the light depicted by the videotape"). The Gonzales Plaintiffs argue that the video evidence in this case is unreliable because the videos have not been corrected to alleviate alleged lens distortions. (Dkt. 243, at 8–9). They claim that "there is a genuine dispute of fact as to whether the court can rely upon the uncorrected videos to draw conclusions" regarding certain facts shown in the videos. (*Id.* at 9). However, the Gonzales Plaintiffs do not claim that the videos are inauthentic or have been edited or manipulated in any way. *But see Ramos v. Taylor*, 646 F. Supp. 3d 807, 816–17 (W.D. Tex. 2022) (refusing, in part, to consider video evidence because of a claim it had been edited when it was placed on YouTube). To the contrary, the videos here "clearly show . . . every particular element of the altercation." *Ramirez v. Martinez*, 716 F.3d 369, 375 (5th Cir. 2013). Further, courts have long relied upon police video captured on scene, including body cameras. *See Scott*, 550 U.S. at

380; *Macias v. Watkins*, No. 23-40580, 2024 WL 3427047, at *1–2 (5th Cir. July 16, 2024). Therefore, while viewing the evidence favorably to the Gonzales Plaintiffs as the nonmovants, the Court "assign[s] greater weight, even at the summary judgment stage, to the . . . video recording[s] taken at the scene" and may discount a plaintiff's version of the facts that are clearly contradicted by that video evidence. *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011); *see also Betts v. Brennan*, 22 F.4th 577, 582 (5th Cir. 2022).

### A. Legal Standard on Excessive Force Claims and Furtive Gestures

Turning to the first prong of the qualified immunity analysis, this Court must determine whether the facts, taken in the light most favorable to the Gonzales Plaintiffs, show that Serrato violated a constitutional right. The Gonzales Plaintiffs bring claims for excessive force under both the Fourth and Fourteenth Amendments. (2d Am. Compl., Dkt. 85, ¶¶ 80–88). However, under binding Supreme Court and Fifth Circuit precedent, "claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham v. Connor*, 490 U.S. 386, 395 (1989); *see also Cuadra v. Houston Indep. Sch. Dist.*, 626 F.3d 808, 814 (5th Cir. 2010) (holding that claims based on alleged pretrial deprivations of constitutional rights, such as prosecution without probable cause, should be brought under the Fourth Amendment, not the Fourteenth Amendment). That is because "the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct" rather than the "more generalized notion of 'substantive due process'" under the Fourteenth Amendment. *Graham*, 490 U.S. at 395. Because the Gonzales Plaintiffs have a cognizable claim for excessive force under the Fourth Amendment, the Court will grant Serrato summary judgment on the Fourteenth Amendment claim and proceed to a Fourth Amendment reasonableness of force analysis.

To prevail in an excessive force claim, "a plaintiff must show that he was seized and that he suffered (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable." *Ballard v. Burton,* 444 F.3d 391, 402 (5th Cir. 2006) (cleaned up). Here, only the last element is at issue. Determining whether an officer's use of force was objectively reasonable "requires careful attention to the facts and circumstances of [the] particular case," including "(1) the severity of the crime at issue, (2) whether the suspect pose[d] an immediate threat to the safety of the officers or others, and (3) whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Trammell v. Fruge,* 868 F.3d 332, 340 (5th Cir. 2017) (quoting *Graham,* 490 U.S. at 396) (internal quotation marks omitted). An officer's use of deadly force is not unreasonable when the officer has reason to believe that the suspect poses a threat of serious harm to the officer or to others. *Mace v. City of Palestine*, 333 F.3d 621, 624 (5th Cir. 2003). Courts must be mindful that police officers are often required to make split-second judgments "in circumstances that are tense, uncertain, and rapidly evolving" and must evaluate an officer's use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396–97.

The Fifth Circuit's recent decision in *Argueta v. Jaradi*, 86 F.4th 1084 (2023), is particularly instructive in this case. In *Argueta*, a police officer shot and killed Luis Argueta who jumped out of his car and fled from officers on foot while he kept his right arm pressed down on the right side of his body. This action made the officer concerned that he could not, if necessary, react in time to stop an attack. Only after the shooting was it revealed that the officer was correct about Argueta's concealed handgun. *Id.* at 1087. The video footage of the incident was unclear, and the district court determined that there were several genuine disputes of material fact that precluded summary judgment on the officer's qualified immunity. The district court noted that it was unclear whether the officer could see Argueta's weapon before the shooting, whether Argueta raised his gun or made

a threatening motion toward the officer before the shooting, and whether the officer warned Argueta before firing his weapon. *Id.* at 1089.

The Fifth Circuit reversed and granted the officer qualified immunity. The Fifth Circuit agreed that fact disputes existed in the video as to whether the officer could see that Argueta had a weapon or whether Argueta raised the gun toward the officer. *Id.* at 1089–90. The court thus assumed that the officer could not see that Argueta was armed before the officer used deadly force and "look[ed] to cases where police officers confronted an individual whose actions suggested that he or she possessed, and might in that moment access, a firearm" in order to decide whether the officer's use of deadly force was reasonable. *Id.* at 1090–91. The court held that Argueta's "clutching his right arm to his side as he fled police confrontation was a furtive gesture" which "created reasonable fear that [Argueta] was about to pull a gun from a hidden location." *Id.* at 1092 (cleaned up). Therefore, whether a gun was visible to the officer prior to the shooting was immaterial. The furtive gesture alone made the officer's conclusion that Argueta posed an immediate danger reasonable, such that his use of deadly force was reasonable as well. *Id.* at 1092–93.

In reaching its decision, the Fifth Circuit cited a long line of furtive-gesture case law. *Id.* at 1090–92.[6] Two of those cases are worth highlighting here. First, the court relied on *Manis v. Lawson*, in which Manis ignored police commands to show his hands and instead "reached under the seat of his vehicle and then moved as if he had obtained the object he sought." 585 F.3d 839, 844 (5th Cir. 2009). The Fifth Circuit found that the officer's use of deadly force did not violate Manis's Fourth Amendment rights, reasoning that deadly force is reasonable when a suspect "moves out of the officer's line of sight such that the officer could reasonably believe the suspect was reaching for a weapon." *Id.*

---

[6] *See e.g.*, *Salazar-Limon v. City of Houston*, 826 F.3d 272, 278 (5th Cir. 2016); *Manis v. Lawson*, 585 F.3d 839, 844 (5th Cir. 2009); *Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379, 385 (5th Cir. 2009); *Reese v. Anderson*, 926 F.2d 494 (5th Cir. 1991); *Young v. City of Killeen*, 775 F.2d 1349 (5th Cir. 1985).

Second, the court cited *Batyukova v. Doege*, in which Batyukova refused to comply with the officer's instructions, became verbally aggressive, and, instead of heeding the officer's admonition to "get down" and show her hands, reached her hand toward the waistband of her pants and behind her back. 994 F.3d 717, 722–23 (5th Cir. 2021). The officer believed that Batyukova was reaching for a weapon to harm him and shot her, even though it was later revealed that Batyukova was unarmed. *Id.* at 723. The Fifth Circuit affirmed the grant of summary judgment in the officer's favor emphasizing that Batyukova "repeatedly ignored [the officer's] commands, walked towards him, was actually facing him, and then made a movement towards her waistband as if she was reaching for a weapon to use against [the officer]." *Id.* at 729. The *Argueta* court reaffirmed that *Batyukova* stood for the proposition that "a suspect's ignoring police commands and reaching behind her back to her waistband justified deadly force notwithstanding the officer's lack of warning." *Argueta*, 86 F.4th at 1093.

## B. Serrato's Use of Force

Turning to the case at hand, the Court must ask whether the totality of circumstances justified Serrato's use of deadly force or whether his actions were objectively unreasonable and clearly excessive. *Macias*, 2024 WL 3427047, at *3 (quoting *Roque v. Harvel*, 993 F.3d 325, 333 (5th Cir. 2021)). In hindsight, it is clear that Serrato did not know crucial pieces of information, which led him to operate under some mistakes of fact. (*See* Serrato Dep., Dkt. 237-8, at 149:5–151:3, 162:25–164:14). For example, by the time Serrato arrived on the scene, Gonzales was injured after Gutierrez shot him in the head, but Serrato did not know that at the time and did not perceive Gonzales as injured. (Serrato Decl., Dkt. 192-3, ¶¶ 14, 18). When Gonzales reached into the rear passenger side of the car, he was not reaching for a gun as the gun was later found on the driver side floorboard. Instead, it seems apparent that Gonzales walked around the car and reached into the rear passenger side door to check on baby Z.A. after the chaos of the first shooting incident. But Serrato did not

know that Z.A. was in the car. (*Id.* ¶ 29). All Serrato knew was that there was a gun at the scene and that it allegedly had been pointed at Gutierrez. (*Id.* ¶ 12). Serrato also did not know that Gutierrez had shot Arellano, and that Arellano was in no danger from Gonzales. (*See id.* ¶ 13). Serrato admitted that he would have reacted differently if he had known these facts at the time. (Serrato Dep., Dkt. 237-8, at 190:2–23, 195:16–196:21).

As knowable as these facts are now, the Court must assess Serrato's use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396–97. Officers are entitled to be mistaken about circumstances requiring use of force as long as those mistakes are reasonable. *See Heien v. North Carolina*, 574 U.S. 54, 57 (2014) ("Under [the Fourth Amendment], a search or seizure may be permissible even though the justification for the action includes a reasonable factual mistake."). That means the Court must consider "only the facts that were knowable" to Serrato, notwithstanding whatever occurred between Gutierrez and Gonzales during the first incident and notwithstanding whatever Serrato learned of the situation after the fact. *See Garza v. Briones*, 943 F.3d 740, 745 (5th Cir. 2019) (quoting *White v. Pauly*, 580 U.S. 73, 77 (2017) (per curiam)). The Court then considers "whether a reasonable officer in the same circumstances" as Serrato "would have concluded that a threat existed justifying" Serrato's use of deadly force. *See Roque*, 993 F.3d at 333.

The video evidence clearly establishes that when Gonzales reached into the red sedan for a second time, his hand disappeared from view into the car. (*See* Serrato BWC, Ex. 12, Dkt. 192-4, at 0:1:51). Serrato made the decision to shoot the same second. The relevant inquiry then is in that instant—in that "moment of the threat"—was it reasonable for Serrato to believe that Gonzales was reaching for a weapon such that he or Arellano was in danger? *See Barnes v. Felix*, 91 F.4th 393, 397 (5th Cir. 2024). The Court finds that it was reasonable under the *Graham* factors and the Fifth Circuit's precedents in *Manis* and *Argueta.*

Based on the dispatch call notes, all Serrato knew when he reached the scene is that an off-duty APD officer was involved in a priority "Hot Shot" incident, incidents that pose an immediate threat to life and the public's safety. (Serrato Decl., Dkt. 192-3, ¶¶ 5–6). Because he heard that the incident had occurred near an apartment complex, Serrato also made a reasonable assumption that the incident may have stemmed from a domestic violence dispute. (Serrato Dep., Dkt. 237-8, at 169:1–19). Once on the scene and a minute before shots were fired, Serrato also learned that there was a gun in the red sedan and that the man near the red sedan—Gonzales—had allegedly pointed it at an off-duty officer. (Serrato Decl., Dkt. 192-3, ¶ 12). This statement gave Serrato reason to believe that Gonzales had committed the offense of Aggravated Assault with a Deadly Weapon, *see* Tex. Pen. Code Ann §§ 22.01(a)(2), 22.02(a)(2), and that Gonzales had a gun that he was willing to point at another person. Further, the video establishes that Serrato saw Arellano on the ground next to the car, close enough for Gonzales to harm her if he was to pull out a gun. Thus, the first *Graham* factor—severity of the crime at issue—and the second *Graham* factor—whether the suspect posed an immediate threat to the safety of the officers or others—weigh in favor of reasonableness of force.

The evidence also establishes that Serrato could reasonably believe that Gonzales had refused to submit to arrest—the third *Graham* factor. From the time that Serrato arrived on the scene to the time he used deadly force against Gonzales, less than a minute and a half transpired. (*See* Serrato BWC, Ex. 12, Dkt. 192-4, at 0:34–1:52). During this stand-off, Serrato issued over thirty commands to Gonzales to put his hands up and walk away from the car. (*See id.*). The video shows that Gonzales complied with one of the commands by momentarily raising his hands. (*See* Serrato BWC, Ex. 12, Dkt. 192-4, at 0:47–1:07). However, he then did not obey any further command, including commands "not to reach" inside the car.

The undisputed video recordings establish that Serrato had multiple reasons to reasonably believe that Gonzales was reaching for a gun that could have been used to harm Serrato or Arellano. Accordingly, in the moment deadly force was used, all three *Graham* factors weigh heavily in favor of Serrato's force. Under both *Manis* and *Argueta*, Serrato's split-second decision to use deadly force in response to Gonzales' furtive gesture was reasonable and not a violation of the Fourth Amendment. *See Manis*, 585 F.3d at 844; *Argueta*, 86 F.4th at 1092–93.

### C. The Gonzales Plaintiffs' Arguments Opposing Qualified Immunity

Despite concluding Serrato's use of force was reasonable, the Court will address the Gonzales Plaintiffs' arguments for why summary judgment on Serrato's qualified immunity is precluded. To survive dismissal on the first qualified immunity prong, it is the Gonzales Plaintiffs' responsibility to proffer issues of fact that are both (1) genuine and (2) material that preclude a finding that Serrato's use of deadly force was objectively reasonable at the exact moment that the facts known or knowable to Officer Serrato made him perceive an imminent deadly threat from Gonzales. *See Argueta*, 86 F.4th at 1088. A "genuine" fact dispute is one that "exists" at all. A material fact dispute is one that has "legal significance" that can preclude summary judgment. *Id.*

The Gonzales Plaintiffs' first set of arguments pertain to decisions that Serrato made prior to the moment that he decided to use deadly force. (Dkt. 243, at 11–12, 14–15). At the outset, these arguments are flawed because in the Fifth Circuit "it is well-established that the excessive-force inquiry is confined to whether the officers or other persons were in danger at the moment of the threat that resulted in the officers' use of deadly force." *Barnes*, 91 F.4th at 397. The moment of the threat doctrine means that the "focus of the inquiry should be on the act that led the officer to discharge his weapon." *Id.* With this restrictive precedent, the Fifth Circuit has cautioned that "[a]ny of the officers' actions leading up to the shooting are not relevant for the purposes of an excessive force inquiry." *Id.* (citing *Harris v. Serpas*, 745 F.3d 767, 772 (5th Cir. 2014)).

The Gonzales Plaintiffs argue that Serrato unreasonably did not obtain enough information before he used force, which creates a fact question preventing summary judgment. (Dkt. 243, at 11–12). However, as explained above, the Court can only consider the facts that were known or knowable to the defendant before "second-guessing [the] officer's assessment, made on the scene, of the danger presented by a particular situation." *Macias*, 2024 WL 3427047, at *3. In a similar vein, the Gonzales Plaintiffs argue that a reasonable officer in Serrato's situation would have interrogated Gutierrez on scene and found out that Gutierrez was the only person on scene to have fired gunshots, which would have led a reasonable officer to not use deadly force against Gonzales. (Dkt. 243, at 14–15). These criticisms about what Serrato did or did not know prior to his use of deadly force amount to criticisms of Serrato's "actions leading up to the shooting" which are not material under *Barnes* and *Serpas*.

Even if these actions were relevant, a reasonable jury would not find that Serrato acted unreasonably in not gathering more information during this rapidly evolving situation. The dash-camera recording confirms that Serrato started driving to the scene of the incident approximately thirty seconds after he assigned himself to the call. (*See* Dash-Cam, Ex. 11, Dkt. 192-4, at 0:00–0:35). He arrived at the scene two minutes later, (*id.* at 1:59), and he used deadly force not even a minute and a half after that, (*id.* at 3:17). Thus, the whole incident took place in less than three and a half minutes. During his two-minute drive, Serrato's bodycam video shows that Serrato did not have access to the call notes because he was using GPS to navigate to the scene. (*See* Serrato BWC, Ex. 12, Dkt. 192-4, at 0:00–0:30).[7] When he arrived on the scene, it was reasonable for Serrato to make a split-second decision to trust Gutierrez' narrative—even if that narrative is now disputed—given that he saw Gutierrez flash his badge and could identify him as an APD officer. During the one

---

[7] The Gonzales Plaintiffs criticize Serrato for not having checked the latest call notes before he exited his car to join the confrontation, but the Gonzales Plaintiffs do not argue what information in these call notes would have made Serrato's use of force unreasonable.

minute that Serrato was on the scene, Serrato did not have time to interrogate Gutierrez and ask for more information because he immediately joined an active stand-off with a man he believed to have a gun. A reasonable jury would not expect Serrato to have gained more information given these undisputed facts.

The Gonzales Plaintiffs also argue that summary judgment is precluded because Serrato unreasonably placed himself in danger when he abandoned the position of cover behind Gutierrez' car to track Gonzales as Gonzales moved around to the passenger side of the red sedan. (Dkt. 243, at 16–17). They argue that a jury may conclude that a reasonable officer in the same circumstances would not have abandoned a position of cover, as is evident by Nenno not abandoning cover during the incident. (*Id.*). This argument is again a criticism of Serrato's "actions leading up to the shooting" which is not material under *Barnes* and *Serpas*. It is also unavailing because Serrato's explanation of why he abandoned cover is a reasonable one: He wanted to maintain a line of sight on Gonzales as he moved around the other side of the red sedan and wanted to be in a better position to protect Arellano if need be. (*See* Serrato Dep., Dkt. 237-8, at 170:17–175:18).

The Gonzales Plaintiffs next proffer a set of alleged fact issues around the time that Serrato used force that they argue precludes summary judgment. They claim that a reasonable officer would have recognized that Gonzales had been shot in the head or had some sort of traumatic head injury. (Dkt. 243, at 12–13). The Gonzales Plaintiffs accuse Serrato of giving "inconsistent statements" on if he saw blood on Gonzales during the incident. (*Id.* at 13). In support, they cite an IA interview that Serrato gave after he had just watched his body-camera footage—wherein Serrato stated he saw a little bit of blood on Gonzales, (Dkt. 237-12, at 19:818–21)—and Serrato's deposition testimony—where Serrato stated that he did not see blood on Gonzales during the standoff, (Serrato Dep., Dkt. 237-8, at 164:6–14). Construing this fact in the Gonzales Plaintiffs' favor, they have created a genuine issue of fact as to if Serrato saw "a little bit of blood" on Gonzales at the scene of the

incident. However, alone, noticing or not noticing a "little bit of blood" is not a material fact question that would preclude qualified immunity.

The Gonzales Plaintiffs allege that if Serrato saw a "bit of blood" on Gonzales, Serrato reasonably should have perceived that Gonzales had been shot in the head and was suffering from a traumatic head injury. (Dkt. 243, at 12–13). They further argue that a reasonable officer would have understood that Gonzales' failure to comply with officer commands was due to the head wound and his inability to hear or understand the commands. Therefore, they argue that a reasonable officer would have recognized that all of Gonzales' actions were "involuntary" and not a conscious decision to resist arrest. According to them, such a realization would have stopped a reasonable officer from using deadly force against Gonzales. (*See id.* at 14, 22). The issue with this line of argument is that the video evidence contradicts the Gonzales Plaintiffs' narrative. No reasonable jury could watch the videos and believe that a reasonable officer should have seen a "bit of blood" on Gonzales and then drawn the conclusion that Gonzales was so wounded by a headshot that his actions were involuntary. On the contrary, the video shows Gonzales walking and performing several actions that required fine motor skills—such as closing and opening car doors. The video also shows that Gonzales temporarily did raise his hands seemingly in compliance with the officers' commands before deciding to put them back down. (*See* Serrato BWC, Ex. 12, Dkt. 192-4, at 0:47–1:07). While, in hindsight, it seems quite likely that Gonzales was impaired by his head injury, the video evidence does not demonstrate that that injury would have been apparent to a reasonable officer who was only on the scene for about a minute. Accordingly, there is no genuine fact issue that Serrato should have perceived a head injury sufficient to render all of Gonzales' actions as involuntary.

In addition, this dispute is not material. "[O]nce a mentally ill victim has acted in such a way that the use of force would be objectively reasonable, it is inconsequential whether the officers attempted to 'accommodate' the illness before using force." *Sanchez v. Gomez*, No. EP-17-CV-133-

PRM, 2020 WL 1036046, at *18 (W.D. Tex. Mar. 3, 2020) (citing *City of San Francisco v. Sheehan*, 575 U.S. 600, 605–06, 612–13 (2015)). Accordingly, whether or not Gonzales was acting involuntarily, once Gonzales reached his hand into the red sedan, out of Serrato's line of sight, any mental impairment became immaterial to the propriety of Serrato's force. Even if Serrato understood that Gonzales was not actively resisting the officers' commands, Serrato still had plenty of reason to reasonably believe that Gonzales could have pulled out a weapon to harm him or Arellano, which justifies his use of deadly force in that moment.

Last, the Gonzales Plaintiffs argue that a genuine issue of material fact exists as to whether Serrato heard Gutierrez give the "precise location" of where the gun was. (Dkt. 243, at 15–16). Gutierrez can be heard on video telling Serrato and Nenno, "He's got a gun. Just to let you guys . . . he's got a gun in the driver's side. Driver's side . . . He had pointed it at me." (Nenno BWC, Ex. 13, Dkt. 192-4, at 0:33–1:00). The Gonzales Plaintiffs claim that this issue is material because if Serrato heard Gutierrez, then Serrato's use of deadly force when Gonzales reached into the rear passenger side door was unconstitutional because Serrato could not reasonably fear that Gonzales was reaching for a gun at that spot in the car. (Dkt. 243, at 15–16). This issue is also not material.

The Fifth Circuit's recent unpublished decision in *Macias v. Watkins* is persuasive on this point. 2024 WL 3427047. In *Macias*, an officer arrived on scene to investigate a potential burglary and was warned that someone "may have a gun." Instead of responding when the officer called out, Macias instead turned around and pointed an object at the officer, which later turned out to be a flashlight. The officer fired at the suspect but missed and hit a wall. *Id.* at *1–3. Accepting that there was a genuine fact regarding whether the officer saw a "pistol-grip" on the flashlight, the Fifth Circuit still affirmed qualified immunity. The court noted that because the officer reasonably believed there might be a gun somewhere and could not see the object, "she could not dispel her

reasonable belief, based on the circumstances known to her then, that [the plaintiff] was armed. That [the plaintiff] was ultimately found to have been unarmed is immaterial." *Id.* at *3.

Here, it is true that after the incident, Gonzales' gun was found on the floor of the driver's seat, but it is undisputed that Serrato never saw the gun before he used lethal force. (*See* Dkt. 243, at 17). Instead, the record shows that Serrato was told that there was a gun, and that Gutierrez had informed Serrato that he had last seen it in the front seat of the red sedan. But that information did not allow Serrato to dispel his belief that Gonzales was attempting to arm himself in the moment he used force. For example, Serrato had no way of knowing if the gun had fallen into a different area of the sedan since Gutierrez allegedly last saw it, such that Gonzales could have been reaching into the rear passenger door to search for the gun. The red sedan was small, and an adult man could likely reach almost anywhere inside the car from the rear-passenger side door. Under Serrato's reasonable understanding of the situation, it is also possible that Gonzales could have been trying to access a second firearm located in the back seat. Gonzales' actions of not complying with police commands also did not dispel Serrato's reasonable fear that Gonzales could have been reaching for a weapon. Just as in *Macias*, nothing that Gutierrez or Gonzales said allowed Serrato to "dispel [his] reasonable belief, based on the circumstances known to [him] then," that Gonzales was attempting to arm himself with a gun. *See Macias*, 2024 WL 3427047, at *3. Because his fears had not been "dispelled," he could still reasonably believe that the Gonzales "was attempting to use or reach for a weapon," such that deadly force was justified. *Id.* at *2.

### D. Conclusion

The undisputed video evidence shows that Serrato's use of deadly force against Gonzales, while regrettable, was reasonable based on the circumstances that a reasonable officer would have understood at the time. His actions did not amount to a constitutional violation because he reasonably perceived that Gonzales was an imminent threat of serious harm. Finding no

constitutional violation under the first prong of qualified immunity, the Court finds it unnecessary to proceed to the second prong. Because of the clear video evidence of the second shooting, no genuine disputes of material fact remain as to this question, and summary judgment on Serrato's qualified immunity is appropriate. Accordingly, the Court grants Serrato's Motion for Summary Judgement because Serrato is entitled to qualified immunity on the Gonzales Plaintiffs' Section 1983 claims against him.

## V. THE CITY'S MOTION TO STRIKE EVIDENCE

The Court next turns to the motions pertaining to Plaintiffs' *Monell* claims against the City. The Court first considers the City's Motion to Strike the Gonzales Plaintiffs' Summary Judgment Evidence. (Dkt. 266). The City moves to strike twenty pieces of evidence cited in support of the Gonzales Plaintiffs' Response to the City's Motion for Summary Judgment, (Dkt. 246). Nineteen of the exhibits are articles published in law reviews, academic journals, newspapers or news sites, or police organizations' publications. The twentieth exhibit is a book chapter. (*See* Dkt. 266). The City offers the same, brief, and cursory objection to each exhibit. It argues that each exhibit contains hearsay that it is inadmissible under Federal Rules of Evidence 802 and 805. It also argues that each exhibit contains irrelevant commentary which is inadmissible under Rule 402 or information that should be excluded under Rule 403 because its probative value is substantially outweighed by the danger of unfair prejudice. (*See id.*).

The Gonzales Plaintiffs responded in opposition. (Dkt. 288). They argue that the City's motion should be denied because the City has not adequately explained their objections, and the exhibits can be admitted either through expert testimony or as a basis of the Gonzales Plaintiffs' expert opinions. (*Id.* at 3–4). The Gonzales Plaintiffs also provide specific responses as to why each exhibit is relevant and is admissible. (*Id.* at 5–13).

At the summary judgment stage, evidence need not be authenticated or otherwise presented in an admissible form. *Maurer v. Indep. Town*, 870 F.3d 380, 384 (5th Cir. 2017); *see also* Fed. R. Civ. P. 56(c). Rather, materials cited to support or dispute a fact need only be *capable* of being presented in a form that would be admissible at trial. Fed. R. Civ. P. 56(c)(2); *see also Lee v. Offshore Logistical & Transp., LLC*, 859 F.3d 353, 354–55 (5th Cir. 2017).

The City's motion to strike is without merit. First, the City has not adequately explained their objections. It has not explained to which portion of each exhibit it objects or identified any particular statement that is hearsay or that is irrelevant or prejudicial. As such, the City has made no showing that the substance or content of the exhibits are incapable of admission at trial. On that basis alone, the motion should be denied.

In contrast, the Gonzales Plaintiffs have adequately explained the relevance of each exhibit in both their Response to the Motion to Strike and their Response to the City's Motion for Summary Judgment. The Gonzales Plaintiffs have also sufficiently demonstrated that each exhibit could be presented in an admissible form at trial. Courts routinely consider summary judgment evidence in the form of news articles and other publications, and this evidence can often be admitted under Rule 803(18) as an exception to the rule against hearsay.

In this instance, thirteen of the exhibits at issue are cited in the expert report of Dr. Michael Sierra-Arevalo, the Gonzales Plaintiffs' designated expert on *Monell* liability. (*See* Sierra-Arevalo Report, Dkt. 244-44). One will be cited in a future supplemental report by Dr. Sierra-Arevalo. (Dkt. 288, at 12). The City has not challenged the admissibility of Dr. Sierra-Arevalo, and scholars like him routinely rely on secondary materials such as the ones cited here. Dr. Sierra-Arevalo's report extensively discusses the reliability of his documentary source materials, including peer-reviewed articles, law review articles, and "gray literature" put out by policing organizations. (*See id*. ¶¶ 28–41.) This provides sufficient indicia as a threshold matter that the cited exhibits are sufficiently "reliable

authority" for purposes of admissibility under Fed. R. Evid. 803(18), and are thus not excludable as

hearsay. Even if they were otherwise excludable as hearsay, the same portion of Dr. Sierra-Arevalo's

report establishes that the exhibits contain the kinds of facts and data on which "experts in the

particular field [of sociology or police science] would reasonably rely" under Fed. R. Evid. 703.

Thus, these exhibits either (1) cannot be excluded as hearsay or (2) can be admitted anyway as a

basis of the Gonzales Plaintiffs' expert's opinions.

As for the other six exhibits, the Court is satisfied by the Gonzales Plaintiffs' explanation

that the content within the articles can be admissible at trial either because they will not be used to

assert the truth of the matter asserted or are admissible under Rule 803(18). Accordingly, the Court

denies the City's Motion to Strike the Gonzales Plaintiffs' Summary Judgment Evidence.

### VI. THE CITY'S MOTIONS FOR SUMMARY JUDGMENT

The Court now turns to the merits of the City's motions for summary judgment. (Dkts. 167,

168). Plaintiffs seek to hold the City responsible for Gutierrez and Serrato's actions under a

municipal liability theory, asserting that they acted as a result of and in accordance with an

unconstitutional practice, custom, or policy of the City's. A city may not be held liable if the court

finds that the plaintiff's constitutional rights were not violated. *City of Los Angeles v. Heller*, 475 U.S.

796, 799 (1986); *Mace*, 333 F.3d at 625. Because the Court has found that Serrato did not violate

Gonzales' constitutional rights, the Court grants the City summary judgment on the Gonzales

Plaintiffs' *Monell* claims based on Serrato's use of force. The rest of this analysis will focus on

whether the City can be held liable for Gutierrez' alleged use of excessive force against both

Gonzales and Arellano.

The City argues that it is entitled to summary judgment on Plaintiffs' *Monell* claims because

Gutierrez did not violate Arellano or Gonzales' constitutional rights. (Dkt. 167, at 10; Dkt. 168, at

10). The City further contends that even if Plaintiffs can raise an issue of fact on the underlying

constitutional claims, Plaintiffs still do not have sufficient evidence to raise an issue of fact to demonstrate that Gutierrez' alleged excessive force was due to an unconstitutional City policy or practice. (*Id.*).

## A. Gutierrez' Alleged Constitutional Violation

Because Gutierrez did not move for summary judgment on Plaintiffs' Section 1983 excessive force claims against him, the Court first briefly analyzes whether Plaintiffs have raised a genuine issue of material fact on their claims against Gutierrez. As a reminder, to prevail on an excessive force claim, a plaintiff must show the conduct was under color of law and "that he was seized and that he suffered (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable." *Ballard,* 444 F.3d at 402 (cleaned up). Viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could find Gutierrez used excessive force when he shot Gonzales and Arellano.

As an initial matter, the City admits Gutierrez' conduct was under color of law. (*See* Answer, Dkt. 90, ¶¶ 139–140; Answer, Dkt. 91, ¶ 139). Regardless, if the jury credits Plaintiffs' evidence, then the jury could believe that Gutierrez engaged with Gonzales and Arellano in a road rage incident. Under Plaintiffs' view of the facts, Gutierrez allegedly shot Gonzales and Arellano without justification and then afterwards allegedly identified himself as a police officer on the 911 call to falsely claim Gonzales had threatened Gutierrez to defend his own misconduct. A reasonable jury could conclude that Gutierrez only responded with force because he was a police officer and believed he could use that fact to get away with shooting Gonzales and Arellano.

There is no doubt that Gonzales and Arellano were injured as a result of Gonzales' actions. There are, however, clear fact disputes that are relevant in determining whether Gutierrez' use of force was objectively reasonable due to the wildly different narratives of what happened during the first shooting. Viewing the incident under Arellano and the Gonzales Plaintiffs' account of the

events—as well as the physical evidence that conflicts with Gutierrez' account—all the *Graham* factors weigh against a finding of reasonableness. First, a reasonable jury could conclude that Gonzales and Arellano were not suspected of serious crimes. Under either account, Arellano was innocent, and Gutierrez himself acknowledged that fact. (Gutierrez Dep., Dkt. 235-10, at 121:21–25). Under Arellano's account, where Gonzales was not pointing a gun at Gutierrez, a jury could also conclude that Gonzales too was innocent of any suspected crime. (Arellano Dep., Dkt. 321-1, 214:13–19). Second, under Arellano's recounting, a jury could conclude that neither of them posed a threat to Gutierrez' safety or the safety of others. Finally, a jury could conclude that neither of them was resisting or attempting to evade arrest. If the jury credits her account, then Arellano was in fact urging Gonzales to de-escalate the situation by driving away. (*Id.* at 139:11–140:19). A similar fact dispute prevails as applied to Gonzales, as the jury could find he too was not resisting since he only verbally challenged Gutierrez according to Arellano's testimony. (*Id.* at 135:18–136:9, 139:3–14).

After resolving all material disputes of fact in favor of Arellano and the Gonzales Plaintiffs, as is required at this stage, a reasonable jury could find that Gutierrez violated the Constitution by using excessive force in shooting Arellano and Gonzales. Therefore, the Court cannot grant summary judgment to the City on the grounds that Gutierrez did not violate Plaintiffs' constitutional rights.

### B. Municipal Liability Legal Standard

The Court now turns to the central question in this *Monell* analysis: whether Plaintiffs have raised material issues of fact to demonstrate that Gutierrez' alleged use of excessive force was caused by an unconstitutional City policy, practice, or custom. Generally, municipalities, such as the City, are not vicariously liable for the constitutional torts of their employees. *See Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 692–93 (1978). Cities are almost never liable under Section 1983 for the isolated actions of their employees, and they can only be held liable for acts that are directly

attributable to it "through some official action or imprimatur." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). A municipality is liable under Section 1983 for its officers and employees' actions when they execute an official policy or custom. *Piotrowski*, 237 F.3d at 579. To establish municipal liability under Section 1983, a plaintiff must show: (1) an official policy (2) promulgated by the municipal policy maker (3) which was the moving force behind the violation of a constitutional right. *Id.*

A policy or custom is official only "when it results from the decision or acquiescence of the municipal officer or body with final policymaking authority over the subject of the offending policy." *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 737 (1989); *Peterson v. City of Fort Worth, Texas*, 588 F.3d 838, 847 (5th Cir. 2009). It is undisputed here that the City's Chief of Police for APD—at the time, Brian Manley ("Manley")—was the relevant policymaker, as he made all final decisions in enacting APD policy, disciplining officers, as well as hiring, firing, and retaining officers. (*See* Manley Dep., Dkt. 276-35, at 36:4–23; City Resp. Interrogs., Dkt. 244-65, at 5–6); *see, e.g.*, *Garza v. City of Donna*, 922 F.3d 626, 637 (5th Cir. 2019) ("Texas police chiefs are final policymakers for their municipalities").

"Official policy establishes culpability, and can arise in various forms." *Peterson*, 588 F.3d at 847. Official policy usually exists as written policy statements, ordinances, or regulations, but also may arise in the form of a widespread practice "so common and well-settled as to constitute a custom that fairly represents municipal policy." *Id.* A municipality's decision not to supervise or train its employees about their legal duty to avoid violating citizens' rights also may rise to the level of an official policy for purposes of Section 1983. *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989). A policy also can be shown in "extreme factual situations" where "the authorized policymakers approve a subordinate's decision and the basis for it," thereby ratifying the subordinate's unconstitutional actions. *Peterson*, 588 F.3d at 848 (cleaned

up). To establish the "moving force" element, a plaintiff must show a direct causal link between the policy and the constitutional violation. *Piotrowski*, 237 F.3d at 580; *Peterson*, 588 F.3d at 848.

Where a plaintiff alleges that his injury resulted from the lack of an appropriate policy, instead of from a facially unconstitutional policy, a plaintiff must establish municipal liability by showing that the city's failure to adopt a policy needed to circumvent predictable violations of federal law amounted to deliberate indifference. *James v. Harris County*, 577 F.3d 612, 617 (5th Cir. 2009). "[T]he plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision. Deliberate indifference is a high standard—a showing of simple or even heightened negligence will not suffice." *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010) (internal quotes and citations omitted).

### C. The City's Liability for Gutierrez' Alleged Excessive Force

Plaintiffs raise a number of different possible theories for how the City can be liable for Gutierrez' alleged excessive force. The Gonzales Plaintiffs argue that the City is liable because (1) Gutierrez created a state danger through his "road rage" behavior and then breached his duties with respect to the danger he created; (2) the City has deficient written policies related to use of force and use of deadly force; (3) the City has deficient written policies related to law enforcement actions while officers are off-duty; (4) the City inadequately trains its officers generally because it follows a "paramilitary police training model" and specifically because it provides inadequate training on use of force, use of firearms, off-duty law enforcement actions, traumatic head injuries, and report writing; (5) the City is liable for Gutierrez' failure to intervene in Serrato's shooting; and (6) the City is liable because it ratified the unconstitutional use of excessive force by Gutierrez. (Dkt. 246, at 28–45). Arellano, on the other hand, focuses on one additional argument: (7) Gutierrez' misconduct flowed directly from APD's longstanding practice of permitting excessive force by maintaining a

deficient investigative and disciplinary process and repeatedly failing to discipline the vast majority of its officers who engage in excessive force. Arellano argues that such a practice created a "dangerous culture of impunity" and caused Gutierrez' alleged use of excessive force against Arellano and Gonzales. (Dkt. 276, at 2). The Court addresses each theory of liability in turn.

### 1. State-Created Danger Theory

First, the Gonzales Plaintiffs argue that the City is liable under a state-created danger theory since Gutierrez created a threat of death or serious harm through his alleged road rage behavior leading up to the first shooting and then breached his duties with respect to the danger he created. (Dkt. 246, at 28–29). This theory of liability stems from the Due Process Clause of the Fourteenth Amendment, which provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "The Due Process Clause . . . does not, as a general matter, require the government to protect its citizens from the acts of private actors." *Fisher v. Moore*, 73 F.4th 367, 371 (5th Cir. 2023) (internal quotation omitted). A number of circuit courts have adopted a "'state-created danger' exception to the general rule, under which a state actor who knowingly places a citizen in danger may be accountable for the foreseeable injuries that result." *Id.* at 371–72.

The problem for the Gonzales Plaintiffs is that the Fifth Circuit has not adopted the state-created danger theory of liability and has "repeatedly declined to recognize" it. *Id.* at 372. While the Fifth Circuit has recently stated that it has "not categorically ruled out the doctrine," it also has been reluctant to recognize the theory because the Supreme Court has recently emphasized that substantive due process is a "disfavored doctrine." *Id.* at 372–73 (cleaned up). Given the Fifth Circuit's repeated reluctance to recognize the state-created danger doctrine and its instruction to consider excessive force claims under the Fourth Amendment, rather than the substantive due

process clause of the Fourteenth Amendment, *see Cuadra*, 626 F.3d at 814, the Court dismisses this theory of liability.

### 2. The City's Written Use of Force Policies

Second, the Gonzales Plaintiffs criticize the City's use of force and use of deadly force policies. APD General Order 200 ("GO 200"), which was in effect on the date of this incident, is APD's use of force or response to resistance policy. (*See* Dkt. 167-1, at 66–73). It provides that, "it is the policy of this department that officers use only that amount of objectively reasonable force which appears necessary under the circumstances to successfully accomplish the legitimate law enforcement purpose in accordance with this order." (Dkt. 265, at 2). The policy then provides APD officers with thirteen factors that they should consider when assessing whether to apply any level of force. (*Id.* at 3). It instructs officers that assessment of the use of force "shall be ongoing" as "the circumstances of a situation change." (*Id.* at 2). As for deadly force, GO 200 states:

> An officer has no duty to retreat and is only justified in using deadly force against another when and to the extent the officer reasonably believes the deadly force is immediately necessary to (Tex. Penal Code § 9.51(c) and (e)):
>> (a) Protect himself or others from what he reasonably believes would be an imminent threat of death or serious bodily injury.
>> (b) Make an arrest or to prevent escape after arrest when the officer has probable cause to believe that:
>>> 1. The subject has committed or intends to commit an offense involving the infliction or threatened infliction of serious bodily injury or death; or
>>> 2. The officer reasonably believes that there is an imminent or potential risk of serious bodily injury or death to any other person if the subject is not immediately apprehended.

(*Id.* at 3–4).

An official, written policy is "itself" unconstitutional only if it "affirmatively allows or compels unconstitutional conduct." *Edwards v. City of Balch Springs, Texas*, 70 F.4th 302, 309 (5th Cir. 2023). Instead, "where such an official, written policy merely commits some decisions to an

individual officer's on-the-scene discretion, or gives some detailed instructions while omitting others, then that policy satisfies *Monell*'s moving-force element only if those features stem from the policymaker's deliberate indifference." *Id.* The Gonzales Plaintiffs argue that GO 200 is defective because it did not provide sufficient guidance to officers on the legal limits of an officer's discretion to use force and lethal force in specific situations. (Dkt. 246, at 13). They critique the policy for not providing a definition of "resistance" and for overemphasizing the *Graham* use of force factors which promote officer discretion without adequately establishing the limits of that discretion. (*Id.* at 13–14). Notably, while the Gonzales Plaintiffs argue that this policy is "defective," they do not argue why the policy is unconstitutional. It is unclear how a policy which emphasizes the *Graham* factors can be unconstitutional when those factors are the actual standards by which courts evaluate use of force. Contrary to the Gonzales Plaintiffs' contention, GO 200 does provide a non-exhaustive list of thirteen factors that officers are to consider when determining whether to apply any level of force and evaluating whether an officer's use of force is objectively reasonable. The Gonzales Plaintiffs have not shown how these factors are insufficient to rein in officer discretion. Because nothing in APD's use of force policy affirmatively allows or compels unconstitutional conduct, it is not facially unconstitutional.[8]

The Gonzales Plaintiffs also argue that APD's lethal force policy was "defective" because it permitted an officer to use force based on the officer's perception that the subject may have engaged in "preparatory resistance"—actions that are not actual resistance but indicate possible future resistance. (Dkt. 246, at 14). In support of this proposition, the Gonzales Plaintiffs and their expert cite the City's Dynamic Resistance Response Model ("DRRM"), the City's use of force model,

---

[8] The Gonzales Plaintiffs also contend that APD's written use of force policy did not comply with federal standards. (Dkt. 246, at 13–14). This contention is not supported by the Gonzales Plaintiffs' own evidence. Their expert report, which the Gonzales Plaintiffs cite for this proposition, states that the content of GO 200 is "largely in line with best practices." (Sierra-Arevalo Report, Dkt. 244-44, at ¶ 96).

contained in APD training materials, that categorizes all perceived threats according to six resistance categories—from not resistant to deadly resistant. (Sierra-Arevalo Report, Dkt. 244-44, ¶¶ 110–117; *see also* Dkt. 244-62, at 15). The problem with the Gonzales Plaintiffs' argument is that neither the City's use of force policy nor the DRRM permit use of force based on "preparatory resistance" alone. As laid out above, GO 200's lethal force policy only permits an officer to use deadly force when the officer reasonably believes that deadly force is immediately necessary to protect himself or others from an imminent threat of death or serious bodily injury. As for the DRRM, it does recognize one category of resistance called "prepatory [sic] resistant," which is when a suspect is exhibiting another, lower level of resistance but may be preparing to offer greater resistance. (Dkt. 244-62, at 21). The DRRM, however, does not authorize an officer to use force solely when an officer recognizes that a subject may be preparing to offer resistance. It simply states that an officer must look out for signs of preparatory resistance to adjust his tactics for such a change in resistance. Even under this category of resistance, the DRRM states that "the appropriate degree of force would depend on the articulable and specific threat perceived by the officer." (*Id.* at 21–22). Nothing in the APD's deadly force policy or DRRM affirmatively allows or compels unconstitutional conduct, and so it too is not facially unconstitutional.

The Gonzales Plaintiffs also contend that the City is liable for constitutional violations arising from Gutierrez' failure to give a deadly force warning prior to using lethal force against Gonzales. (Dkt. 246, at 35–36). APD's General Order 202.1.1 provides "Where feasible, a warning should be given before an officer resorts to deadly force . . . . A specific warning that deadly force will be used is not required by this order; only that a warning be given if feasible." (Dkt. 167-1, at 74–75). This policy is consistent with the requirements of *Tennessee v. Garner*, 471 U.S. 1 (1985), which "requires a warning before deadly force is used 'where feasible,'" *Cole v. Carson*, 935 F.3d 444, 453 (5th Cir. 2019) (quoting *Garner*, 471 U.S. at 11–12). The Gonzales Plaintiffs have provided no

details as to how APD's policies and training are unconstitutional or otherwise defective on this issue.

Moreover, as to all these use of force policies, the Gonzales Plaintiffs have not satisfied *Monell*'s moving force causation element. They offer no evidence that the moving force of Gutierrez' alleged excessive force was the application of APD's use of force policies Accordingly, the Gonzales Plaintiffs' claim that APD's use of force policies are unconstitutional is without merit.

### 3. The City's Written Off-Duty Law Enforcement Actions Policy

The Gonzales Plaintiffs also challenge APD's policies regarding off-duty law enforcement actions. APD's Off-Duty Law Enforcement Actions policy, General Order 364 ("GO 364"), provides in pertinent part as follows:

> **364.1 PURPOSE AND SCOPE**
> The decision to become involved in a law enforcement action when off-duty can place an officer as well as others at great risk and must be done with careful consideration. This order is intended to provide guidelines for officers of the Austin Police Department with respect [sic] taking law enforcement action while off-duty. The same standard of objective reasonableness that applies to on-duty enforcement actions shall also apply to off-duty enforcement actions.
>
> **364.2 POLICY**
> Initiating law enforcement action while off-duty is generally discouraged, particularly when officers are outside their jurisdiction. Reporting to the appropriate law enforcement agency and safe monitoring of suspected criminal activity is favored.
> (a) Officers should not attempt to initiate enforcement action when witnessing minor crimes; Officers are not expected to place themselves in unreasonable peril.
> (b) Officers who becomes aware of an incident or circumstance that he reasonably believes poses an imminent threat of serious bodily injury or death, or significant property damage, should take reasonable action to minimize the threat.
> (c) Officers must remember that their authority to arrest may be limited based upon their jurisdiction.

**364.4 DECISION TO INTERVENE**
Generally, off-duty officers should consider waiting for on-duty uniformed officers to arrive and gather as much accurate intelligence as possible instead of immediately intervening.
(a) Officers should take into consideration the following factors when making a decision on whether or not to intervene:
1. The tactical disadvantage of being alone and the fact there may be multiple or hidden suspects.
2. The inability to communicate with responding units.
3. The lack of equipment, such as handcuffs, OC or baton.
4. The lack of cover.
5. The potential for increased risk to bystanders if the off-duty officer were to intervene.
6. Unfamiliarity with the surroundings.
7. The potential for the off-duty officer to be misidentified by other peace officers or members of the public.

(Dkt. 167-1, at 297–98). GO 364 also states that "[u]nless there is an exigent circumstance, employees shall refrain from handling police incidents of personal interest (e.g., family or neighbor disputes). When practicable, employees should report the matter to 9-1-1 so that an on-duty officer can respond." (*Id.* at 298). Further, the policy allows APD officers to "carry firearms while off-duty in accordance with federal and state law and department general orders." (*Id.* at 297).

Similar to their arguments regarding APD's use of force policies, the Gonzales Plaintiffs once again argue that GO 364 is "defective" because it "leaves off-duty law enforcement decisions to the unguided discretion of the officer." (Dkt. 246, at 21). However, as is the case with the City's use of force policies, this critique is unpersuasive. It is not true that the policy gives officers unbridled discretion. The policy explicitly states that initiating law enforcement action while off-duty is "generally discouraged." The policy also provides officers with specific guidelines to use when considering whether to intervene while off-duty and provides that the same standard of objective reasonableness that applies to on-duty enforcement actions shall also apply to off-duty enforcement actions. Because the policy does not affirmatively allow or compel unconstitutional conduct, it is not facially unconstitutional.

The Gonzales Plaintiffs criticize the policy for not providing guidance on "specific known examples" of off-duty involvement such as "off-duty 'road rage' events" and failing to provide sufficient guidance regarding "contextual factors unique to off-duty situations." (Dkt. 246 at 21–22). They contend that APD has "long been aware of its need to provide specific training on off-duty topics" to avoid abuse by officers in matters of personal interest, including personal "road rage" encounters. (*Id.* at 22). "[A] written policy is not facially unconstitutional just because it leaves out 'detailed guidance that might have averted a constitutional violation.' If it were otherwise, a … policy would be facially unconstitutional only if it recited every jot and tittle of the applicable caselaw." *Edwards*, 70 F.4th at 310 (quoting *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 392 (8th Cir. 2007)). Instead, the City's failure to include such a specific point of training must amount to deliberate indifference to the constitutional rights of the public. *See id.*; *see also Szabla*, 486 F.3d at 392. The Gonzales Plaintiffs cite the following pieces of evidence in support of a finding that the City was deliberately indifferent in not updating their off-duty policy to provide specific guidance on road rage incidents: a 2020 memo detailing a disciplinary action taken against an APD officer who was involved in a road rage incident while off-duty, (Dkt. 244-31); a chart summarizing IA disciplinary actions for APD officers alleged to have violated the off-duty policy from 2012 to 2021, (Dkt. 244-66, at 5; Dkt. 244-30);[9] a 2014 news article about a Harris County off-duty officer involved in a deadly road rage incident, (Dkt. 244-32); and expert testimony stating that cases of off-duty officer road rage incidents have been documented across the county, (Sierra-Arevalo Report, Dkt. 244-44, ¶¶ 263).[10]

---

[9] This chart seems to represent all allegations of violations of the off-duty policy, but not specific allegations based on road rage incidents.

[10] The Gonzales Plaintiffs cite two additional pieces of evidence: a 2023 article regarding a second off-duty APD officer involved in a road rage incident, (Dkt. 244-33), and a 2024 memo from OPO suggesting amendments to the City's off-duty policy, (Dkt. 244-16). Because both documents post-date the incident in this case, they cannot support a finding that the City was deliberately indifferent in failing to amend its off-duty policy prior to 2021.

This evidence does not show that the City had a history of off-duty police officers unreasonably using force while part of road rage incidents, such that the need for additional training was plain. *See City of Canton*, 489 U.S. at 390 & n.10 (describing how a pattern of constitutional rights violations can support a finding of deliberate indifference). On the contrary, the evidence shows one clear incident of an off-duty APD officer being involved in a road rage incident prior to 2021, and that the City has disciplined officers for violations of the off-duty policy. The Gonzales Plaintiffs have not shown that the City's failure to offer officers specific guidelines on how to handle road rage incidents while off-duty is unconstitutional. Nor have the Gonzales Plaintiffs presented evidence that the moving force of Gutierrez' use of alleged excessive force was the application of APD's off-duty policy. As such, the Gonzales Plaintiffs' claim that APD's off duty policy is unconstitutional also fails.

### 4. Failure to Train

The Gonzales Plaintiffs next contend that various aspects of the City's training of APD officers are deficient and are the causes of Gutierrez' alleged use of excessive force. For their inadequate training claims, the Gonzales Plaintiffs must prove that: (1) the City's training policy or procedures were inadequate, (2) the inadequate training policy was a "moving force" in causing the violation of Gonzales' rights, and (3) the City was deliberately indifferent in adopting its training policy. *Sanders-Burns v. City of Plano*, 594 F.3d 366, 381 (5th Cir. 2010). The Gonzales Plaintiffs must show that "in light of the duties assigned to specific officers or employees, the need for more or different training is obvious, and the inadequacy so likely to result in violations of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton,* 489 U.S. at 390. Claims of inadequate training generally require that the plaintiff demonstrate a pattern of similar violations. *Sanders-Burns*, 594 F.3d at 381. However, a showing of deliberate indifference is possible, though difficult, to prove through a single incident.

The "single incident exception is narrow and to rely on the exception a plaintiff must prove that the highly predictable consequence of a failure to train would result in the specific injury suffered, and that the failure to train represented the moving force behind the constitutional violation." *Id.* (cleaned up). The Gonzales Plaintiffs have not met their burden on these elements as to their various failure to train claims.

The Gonzales Plaintiffs first argue that APD inadequately trained Gutierrez on the use of force by basing his training on a paramilitary training model. (Dkt. 246, at 15). They base this argument on two pieces of evidence: a 2021 evaluation of the APD Training Academy performed by Kroll Associates, Inc., which was commissioned by OPO in consultation with the City Manager's Office, (Dkt. 244-58), and a video series which depicts portions of APD cadet training in 2012, (Dkt. 244-56). The Gonzales Plaintiffs rely on portions of the Kroll Report and these videos to argue that APD's paramilitary training practices:

> emphasized strict adherence to chain-of-command; used group punishment as discipline for individual infractions; used purposeful exposure to high-stress situations; emphasized physical combat training; emphasized defensive tactics, use of weaponry, and deployment of physical force; used "boot camp" style training techniques; used mental and physical repetition to instill lessons at the level of instinct; and used training techniques intended to elevate an officer's identity as a member of a group (the police department) above the officer's own individual self-identity.

(Dkt. 246, at 16). They argue that the negative side effects of a paramilitary model include: (1) "the creation and fostering of a 'warrior mindset' in officers as a result of repeatedly triggering a cadet's 'fight or flight' survival instincts throughout police training"; (2) "cultivation and reinforcement of an 'us versus them' mentality that shapes officers' interactions with civilians"; and (3) "exacerbation of officers' fear and anxiety such that they are more likely to use excessive and unnecessary force out of an overconcern for their own safety." (*Id.* at 19). The Gonzales Plaintiffs allege that the City has "long known that APD's paramilitary-style of police training causes" these harmful side effects due

to the longstanding police research into the negative effects of this type of police training. (*Id.* at 17, 19–20).

The Court finds that the Gonzales Plaintiffs have not presented sufficient evidence to sustain their failure to train claim as to the alleged deficiencies in the City's use of force training. The City provides evidence that it provides 800 hours of training to its officers, including over 600 hours certified by the Texas Commission on Officer Standards and Education ("TCOLE") and that APD's training requirements far exceed the minimum TCOLE hours required by the State of Texas. (Chancellor Decl., Dkt. 167-2, ¶ 3). Compliance with state training minimums "counsels against" a finding of failure to train. *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 171 (5th Cir. 2010). The training program includes training on a range of subjects including the use of force and the escalation and de-escalation of officer-applied force in responses to actions by a subject. (*Id.* ¶¶ 4–5). A review of the lesson plans and training materials cited by Plaintiffs also confirms that APD's training was extensive and consistent with legal standards. (*See, e.g.*, Dkts. 244-86, 244-87, 244-88, 244-89, 244-90). Indeed, many of the attributes of the paramilitary model that the Gonzales Plaintiffs critique—exposure to stressful situations, instilling lessons about instinct, emphasizing an officer's survival instincts—are expected characteristics of a police training curriculum. As such, the Gonzales Plaintiffs have not established that the City's use of force training is inadequate.

Additionally, the Gonzales Plaintiffs have not met their burden in proving that the alleged paramilitary nature of APD's training proximately caused this incident. The Gonzales Plaintiffs try to connect the training to this incident by contending that APD's "fear-based training" caused an excessive degree of fear in Gutierrez that triggered a "trauma-like fight/flight physiological response" in his body, which caused him to misperceive events that were taking place. (Dkt. 246, at 38–39). This argument is speculative and not supported by the record. Gutierrez did testify that he was fearful during the events leading up to the first shooting. (*See* Gutierrez Dep., Dkt. 235-10, at

25:10-29:8, 70:3-15, 86:19-87:5). However, there is no evidence to suggest that this fear was caused by some physiological response that was ingrained in Gutierrez due to APD training, rather than the average flight or flight response that all people experience. In short, the Gonzales Plaintiffs have not proven that the City had an inadequate use of force training program that caused Gutierrez' alleged use of excessive force.

The Gonzales Plaintiffs also challenge the City's firearms training. They allege that "APD has long known that survival-centric training used for police firearms training will result in officers who are prone to overreact in real-life situations when they unreasonably perceive a lethal force danger . . . ." (Dkt. 246, at 20–21). However, the Gonzales Plaintiffs' exhibits that purportedly support this statement are not even APD documents and do not mention APD at all. (*See* Dkts. 244-74; 244-75; 244-76). Similarly, Plaintiff contends that APD "has long known that this aspect of its firearms training is likely to lead to police use of lethal force and excessive lethal force." (Dkt. 246, at 21). Yet, the Gonzales Plaintiffs' citations to their academic expert's report for this proposition do not discuss APD's firearms policy or APD's knowledge of ramifications of its firearms policy at all. (*See* Sierra-Arevalo Report, Dkt. 244-44, ¶¶ 77–80, 82–84, 104–117, 124–126; 144–154). Instead, the evidence shows that APD provides extensive firearms scenario-based training using live actors and environmental factors to recreate stress levels that officers will be faced with while on duty. (*See, e.g.*, Wise Dep., Dkt. 265-4, 36:12–38:11, 42:24–43:13, 99:25–102:4). APD's firearms training includes repetitive mechanical training so that officers can instinctively unholster and draw their firearm so they can focus more on interacting with suspects. (*Id.* at 44:14–47:16). Additionally, APD firearms qualification training is more stringent than the training required by TCOLE. (*Id.* at 90:6–91:6). As such, the Gonzales Plaintiffs have not established that APD provides inadequate firearms training or that they were deliberately indifferent in adopting that training.

The Gonzales Plaintiffs next contend that APD provides inadequate training on off-duty law enforcement actions. (Dkt. 246, at 21–23). It is undisputed that APD provides training to its cadets and officers on APD's off-duty policy, and that Gutierrez received training on the off-duty policy. (*See* Chancellor Decl., Dkt. 167-2, ¶¶ 4, 9; Dkt. 244-6, at 17–18; Gutierrez Dep., Dkt. 235-10, at 68:19–69:10). The Gonzales Plaintiffs do not provide evidence demonstrating how the training on the off-duty policy was inadequate or how any inadequate training on the off-duty policy was the actual cause of the alleged constitutional violation here. Moreover, as stated above, the Gonzales Plaintiffs cannot establish that the City was deliberately indifferent in adopting an off-duty policy that did not contain specific training on off-duty incidents of personal interest, such as road rage incidents. The Fifth Circuit's recent unpublished decision in *York v. Welch*, 2024 WL 775179, No. 20-40580 (5th Cir. Feb. 26, 2024), is instructive on this point. In *York*, the Fifth Circuit held that the absence of training on the use of tasers while off duty constitutes the "sort of nuance [that] simply cannot support an inference of deliberate indifference." *Id.* at *6 (quoting *Connick*, 563 U.S. at 67). So too here, the absence of training on specific off-duty incidents such as road rage incidents cannot support an inference of deliberate indifference. As such, this inadequate training claim also fails.

The Gonzales Plaintiffs further claim that APD's training on traumatic head injuries was inadequate. (Dkt. 246, at 23). They allege that Gutierrez did not receive state-mandated training on how to recognize and deal with citizens suffering a traumatic head injury. (*Id.*). However, the City provides evidence demonstrating that Gutierrez received training from APD on traumatic head injuries as part of the Basic Peace Officers course. (*See* Chancellor Decl., Dkt. 167-2, ¶ 4; Dkt. 167-2, at 8–16; Dkt. 244-17; Dkt. 244-18). The Gonzales Plaintiffs provide no other evidence as to how APD's training on this issue was actually inadequate, how any alleged inadequacy with the training caused this incident, or how APD was deliberately indifferent in adopting its training on traumatic head injuries. Accordingly, this claim is also without merit.

Finally, the Gonzales Plaintiffs also make a brief argument that APD is liable for alleged false and misleading statements made by Gutierrez after the first shooting incident which could have led to the second shooting by Serrato. (Dkt. 246, at 40–41). As evidence that APD's training was a moving force of Gutierrez' statements, Plaintiffs cite a portion of APD's materials on report writing, (*See* Dkt. 244-90), and a segment of Gutierrez' deposition where he confirms that he received training on report writing, (Gutierrez Dep., Dkt. 235-10, at 432:6–437:8). Yet, the alleged false and misleading statements of Gutierrez were not contained in a report—they were in a 911 call—and Plaintiffs fail to explain how APD's training on effective report writing was either inadequate or could possibly have been the actual cause of either shooting. Accordingly, the Gonzales Plaintiffs' final inadequate training claim also fails.

### 5. Failure to Intervene

The Gonzales Plaintiffs contend that the City is liable for Gutierrez' alleged failure to intervene and stop Serrato's alleged constitutional violation. "An officer is liable for failure to intervene when that officer: (1) knew a fellow officer was violating an individual's constitutional rights, (2) was present at the scene of the constitutional violation, (3) had a reasonable opportunity to prevent the harm but nevertheless, (4) chose not to act." *Joseph v. Bartlett*, 981 F.3d 312, 319 (5th Cir. 2020). Here, this claim fails because the Court has already found that Serrato has not committed a constitutional violation. Further, the Gonzales Plaintiffs have not met their burden to prove that the City is liable under *Monell* either for an unconstitutional policy or practice on the duty to intervene or inadequate training on the duty to intervene. It is undisputed that APD has a policy on an officer's duty to intercede. (Dkt. 167-1, at 67). The Gonzales Plaintiffs offer no argument or evidence on how APD's Duty to Intercede policy is unconstitutional or deficient. They likewise offer no argument or evidence that APD's training on the duty to intercede is inadequate, how any training inadequacy on the duty to intercede actually caused the alleged violation or how the City was

deliberately indifferent with regard to its training on this topic. As a result, the City cannot be liable solely under a failure to intervene theory.

### 6. Ratification

The last argument that the Gonzales Plaintiffs make is that the City is liable because a reasonable jury could find that the City ratified Gutierrez' alleged use of excessive force. (Dkt. 246, at 43). The Gonzales Plaintiffs' theory of ratification rests on the fact that Chief Chacon decided not to discipline Gutierrez after reviewing the results of the IA investigation into the incident whereas the OPO and the CPRC both recommended discipline on the review of the same facts as were before Chacon. They allege that Chacon was on notice that he needed to act and disavow Gutierrez' actions but nonetheless chose to restore him to full employment. (*Id.* at 43–45).

In *City of St. Louis v. Praprotnik*, a plurality of the Supreme Court provided that if "authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." 485 U.S. 112, 127 (1988). In the Fifth Circuit, the theory of ratification, however, has been limited to "extreme factual situations." *Peterson,* 588 F.3d at 848. Therefore, unless the subordinate's actions are sufficiently extreme, a policymaker's ratification or defense of his subordinate's actions is insufficient to establish an official policy or custom. *Id.* Further, the Fifth Circuit has explained that its precedent "does *not* stand for the broad proposition that if a policymaker defends his subordinates and if those subordinates are later found to have broken the law, then the illegal behavior can be assumed to have resulted from an official policy." *Coon v. Ledbetter,* 780 F.2d 1158, 1161 (5th Cir. 1986) (emphasis in original). Instead, a municipality can be held liable under a theory of ratification only if the version of the story ratified by the municipality was "manifestly indefensible." *Id.* at 1162.

The Court finds that the Gonzales Plaintiffs have not presented sufficient argument or evidence on their ratification claim. Under Gutierrez' version of the first shooting, he used force in

response to Gonzales pointing a gun at him. Although key pieces of evidence contradict Gutierrez'

version of the events, this version, as accepted by the City, is not "manifestly indefensible."

Moreover, the Court does not find that this case presents the "extreme factual situations" required

by the Fifth Circuit to sustain a ratification claim. *Compare Grandstaff v. City of Borger*, 767 F.2d 161

(5th Cir.1985) (finding ratification in case in which officers "poured" gunfire onto a truck and killed

innocent occupant), *with Snyder v. Trepagnier*, 142 F.3d 798, 798 (5th Cir. 1998) (refusing to find

ratification in case in which officer shot fleeing suspect in the back), *and with Peterson*, 588 F.3d at 848

(declining to find ratification where during a post-incident investigation, a police chief determined

that the offending officers' conduct "complied with the department policies"). In essence, the

Gonzales Plaintiffs' ratification claim boils down to one that seeks to hold the City liable due to

Chacon's decision to defend Gutierrez' decisions, even if a jury later finds that Gutierrez' actions

were unlawful. Because the Fifth Circuit's ratification doctrine does not recognize liability for such

an argument, the Gonzales Plaintiffs' ratification claim cannot succeed.

### 7. Practice of Permitting Excessive Force

The Court now turns to Arellano's main argument for *Monell* liability. Arellano alleges that

the City has a longstanding practice of not investigating the majority of APD officers' uses of force

and not disciplining officers who engaged in excessive force. (Dkt. 276, at 48). She argues that this

custom persisted due to successive police chiefs' decisions to never reform key deficiencies in APD's

disciplinary practices—deficiencies such as: "filtering complaints so formal investigations were rare,

constraining those investigations so discipline for use of force was even more scarce, rarely

disciplining blatant excessive force even when it was obvious despite a biased or cursory

investigation, and never disciplining officers for failing to intervene." (*Id.*). Arellano contends that

these decisions created a practice permissive of excessive force—a "culture of impunity"—which

was the official policy of the City for the years preceding this incident. She argues that this culture, in

turn, caused Gutierrez to allegedly engage in a road rage incident with Gonzales and Arellano, use excessive force against them, and falsely report the incident as being Gonzales' fault because Gutierrez knew he could get away with it. (*See id.*).[11] The City denies that Arellano has produced evidence of a custom of allowing excessive force and denies that any such custom actually caused the constitutional violation in this case. (*See* Dkt. 282).

### a. Evidence of an Official Custom and Deliberate Indifference

Arellano presents various pieces of evidence to demonstrate that the City had an unwritten but long-standing practice of not disciplining nearly all incidents of excessive force and that the City was deliberately indifferent in not reforming such a practice. Municipal liability claims based on a local government's practices generally require that the plaintiff establish a pattern of conduct because "one act is not itself a custom." *Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002). To prove a pattern or practice, the plaintiff must present evidence of "sufficiently numerous prior incidents of police misconduct." *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989) (cleaned up). When prior incidents are used to prove a pattern, they "must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees." *Webster v. City of Houston*, 735 F.2d 838, 842 (5th Cir. 1984). A pattern also requires "similarity and specificity," such that the pattern "point[s] to the specific violation in question." *Peterson*, 588 F.3d at 851.

---

[11] Although the Gonzales Plaintiffs did not specifically argue that the City is liable due to an alleged practice of permitting excessive force, the Court considers the theory as applied to Gutierrez' use of alleged excessive force against both Arellano and Gonzales because, if accepted by a jury, such an official City policy could be found to be the moving force behind both shootings.

i. Prior Incidents

Arellano first provides evidence of 20 high-profile incidents where APD officers allegedly engaged in excessive force from 2009 until this incident in 2021. (Dkt. 276, at 9–24). She also provides evidence of three specific incidents in which APD officers used excessive force during the May 2020 Black Lives Matter protests, which occurred only months before the alleged excessive force in this case. (*Id.* at 24–26, 52–53). The City contends that many of these incidents should not be considered because the incidents cited are not substantially similar to the shootings in this case. (*See* Dkt. 282, at 3–9). The Court agrees that four incidents in which juries found that officers did not use excessive force should be excluded.[12] However, enough information is presented about the other 16 high-profile incidents that, if true, would suggest that they involved excessive force,[13] and the officers involved in those incidents faced no or minor discipline as a result of the use of force. The three protest-related incidents cited by Arellano also involve sufficient allegations of excessive force where officers were not disciplined even as they were indicted by a grand jury. As such, the Court finds that these 19 incidents are sufficiently similar to the instant incident to be considered as potential evidence of a pattern permissive of excessive force.[14]

The Court must determine whether these 19 incidents can constitute evidence of a pattern. The Fifth Circuit's decision in *Peterson v. City of Fort Worth* is helpful in this regard. 588 F.3d 838. In *Peterson*, the plaintiff alleged that the City of Fort Worth had an unwritten policy permitting excessive force based on 27 complaints of such force between 2002 and 2005. The incidents cited by the plaintiff included alleged uses of force "that, if true, would be emphatically excessive." *Id.* at 851. Yet

---

[12] These are the incidents involving Byron Carter, Jr., Caroline Callaway, Grady Bolton, and Justin Scott.
[13] In fact, in at least two of these incidents—those involving Pete Hernandez and Landon Nobles—juries found the officers to have committed excessive force.
[14] These are the incidents involving Nathaniel Sanders and Sir Smith, Carlos Chacon, Pete Hernandez, Hunter Pinney, Jawhari Smith, Joseph Cuellar, Breaion King, Richard Munroe, Gregory Jackson, Jason Roque, Landon Nobles, Justin Grant, Michael Yeager-Huebner, Javier Ambler, Paul Mannie, and Michael Ramos. The protest-involved incidents are those involving Nicole Underwood, Anthony Evans, and Meredith Drake.

the court found that the plaintiffs failed to establish a pattern, given the size of the Fort Worth police department and the absence of contextual information about the number of arrests during that three-year period. Here, Arellano presents evidence of fewer incidents of excessive force over a significantly longer period of time, ten years. APD is also a larger force than the force in *Peterson. See Ambler v. Nissen*, No. 1:20-CV-1068-DII-SH, 2023 WL 4879903, at *11 (W.D. Tex. July 31, 2023), *report and recommendation adopted*, No. 1:20-CV-1068-DII, 2023 WL 6168253 (W.D. Tex. Sept. 21, 2023). Arellano also does not provide context for her evidence, such as the number of arrests or how her evidence compares to other law enforcement departments of similar size. Accordingly, under *Peterson*, Arellano's 19 similar cited incidents alone cannot constitute sufficient evidence of a pattern. Instead, these incidents must be considered alongside Arellano's other evidence.

ii. Statistical Evidence

Arellano next presents certain statistical evidence. She points to reports from the former Office of the Police Monitor ("OPM"), which show that citizens made a total of 815 allegations of excessive force to OPM between 2004 and 2015. (Dkt. 276, at 28 & n.182). However, Arellano does not provide details for the uses of force which make up these 815 allegations. As such, these statistics provide no information to support a conclusion that the incidents behind the statistics actually involved excessive force, rather than mere allegations. *Cf. Pineda*, 291 F.3d at 329 (considering only complaints for which offense reports were provided out of 500 narcotics complaints).

Arellano also provides statistics from a survey of police camera footage conducted by the City's independent contractor, Kroll Associates. (*See* Kroll Report, Dkt. 276-39, at 4). Kroll examined a six-month period in 2019 and evaluated 1,321 incidents. It reviewed incident reports and accompanying body camera and dashboard videos to determine whether APD's use of force incidents during this timeframe were appropriate and reported accurately. (*Id.*). In the end, Kroll

found that 91.5% of the incidents were appropriate uses of force. (*Id.* at 74). However, it identified 112 use of force incidents—approximately 8.5% of the incidents reviewed—that "contained issues of concern." Of those 112 incidents which raised concern, Kroll determined that 82 cases involved a use of force that was "unnecessarily escalated or inappropriate." (*Id.*). For all but one of these 82 incidents, the officers' supervisors simply approved the uses of force, so no further investigations were conducted. (*Id.* at 5, 85). Kroll's report concluded that "The APD use of force process appears to lack proper internal supervisory review and investigation, and thus frequently fails to address the appropriateness of the use of force used against members of the public." (*Id.* at 5).

Arellano compares the rate of excessive force found over that six-month period in 2019 to the rate of APD's force-related discipline over the ten years before the shootings in this case. During the same time period in 2019 that Kroll assessed, APD disciplined only 6 officers arising from uses of force—on average, 1 officer per month. (Dkt. 276-41). But Kroll found that there were 82 incidents of excessive force over the same six-month period—or 13.7 incidents of excessive force on average per month and 164 incidents per year. Stepping back even further, the rate of 1 officer disciplined per month is the same if APD's force-related discipline rate is calculated for the ten years preceding this incident, from January 2010 through January 2021. (*Id.*).[15] Arellano argues that if one assumes that the six-month period reviewed by Kroll is a representation of an average six-month period over the years preceding the incident in this case, then, per month, 1 of 13.7 excessive force incidents received discipline—only 7%. Accordingly, she contends that an average of 93% of incidents where APD officers used excessive force—over 152 cases per year[16]—resulted in "no

---

[15] In other words, there were 120 instances of discipline arising from use of force from January 5, 2010, through January 5, 2021, which is a 120-month period. (Dkt. 276-41). This number includes even minor force-related disciplinary actions, such as oral reprimands for violations of the "attitude and courtesy" policy. (Dkt. 276, at 31).

[16] 164 cases per year minus 12 officers disciplined per year is 152 cases of excessive force per year that received no discipline.

investigation other than a supervisory rubber-stamp and no discipline for ten years before" this incident. (Dkt. 276, at 31).[17] Arellano points to testimony from her expert, a former police chief, who opined that a police chief of a large police department would be expected to know if over half of excessive force incidents were not investigated or disciplined. (Howse Decl., Dkt. 276-136, at 2–4).

The City contends that the Kroll report statistics, like the statistics from the OPM reports, provide little to no context concerning any of the use of force incidents analyzed by Kroll, and thus the Court cannot determine whether the incidents behind these statistics were officer-involved shootings or otherwise substantially similar to the incident in this case. (Dkt. 282, at 13). The City further argues that the concerns raised by Kroll regarding officers' supervisors not recommending further investigation are not indicative of any inadequate investigation of this incident or other officer-involved shootings because those incidents are always investigated by Internal Affairs. (*Id.* at 13–14). The City's argument is well-taken but unavailing at this stage. While we do not know the factual details surrounding each excessive force incident, the City's own agent determined that these incidents involved excessive force. The City cannot now question the determination of the experts it itself hired. Further, viewing the Kroll data in the light most favorable to Arellano, even if some of these excessive force incidents were not officer-involved shootings, it is reasonable that a jury could conclude that the rate of non-shooting, excessive force incidents and the non-discipline of the majority of those incidents could still support Arellano's overall argument that the City encourages a

---

[17] The Court's calculation is slightly different than Arellano's. Arellano argues that 88% of excessive force incidents went undisciplined, (Dkt. 276, at 31), but this percentage seems to be the result of a mistake in Arellano's math. Arellano's claim is based on the following calculation: "Kroll found 82 incidents in six months, or 8.2 incidents per month. 1 is 12.2% of 8.2." (*Id.* at 31 n. 196). However, the correct calculation would be that 82 incidents over six months is 13.7 incidents per month. 1 (for one officer disciplined per month) is then approximately 7% of 13.7. Accounting for this correction, the statistic would be even more favorable to Arellano's claim: an average of 93% of excessive force incidents go undisciplined.

culture of impunity by under-disciplining *all* types of excessive force, not just officer-involved shootings.

          iii. Structural Evidence of the City's Investigatory and Disciplinary Processes

        Arellano's third piece of pattern or practice evidence is the way in which the City structures its investigatory process of officers' uses of force. Arellano argues that "the City has deliberately structured its administrative investigations to protect officers rather than to detect and punish policy violations." (Dkt. 276, at 54). As explained above, the review process for uses of force depends on the severity of the force employed. Under the policy applicable in 2021, "level 1" uses of force— those involving a firearm or causing hospitalization or death—were automatically investigated by IA for violations of APD policies and SIU for a criminal investigation. Any other degree of force would be internally referred to IA only if the officer's direct supervisors made the referral, even in instances of external civilian-initiated complaints. (Dkt. 276, at 26–27; *see also* Dkt. 282, at 9–10). As a result, Arellano alleges that most uses of force and complaints were not investigated by APD's IA. (Dkt. 276, at 27).

        Arellano further contends that even in instances where APD did initiate an administrative investigation, that investigation process was, and still is, flawed, as demonstrated by the issues with the IA investigation in this case.[18] Here, the evidence demonstrates that Shand—who led the IA investigation—was constrained in only considering specific alleged policy violations and could not challenge Gutierrez' honesty, even when there were discrepancies in his account. (Shand Dep., Dkt. 276-38, at 47:6–17, 93:2–13, 22–25, 149:16–150:9, 220:19–21, 224:21–24; *see also* Manley Dep., 149:16–150:9). Further, Shand was not provided formal training for his duties, nor did he have

---

[18] The City argues that Arellano's focus on the alleged deficiencies in the IA investigation in this case is misplaced because allegations of an inadequate investigation alone cannot support a finding of municipal liability. (Dkt. 282, at 15–16). Here, however, Arellano is emphasizing the IA investigation in this case not to suggest that this investigation caused the shooting, but rather as an example of broader issues in APD's administrative investigations that predated the incident in this case.

previous homicide investigation experience. (Shand Dep., Dkt. 276-38, at 28:6–12, 31:3–15, 37:18–22, 39:23–40:8). The investigation also ignored Arellano's statement entirely, and the IA case summary failed to identify nearly every obvious discrepancy between Gutierrez' version of events and the evidence. Nonetheless, Chief Chacon testified that the investigation comported with policy and APD's expectations. (Chacon Dep., Dkt. 276-36, at 73:7–13, 75:14–20, 103:23–104:3).

Arellano presents evidence that these deficiencies in APD's IA investigations have long been known to be a problem to APD's police chiefs. She provides a 2008 letter from the Department of Justice that identified various structural problems with APD's IA process such as: (1) APD's IA lacked staff with specialized internal affairs instruction other than "on the job training"; (2) IA did not require that if collateral conduct is uncovered by an IA investigator, then IA will also investigate that conduct; and (3) IA does not audit uses of force, only investigating formal complaints. (Dkt. 276-118, at 36–39). Arellano also points to an independent investigation done in 2009 by Keypoint, paid for by the City, that echoed the DOJ's criticisms by noting an IA investigation they reviewed reflected "bias[] toward the involved officers." (Dkt. 276-59, at 7).[19] A 2011 follow-up letter from the DOJ reconfirmed its previously stated concerns about APD by continuing to recommend that IA "conduct investigations in an objective and probing manner." (Dkt. 276-119, at 2). From 2009 through 2020, various City oversight offices also criticized the City's administrative systems and warned that the above deficiencies could result in issues of under-investigation and under-discipline. (*See, e.g.*, Dkt. 276, at 57 n.345 (citing various OPM reports from 2009 through 2015); 2016 City Auditor Report, Dkt. 120, at 3–7; 2020 OPO Memo, Dkt. 102).

Arellano argues that these structural issues lead APD to fail to question officers' truthfulness. She highlights former APD Chief Art Acevedo's statement in 2016 that APD officers

---

[19] The IA investigation reviewed by Keypoint was of the shooting involving Sir Smith and Nathaniel Sanders, one of the cited incidents of excessive force mentioned above. (Dkt. 276-59, at 2–7).

"have this attitude of" falsifying reports about using force with "creative writing." (Dkt. 276-56, at 7). In this case, Former Chief Manley testified he was not aware of any incident where IA even investigated whether an officer was being dishonest as opposed to having "misperceived" events. (Manley Dep., Dkt. 276-35, at 152:8–21). He also agreed that if APD failed to discipline for dishonesty, then that would risk encouraging "bad apples to continue to use dishonesty to avoid accountability." (*Id.* at 156:1–11). Yet, Arellano presents evidence of four alleged instances of officer dishonesty during investigations into uses of force that went unpunished by APD. (Dkt. 276, at 37–39).

Arellano also criticizes the police chiefs' practice of not explaining their reasoning in writing when they decide not to discipline officers. (*Id.* at 39–40). Chiefs Manley and Chacon testified that the reason APD chiefs of police generally do not prepare and release detailed written findings when they decide that no discipline is warranted is that the findings would be considered confidential under Texas law and thus not releasable. (Manley Dep., Dkt. 276-35, at 52:24–53:22, 55:21–56:25; Chacon Dep., Dkt. 168-3, at 85:13–86:6). Chief Manley argued against the City Auditor and OPM in favor of this practice even before he was police chief. (*See* 2016 APD Audit Report, Dkt. 276-120, at 12, 18). Arellano, however, convincingly argues that this explanation falls flat because a confidential explanation would be available to the department and could still serve as institutional knowledge to future police chiefs or others in the chain-of-command as to what uses of force do not violate APD policy and why. (*See* Dkt. 276, at 40). Chacon testified that a police chief is responsible for sending a clear and strong message about what is acceptable versus what will not be tolerated, (Chacon Dep., Dkt. 276-36, at 129:12–130:7), but a police chief cannot do so if he does not describe the facts that were found in an incident where no discipline was issued. Indeed, Chief Robin Henderson— Chacon's immediate successor—conceded that she and APD cannot identify any lessons learned from the two shootings in this case because of the practice of never writing down the findings when

discipline is rendered. (Henderson Dep., Dkt. 273-19, at 195:6–9). As such, a reasonable jury could find that APD's policy of not providing written explanations when no discipline is issued is a deficiency in APD's investigatory process. This alleged deficiency, in combination with the APD chiefs' awareness of deficiencies allowing bias in IA investigations and APD's failure to question officers' honesty during IA investigations, supports a finding that APD has a culture permissive of excessive force.

iv. The City's Alleged Practice of Failing to Enforce Its Failure to Intervene Policy

Finally, Arellano argues that APD's failure to enforce its intervention policy supports her theory that the Court has adopted a culture that is permissive of excessive force. (Dkt. 276, at 41). Since at least 2011, APD has had a written policy requiring that an officer intercede to prevent ongoing harm when excessive force is being used. (Dkt. 276-123, at 56). The City has testified in earlier litigation that its intervention policy is extremely important to serve as a check against the risk of abuse by other officers. (Staniszewski Dep., Dkt. 276-42, at 55:19–56:2; *see also* Howse Decl., Dkt. 276-136, at 2–3). The City agreed that never punishing officers for failing to intervene, or never investigating possible failures to intercede, would promote a culture of "letting it slide" that could create a feedback effect of officers engaging in more excessive force because they believe they can get away with it, as their fellow officers are not stepping in to stop them. (Staniszewski Depo., Dkt. 276-42, at 63:7–64:20). And the City testified that all of these risks were known to Chief Manley in 2019. (*Id.* at 64:1–3, 65:6–10).

Nonetheless, Chief Chacon admitted APD had never disciplined anybody for failing to intervene to stop excessive force until after the incident in this case. (Dkt. 276-55, at 101:23–102:23). Chief Manley concurred, testifying that he was not aware of APD ever even investigating an officer for failure to intervene before this shooting, (Dkt. 276-53, at 191:18–25), though it later turned out that there had been one such investigation in the ten years before this incident, (*see* Staniszewski

Dep., Dkt. 276-42, at 90:6–19, 91:18–92:8). This Court recently concluded in another litigation that there was "sufficient evidence to show that APD's lack of investigation and discipline of officers who were potentially liable as bystanders was so uniform as to constitute an official policy" and that there was sufficient evidence to support a finding that the City was deliberately indifferent in maintaining this policy. *Ambler*, 2023 WL 4879903, at *12–13.

Accordingly, the Court considers the City's alleged practice of failing to enforce its intervention policy in combination with Arellano's other evidence supporting her theory that the City has a broader practice of permitting excessive force. A reasonable jury could find that the City's alleged failure to enforce its intervention policy contributes to a culture of permitting excessive force, because officers will be less hesitant to use excessive force knowing their fellow officers will not intervene and will not be disciplined for not intervening.[20]

### b. Analysis

### i. Official City Practice

The Court finds that the above evidence, in combination, creates a genuine dispute of material fact as to whether, in the years before Gutierrez shot Gonzales and Arellano, the City maintained an unconstitutional official practice of permitting excessive force. A reasonable jury could conclude that the City maintained this practice by failing to adequately investigate the majority of officers' uses of force and not disciplining nearly all officers who engaged in excessive force.

The evidence shows that based on how the City structures its investigatory processes, the majority of uses of force—non-Level 1 uses of force—go unexamined by IA and are only reviewed

---

[20] The City argues that its alleged failure to enforce its intervention policy is not relevant to Arellano's *Monell* claim because Plaintiffs have not shown that this case involved an officer who failed to intervene to stop another officer's excessive force. (Dkt. 282, at 17–19). Indeed, as already discussed, the Court agrees with the City that a failure to intervene theory *alone* cannot support *Monell* liability in this case for that reason. However, the City's alleged policy of not enforcing its intervention policy can be one piece of evidence, *among others*, that demonstrate that the City had a practice of permitting excessive force by under-investigating and under-disciplining it.

within an officers' chain of command. Even when IA does investigate uses of force, a reasonable

jury could agree with Arellano that the City has structured its investigations in such a way as to

protect officers at the expense of detecting and punishing excessive force. That is because the

evidence shows that, at times, IA investigators (1) do not receive specific on the job training, (2)

only investigate specific policy violations, (3) do not adequately highlight discrepancies that

undermine an officer's account of his use of force, and (4) generally fail to question officers'

truthfulness. Further, a reasonable jury could find that APD's investigative structure is permissive of

excessive force because police chiefs never explain their reasoning when they decide not to

discipline officers. This aspect of the process is particularly troubling because the police chiefs'

explanation for why they do not issue written decisions is unpersuasive. Even if these decisions

could not be released publicly, they could serve as points of institutional knowledge that dictate what

fact patterns constitute violations of APD policy and which do not. Under the current system,

however, one could reasonably surmise that police chiefs do not provide an explanation for their

non-disciplinary decisions because there is none—they are simply rubber-stamping an officer's use

of force, no matter how unjustified it is. A reasonable jury could find all these deficiencies evidence

of a City practice of maintaining a biased or cursory investigatory structure that allows excessive

force to go unpunished.

A reasonable jury could also conclude that the City did not discipline nearly all uses of

excessive force prior to this incident. The Kroll Report stated that all but one of the 82 instances of

excessive force it found resulted in no investigation or discipline. In the ten years preceding the

incidents in this case, the City only reported 120 instances of discipline—1 discipline per month.

However, Kroll found 82 incidents over a six-month period, suggesting that there were 13.7

instances of excessive force per month. Viewing these statistics in the light most favorable to

Arellano, a reasonable jury could conclude that roughly 90% of excessive force incidents—an

average of 152 incidents per year—went undisciplined in the ten years before this incident. That pattern is corroborated by the 19 high-profile incidents in which officers allegedly used excessive force, but that force went undisciplined by APD.

That pattern is also compounded by the City's alleged policy of not enforcing its intervention policy in the same ten-year timeline. During this time, the City only investigated one officer for failing to intervene in another's use of excessive force and did not discipline any officer for failure to intervene. A reasonable jury could conclude that the City's practice of not enforcing its failure to intervene policy is evidence of a broader City custom that allows excessive force to go unchecked—whether it be unchecked by APD itself or by APD officers witnessing their colleagues' excessive force.

"[T]he existence of a persistent pattern of illegal conduct, tolerated by municipal policymakers, tends to show that the subject conduct does not represent an unauthorized departure from lawful policy but instead represents the realization of an *unlawful* policy." *Milam v. City of San Antonio*, 113 Fed. App'x 622, 625 (5th Cir. 2004) (emphasis in original); *see also Lawson v. Dallas Cnty.*, 286 F.3d 257, 263 (5th Cir. 2002) (fact that practices "were consistently applied" was sufficient to show municipal policy). Taken together, Arellano's allegations of structural deficiencies in APD's investigatory process, the high rate of excessive force incidents that went undisciplined, and the City's custom of not enforcing its intervention policy could evince an official, albeit unwritten, unconstitutional City practice. The Court finds that Plaintiffs have offered sufficient evidence to show that the City had a practice of permitting excessive force by under-investigating and under-disciplining the majority of officers who engaged in excessive force. The Court also finds that a reasonable jury could find that such a practice created a culture of officer impunity.

ii. Deliberate Indifference

Plaintiffs must also show that the City's policymaker knew about the City's practice of allowing excessive force and that this practice constituted deliberate indifference. Knowledge by the policymaker is the "*sine qua non* of municipal liability." *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003). "[T]he plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision. Deliberate indifference is a high standard—a showing of simple or even heightened negligence will not suffice." *Valle*, 613 F.3d at 542. (internal quotes and citations omitted). For at least a few reasons, a reasonable jury could find that the chief of police realized that APD's widespread and longstanding failure to discipline most instances of excessive force existed and was substantially likely to cause officers to continue to violate the Constitution.

Arellano's expert attested that a police chief of a large police department would be expected to know if over half of excessive force incidents were not investigated or disciplined. A reasonable jury could conclude that if approximately 90% of incidents of excessive force—an average of 152 incidents per year—are not disciplined, then the practice is widespread enough that that chief of police would actually know about it. "Sufficiently numerous prior incidents of police misconduct, for example, may tend to prove a custom and accession to that custom by the municipality's policymakers." *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989). In addition, the chief was aware of the 120 incidents that were disciplined in the prior ten years and the decisions not to discipline in other incidents that reached the chief's desk. For each of the 19 cases cited by Arellano, the chief was almost certain to know about them given their high-profile nature, coverage in the media, specific disciplinary findings overseen by the chief, and the fact that many proceeded through litigation. The police chief additionally knew that no officer had been investigated, much less disciplined, for failing to intervene before January 5, 2021. It is obvious that failure to discipline

excessive force will result in more excessive force. But even looking at just the failures to intervene, the City was aware that this practice alone would have the known and obvious consequence that officers would not only fail to intervene but also use excessive force more often as a result. Third, the structural deficiencies in APD's administrative oversight, and that their consequence would be under-investigation and under-discipline, were known and publicly criticized multiple times by credible sources long before this shooting—the Department of Justice in 2008 and 2011, the City's independent contractor, Keystone, in 2009, the OPM from 2009 through 2015, the City Auditor in 2016, and finally the OPO in 2020.

"A pattern could evidence not only the existence of a policy but also official deliberate indifference." *Piotrowski*, 237 F.3d at 582. Here, a reasonable jury could surmise the City's indifference due to its lack of corrective action in supervision and policies, and by the fact that in an average of 152 excessive force per year, and in all incidents of failure to intervene—including over a dozen prior high-profile incidents actually known to the chief of police—officers received no reprimands or discharges from the City. This deliberate indifference can further be demonstrated by the fact that the City admits it knew enforcement of the use of force policy was required to deter exactly the type of ongoing misconduct APD was exhibiting, (Staniszewski Dep., Dkt. 276-42, at 64:15–65:10; Ex. 36, Chacon Dep., Dkt. 276-36, at 194:15–19, 195:1–10)—but then did not enforce the use of force policy in approximately 90% of instances of excessive force and never enforced the failure to intervene policy at all. *See Williams v. Treen*, 671 F.2d 892, 899 (5th Cir. 1982) ("If an official's conduct contravenes his own state's explicit and clearly established regulations, a subjective belief in the lawfulness of his action is per se unreasonable."). A reasonable jury could find that the City had the option to start disciplining officers, implement regular audits to ensure administrative investigations were adequately happening, and make the other structural changes that had been repeatedly recommended as early as 2008, but chose not to—instead, allowing the problem to

persist. As such, the Court finds that Plaintiffs have shown a pattern of failure to investigate and discipline excessive force sufficient to support a finding of deliberate indifference at the summary judgment stage.

### iii. Moving Force

Last, Arellano must show that the City's practice of not disciplining the vast majority of officers who used excessive force was a "moving force" of Gutierrez' alleged use of excessive force. To establish the "moving force" element, a plaintiff must show a direct causal link between the policy and the constitutional violation. *Piotrowski*, 237 F.3d at 580.

The City's leadership has conceded that a failure to discipline excessive force and non-intervention would promote a culture of "letting it slide." Such a culture would undermine the deterrent effect of discipline and ultimately create a positive feedback effect where officers will be less hesitant to use excessive force knowing their fellow officers will not intervene and will not be disciplined for not intervening. (*See* Staniszewski Dep., Dkt. 276-42, at 64:21–65:5; Chacon Dep., Dkt. 276-36, at 194:15–19, 195:1–10; Manley Dep., Dkt. 276-35, at 180:23–181:16). Plaintiff's expert opines that APD did have such a widespread failure to discipline, corroborates these principles, and concludes that Gutierrez' actions are consistent with flowing directly from the culture of impunity. (Howse Decl., Dkt. 276-136, at 4–5). A jury could reasonably conclude that Gutierrez' conduct matched APD's own expectations.

Indeed, Gutierrez testified that he was not aware of any discipline for an officer shooting someone. (Gutierrez Dep., Dkt. 235-10, at 106:9–18). In particular, Gutierrez was specifically aware of the allegations of excessive force that took place during the May 2020 protests, (*id.* at 493:22–494:7)—allegations of officers shooting innocent people, similar to the allegation that Gutierrez shot Arellano—none of whom were disciplined. This—combined with the widespread nature of the

culture of impunity—"creates a fact issue as to whether [Gutierrez] was aware of a lack of enforcement" and thus whether it caused his actions. *See Ambler*, 2023 WL 4879903, at *13.

If a jury finds that Gutierrez is liable for excessive force, then they could also reasonably find that he engaged in that use of force and misleadingly reported the incident after the fact because he trusted that the APD would not question his story, even as it conflicted with several pieces of witness testimony and physical evidence. As such, Plaintiffs have presented sufficient evidence that the City's practice of allowing excessive force by under-investigating and under-disciplining it was a "moving force" of Gutierrez' alleged excessive use.

### 8. Conclusion on the City's Motions for Summary Judgement

In summary, the Court finds that Plaintiffs have failed to allege the following theories of *Monell* liability: state-created danger, deficient written use of force and off-duty law enforcement action policies, failure to train, failure to intervene, and ratification. Accordingly, the Court will grant the City's motions for summary judgment on these grounds.

However, Plaintiffs have demonstrated that there is a genuine issue of material fact as to whether the City had an official, unwritten practice of allowing excessive force, in the years prior to this incident, by under-investigating and failing to discipline the vast majority of excessive force cases. Plaintiffs have also adequately presented evidence to support a finding that the City was deliberately indifferent in maintaining such a practice and that this practice was the moving force of Gutierrez' alleged use of excessive force. If the jury finds that Gutierrez committed excessive force when he shot Gonzales and Arellano, then a reasonable jury could also find that Gutierrez' conduct would not have occurred but for the APD's culture of impunity, which flowed directly from a longstanding practice of under-investigating and under-disciplining officers for excessive force. Accordingly, the Court denies the City's motion for summary judgment on this claim alone and allows this *Monell* claim to proceed to trial.

## VII. THE GONZALES PLAINTIFFS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT

Finally, the Court turns to the Gonzales Plaintiffs' motions for partial summary judgment. (Dkts. 175, 176, 177). They request summary judgment on Gutierrez, Serrato, and the City's "undeveloped or inapplicable affirmative defenses." (*Id.*). The Gonzales Plaintiffs do not, however, request summary judgment on the officers' defense of qualified immunity. (*See* Dkt. 175, at 3; Dkt. 176, at 3). Because the Court has granted Serrato's motion for summary judgment, the Court will moot the Gonzales Plaintiffs' motion for partial summary judgment against Serrato. The Court now briefly discusses the motions against Gutierrez and the City.

### A. Motion for Partial Summary Judgment Against Gutierrez' Defenses

The Gonzales Plaintiffs argue that Gutierrez has asserted "several defenses or affirmative defenses that either are wholly inapplicable to this case or else for which they have developed no factual support in discovery." (Dkt. 175, at 1). They first ask the Court to dispose of three immunity defenses—Gutierrez' Seventh, Ninth, and Eleventh Defenses—to the extent that these defenses assert anything other than qualified immunity. (*Id.* at 4–7 (citing Gutierrez Am. Answer, Dkt. 92, ¶¶ 8, 10, 12)). In his response, Gutierrez clarifies that "[a]ll immunity defenses, except qualified immunity, are asserted against the negligence claim under Texas law." (Dkt. 238, at 4). Because the Court has already dismissed the Gonzales Plaintiffs' common law negligence claim against Gutierrez, the Gonzales Plaintiffs' request as to these three immunity defenses is moot.

Next, the Gonzales Plaintiffs challenge Gutierrez' Eighth and Thirteenth Defenses, which generally allege that Gonzales caused or contributed to his own damages. (Dkt. 175, at 7–8 (citing Gutierrez Am. Answer, Dkt. 92, ¶¶ 9, 51)). Gutierrez' discussion of these defenses in his response cites Texas law, which suggests that he again raised this defense in relation to the common law negligence claim, not the Section 1983 claims. (*See* Dkt. 238, at 15–16). As such, the Court once again finds that the Gonzales Plaintiffs' request as to the contribution defenses is moot.

The Gonzales Plaintiffs further challenge Gutierrez' Twelfth and Fourteenth Defenses, both dealing with punitive damages. (Dkt. 175, at 8–9). The Twelfth Defense states that "[p]unitive damages are not recoverable against a governmental entity." (Gutierrez Am. Answer, Dkt. 92, ¶ 11). Gutierrez admits that this defense applies to the common law negligence claim and not the Section 1983 claim. (Dkt. 238, at 18). As such, the request for summary judgment on this defense is moot. As for the Fourteenth Defense, it states that "it would be violative of the Due Process Clause of the United States Constitution to impose punitive damages on [Gutierrez] under the circumstances of this case and requests that any punitive damage claims against [Gutierrez] be separately tried." (Gutierrez Am. Answer, Dkt. 92, ¶ 52). Gutierrez does not address this defense in his response, and he has not moved for a separate trial on punitive damages claims. It is well-established that punitive damages are available against police officers who exhibit reckless disregard for citizens' constitutional rights. *See, e.g., Williams v. Kaufman Cty.*, 352 F.3d 994, 1015–16 (5th Cir. 2003) (affirming award of punitive damages against sheriff). As such, to the extent that the Fourteenth Defense is in fact a true defense, the Court dismisses it.

Last, the Gonzales Plaintiffs ask the Court to grant summary judgment on Gutierrez' Tenth Defense, (Dkt. 175, at 9), which simply states "Defendant specifically denies he breached any duty to Plaintiffs, acted with deliberate indifference, or deprived Plaintiffs and Alex Gonzalez, Jr. of any civil or constitutional right," (Gutierrez Am. Answer, Dkt. 92, ¶ 11). "[W]hen a negative averment is labeled as an affirmative defense instead of as a specific denial, the proper remedy is to treat the defense as a denial." *Rodriguez v. Target Corp.*, No. EP-09-CV-301-DB, 2010 WL 11601211, at *6 (W.D. Tex. Jan. 4, 2010) (citing 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 1269 (3d ed. 2004)). The Tenth Defense is a denial, and thus it is not necessary to strike or grant summary judgment on this "defense." *See id.*

In sum, the Court grants in part and denies in part Gonzales Plaintiffs' Motion for Partial Summary Judgment against Gutierrez' Defenses. The motion is granted in part as to the Fourteenth Defense, which is dismissed. The motion is denied in part as to the other defenses, as the Tenth Defense is a denial, and the Seventh, Eighth, Ninth, Eleventh, Thirteenth, and Twelfth Defenses are moot.

### B. Motion for Partial Summary Judgment Against the City's Defenses

The Gonzales Plaintiffs similarly ask for summary judgment on the City's allegedly inapplicable defenses. (Dkt. 177, at 1). Specifically, the Gonzales Plaintiffs challenge two affirmative defenses that the City has asserted. (*See id.* at 4–6). The City asserted "governmental immunity as a municipal corporation" as its first affirmative defense, claiming it is "entitled to immunity while active in the performance of its governmental functions, absent express waiver." (City Am. Answer, Dkt. 90, at 6). The City also asserted "the affirmative defense of governmental immunity since its employees are entitled to qualified/official immunity for actions taken in the course and scope of their employment, absent express waiver." (*Id.*). The Gonzales Plaintiffs argue that neither defense is cognizable for their Section 1983 claims. (*See* Dkt. 177, at 4–6).

In its response, the City clarifies that it asserted those two defenses only "as to any state-law claims asserted by" the Gonzales Plaintiffs. (Dkt. 234, at 1). The City explains that it found some of the Gonzales Plaintiffs' allegations in their Third Amended Complaint to be "vague and ambiguous" such that they did not know if the Gonzales Plaintiffs planned to bring state law claims against the City. The City then states, "If the [Gonzales Plaintiffs] make clear that they are not asserting state-law claims against the City then the disputed affirmative defenses will be inapplicable." (*Id.*). In their reply, the Gonzales Plaintiffs clarify that they do not bring any independent state law tort claims against the City. (Dkt. 262, at 1). Indeed, a review of the Third Amended Complaint reveals that the Gonzales Plaintiffs' only enumerated claims against the City are their Section 1983 *Monell* claims. (*See*

3d Am. Compl., Dkt. 86, at 52, 56). Because the Gonzales Plaintiffs bring no claims to which the City's immunity defenses apply, the Court grants the Gonzales Plaintiffs' motion for summary judgment on those two defenses.

## VIII. CONCLUSION

For these reasons, **IT IS ORDERED** that Gutierrez' Motion for Partial Summary Judgment and Motion to Dismiss, (Dkt. 171), is **GRANTED IN PART AND DENIED AS MOOT IN PART**. The motion is granted in part as to the Gonzales Plaintiffs' common law negligence claim against Gutierrez, which is **DISMISSED WITH PREJUDICE**. The motion is moot in part as to Gutierrez' request for relief in regard to the Gonzales Plaintiffs' "claim" for failure to render medical aid.

**IT IS FURTHER ORDERED** that Serrato's Motion for Summary Judgment, (Dkts. 189, 192), is **GRANTED**. Serrato is entitled to summary judgment on the Gonzales Plaintiffs' Section 1983 claims against him. As all claims against Serrato have been resolved, Serrato is **TERMINATED** as a party in this action.

**IT IS FURTHER ORDERED** that the City's Motion to Strike the Gonzales Plaintiffs' Summary Judgment Evidence, (Dkt. 266), is **DENIED**.

**IT IS FURTHER ORDERED** that the City's Motions for Summary Judgment, (Dkts. 167, 168), are **GRANTED IN PART AND DENIED IN PART**. The motions are granted in part because the City is entitled to summary judgment on the parties' *Monell* claims based on Serrato's use of force and claims based on Gutierrez' use of force under the following theories of liability: state-created danger, deficient written use of force and off-duty law enforcement action policies, failure to train, failure to intervene, and ratification. The motion is denied in part as to the *Monell* claims based on Gutierrez' use of force caused by the City's alleged practice of permitting excessive force.

**IT IS FURTHER ORDERED** that the Gonzales Plaintiffs' Motion for Partial Summary Judgment against Defendant Serrato's Undeveloped or Inapplicable Affirmative Defenses, (Dkt. 176), is **MOOT**.

**IT IS FURTHER ORDERED** that the Gonzales Plaintiffs' Motion for Partial Summary Judgment against Defendant Gutierrez' Undeveloped or Inapplicable Affirmative Defenses, (Dkt. 175), is **GRANTED IN PART AND DENIED IN PART**. The motion is granted in part as to the Fourteenth Defense, on which the Gonzales Plaintiffs are entitled to summary judgment. The motion is denied in part as to the other defenses, as the Tenth Defense is a denial, and the Seventh, Eighth, Ninth, Eleventh, Thirteenth, and Twelfth Defenses are moot.

**IT IS FINALLY ORDERED** that the Gonzales Plaintiffs' Motion for Partial Summary Judgment against Defendant City of Austin's Undeveloped or Inapplicable Affirmative Defenses, (Dkt. 177), is **GRANTED**. The Gonzales Plaintiffs are entitled to summary judgment on the City's affirmative defenses Numbers 1 and 2, as listed in their Amended Answer, (Dkt. 90, at 6).

In summary, the claims remaining for trial are the Gonzales Plaintiffs and Arellano's Section 1983 claims against Gutierrez and their *Monell* claims against the City of Austin, under a theory that Gutierrez' alleged excessive force was caused by an alleged City practice of permitting excessive force.

**SIGNED** on March 27, 2025.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE