IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| ALEX GONZALES, SR., individually and as "Next Friend" to minor child Z.A.G. and ELIZABETH HERRERA, aka ELIZABETH GONZALES, individually and as "Next Friend" to minor child Z.A.G., <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF AUSTIN, <br><br> Defendants. | § § § § § § § § § § § § § | 1:22-CV-655-RP |
| JESSICA ARELLANO, individually, and as next friend of Z.A., a minor child, wrongful death beneficiary and heir to the Estate of Alex Gonzales, Jr., <br><br> Plaintiffs, <br><br> v. <br><br> THE CITY OF AUSTIN, GABRIEL GUTIERREZ, and LUIS SERRATO, <br><br> Defendants. | § § § § § § § § § § § | 1:23-CV-8-RP |
| ALEX GONZALES, SR., et al., <br><br> Plaintiffs, <br><br> v. <br><br> LUIS SERRATO and GABRIEL GUTIERREZ, <br><br> Defendants. | § § § § § § § § § § | 1:23-CV-9-RP |

## **ORDER**

Before the Court are ten motions to exclude expert testimony: Defendant Gabriel Gutierrez'
("Gutierrez") Motion to Exclude Testimony of Arthur S. Chancellor, (Dkt. 143); Plaintiffs Alex
Gonzales, Sr. and Elizabeth Herrera's (collectively, the "Gonzales Plaintiffs") Motion to Exclude
Expert Testimony of Joseph Chacon, (Dkts. 145, 162);[1] Defendant City of Austin's (the "City")
Motion to Exclude Expert Opinions and Testimony of Keith A. Howse, (Dkt. 156); the Gonzales
Plaintiffs' Motion to Exclude Expert Testimony of Robin Henderson, (Dkts. 164, 196); Plaintiff
Jessica Arellano's ("Arellano") Motion to Partially Exclude Expert Testimony of Albert Rodriguez,
(Dkt. 179); the Gonzales Plaintiffs' Motion to Exclude Expert Testimony of Albert Rodriguez,
(Dkts. 190, 198); the Gonzales Plaintiffs' Motion to Exclude Expert Testimony of Brian Manley,
(Dkts. 181, 197); Arellano's Motion to Partially Exclude Expert Testimony of Criag Miller, (Dkt.
208); the Gonzales Plaintiffs' Motion to Exclude Expert Testimony of Craig Miller, (Dkt. 211); the
Gonzales Plaintiffs' Motion to Exclude Expert Testimony of Mass-Designated Witnesses, (Dkt.
294); and all responsive briefing.[2] Having reviewed the parties' briefing, the record, and the relevant
law, the Court issues the following order.

## **I. BACKGROUND**

This is a Section 1983 case arising from two police officer involved shootings that took place
in the early morning of January 5, 2021. The facts of this consolidated action are more fully
explained in the Court's order on the parties' motions for summary judgment. The Court provides a
brief summary of those facts here for the purposes of this order.

---

[1] The preceding docket entries refer to both redacted and previously sealed versions of the motion. The
Court will occasionally cite to both versions of various filings throughout this order.
[2] The Court will address the Gonzales Plaintiffs and Arellano's motions to exclude Patricia Rosen, (Dkts. 286,
289), in a future order.

Sometime after midnight on January 5, 2021, Alex Gonzales, Jr. ("Gonzales") and his longtime partner Plaintiff Arellano, along with Arellano's two-month-old child Z.A., were driving in the Riverside neighborhood of Austin on their way to purchase baby formula from a CVS pharmacy. At the same time, Defendant off-duty Austin Police Department ("APD") Officer Gutierrez was driving home from the gym when he encountered Gonzales and Arellano on Oltorf Road. After Gutierrez allegedly cut Gonzales off, Gonzales decided to change course and follow Gutierrez as he turned left onto Wickersham Lane. Shortly after the parties turned onto Wickersham, Gonzales drove from behind Gutierrez to come up alongside him on Gutierrez' left side, such that the vehicles were roughly aligned.

Within a few seconds of the cars coming to a stop, Gutierrez fired into Gonzales' car seven or eight times. According to Gutierrez, he opened fire because Gonzales pointed a gun at him. Arellano, however, states that Gonzales did not have a gun. Instead, she said that once the cars were next to each other, Gonzales spoke to Gutierrez through the cars' open windows saying, "Hey, dude, you got a fucking problem?" Arellano then turned in her seat to face Gonzales and began to say something to the effect of, "Alex, let's just go, this is stupid." Before she finished her sentence, she alleges that Gutierrez fired his gun into the family's car for no reason. One of Gutierrez' shots struck Gonzales across the top of his head, while three others struck Arellano.

After the first shooting, Gutierrez called for backup, claiming that Gonzales had threatened him with a firearm and was still armed. Defendant on-duty APD Officer Luis Serrato ("Serrato") then arrived at the scene two minutes later as one of the responding officers. A minute-and-a half confrontation transpired, during which Gonzales did not respond to Serrato's commands to put his hands up and step away from the vehicle. Serrato then fatally shot Gonzales after Gonzales placed his hand into the car, because Serrato believed that Gonzales was reaching for a gun to harm him or

Arellano. In hindsight, it appears that Gonzales was attempting to check on baby Z.A. who was still in his car seat on the rear passenger side of the car.

Gonzales died at the scene from his multiple gunshot wounds. Arellano was rushed to the hospital but survived the incident with permanent injuries. Her child Z.A. was not physically injured in the shootings. Neither officer was criminally indicted for their uses of force. After conducting an Internal Affairs ("IA") investigation into Gutierrez and Serrato's actions, the City decided not to discipline either officer. However, two City oversight offices—the Office of Police Oversight ("OPO") and the Community Police Review Commission ("CPRC")—recommended that one or both officers be disciplined.

The two shootings resulted in three lawsuits, which have been consolidated into this action. Gonzales' parents, the Gonzales Plaintiffs, sued first, filing their complaint on July 6, 2022, against the City in Cause Number 1:22-cv-655. (Compl., Dkt. 1). On January 3, 2023, Arellano sued Gutierrez, Serrato, and the City in Cause Number 1:23-cv-8. (Compl., Dkt. 1, 1:23-cv-8). The same day, the Gonzales Plaintiffs filed their second lawsuit—the third suit overall—against all three defendants in Cause Number 1:23-cv-9. (Compl., Dkt. 1, 1:23-cv-9). On August 2, 2023, the Court consolidated all three cases into this action. (Order, Dkt. 54).

The Gonzales Plaintiffs assert claims under 42 U.S.C. § 1983 as wrongful death beneficiaries of Gonzales and heirs to the Estate of Gonzales. They allege that Gutierrez and Serrato used excessive force against Gonzales in violation of the Fourth Amendment. (2d Am. Compl., Dkt. 85, ¶¶ 80–96). Arellano brings a Section 1983 claim against Gutierrez alleging that he used excessive force when he shot her, violating her Fourth Amendment rights. (Am. Compl., Dkt. 87, ¶¶ 139–147). The Gonzales Plaintiffs and Arellano also assert claims against the City pursuant to *Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658 (1978). They allege that the City is liable for Arellano's injuries and Gonzales' death because the City's official policies, practices, and customs

were a cause of Gutierrez and Serrato's uses of excessive force. (*See id.* ¶¶ 148–158; 3d Am. Compl., Dkt. 86, ¶¶ 138–162).[3]

In the Court's recent order on the parties' motions for summary judgment, the Court granted Serrato's motion for summary judgment, finding that Serrato was entitled to qualified immunity on the Gonzales Plaintiffs' Section 1983 claims against him. The Court also granted in part and denied in part the City's motions for summary judgment. The Court held that a reasonable jury could find that Gutierrez committed excessive force when he shot Gonzales and Arellano. On Plaintiffs' *Monell* claims, the Court granted the City summary judgment on six theories of *Monell* liability but denied summary judgment on a seventh theory, holding that a reasonable jury could find that Gutierrez' alleged excessive force was caused by an alleged City practice of permitting excessive force by under-investigating and under-disciplining it. Ahead of trial, the Court now resolves the parties' motions to exclude expert testimony.

## II. LEGAL STANDARDS

### A. Non-Retained Expert Witnesses

Federal Rule of Civil Procedure 26 requires a party to disclose the identity of any expert witness it may use at trial. Fed. R. Civ. P. 26(a)(2)(A). The disclosure must be accompanied by a written report "if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." Fed. R. Civ. P. 26(a)(2)(B). Non-retained expert witnesses are exempt from Rule 26's reporting

---

[3] Arellano originally also asserted claims on behalf of her child Z.A. as a wrongful death beneficiary and heir of Gonzales. She brought claims against all three defendants due to Gutierrez and Serrato's alleged excessive force against Gonzales and the City's alleged *Monell* liability due to both shootings. (Am. Compl., Dkt. 87, ¶¶ 1–2, 139–158). On August 8, 2024, Arellano and all three defendants filed an agreed notice of voluntary dismissal in which the parties dismissed without prejudice the claims Arellano was bringing in her capacity as Next Friend of Z.A. and made on behalf of the Estate of Gonzales. (Dkt. 253). The following day, the Court dismissed these claims. (Order, Dkt. 254). As such, Arellano's remaining claims are her Section 1983 claim against Gutierrez and her *Monell* claim against the City. She has no live claims against Serrato.

requirement. Fed. R. Civ. P. 26 advisory committee's note to 1993 amendment ("The requirement of a written report in paragraph (2)(B) . . . applies only to those experts who are retained or specially employed to provide such testimony."). Instead, non-retained expert witnesses must provide a disclosure stating: "(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C). If a party fails to disclose information required by Rule 26(a), "the party is not allowed to use that information or witness" at trial unless the failure to disclose was "substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

## B. *Daubert* Motions to Exclude

The root of the court's admissibility analysis is Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Supreme Court has interpreted this rule as imposing a "gatekeeping role" upon district court judges, tasking them with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). "The reliability prong mandates that expert opinions be grounded in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief." *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (internal quotation marks omitted). "The relevance

prong requires the proponent to demonstrate that the expert's reasoning or methodology can be properly applied to the facts in issue." *Id.* (internal quotation marks omitted). The burden on the proponent of the expert testimony is only to prove, by a preponderance of the evidence, that the testimony is reliable; they need not prove the expert's testimony is correct. *Id.*

The *Daubert* standard requires courts "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). The *Daubert* inquiry "is not intended to serve as a replacement for the adversary system." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002) (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment). Accordingly, "a trial court must take care not to transform a *Daubert* hearing into a trial on the merits." *Id.* In interpreting *Daubert*, courts in this jurisdiction use a three-factor framework for determining whether expert evidence is admissible. Proponents of expert testimony must demonstrate that "(1) the expert is qualified; (2) the evidence is relevant to the suit; and (3) the evidence is reliable." *Bonnet-Pritchett v. Washington Cnty.*, 2022 WL 3082522, at *1 (W.D. Tex. June 16, 2022).

## III. DISCUSSION

At the outset the Court finds that several motions are moot as a result of the Court's order on the parties' motions for summary judgment. The Gonzales Plaintiffs' motion to exclude the expert testimony of Former APD Police Chief Robin Henderson ("Henderson") pertains to an expert Serrato designated. (*See* Mot., Dkt. 164; Serrato Expert Designation, Dkt. 111, at 5). The Court has granted Serrato summary judgment and terminated him as a party in this suit. Neither Gutierrez nor the City designated Henderson as a non-retained expert. (*See* Dkts. 110, 113).[4]

---

[4] In its expert designation, the City stated that it "reserves the right to call at trial or elicit expert opinion testimony on cross-examination from all testifying expert witnesses designated by any other party to this action." (Dkt. 113, at 5). The Gonzales Plaintiffs stated in their motion to exclude that they do not consider

Accordingly, the Gonzales Plaintiffs' Motion to Exclude Expert Testimony of Robin Henderson is moot.

Additionally, the Gonzales Plaintiffs and Arellano both moved to exclude the expert testimony of Albert Rodriguez ("Rodriguez"), (Dkts. 179, 190, 198), Serrato's retained use-of-force expert, (Serrato Expert Designation, Dkt. 111, at 2–3). Neither Gutierrez nor the City designated Rodriguez as a retained expert. (*See* Dkts. 110, 113).[5] Because Arellano has voluntarily dismissed her claims against Serrato, and the Court has otherwise terminated Serrato as a party in this suit, the Gonzales Plaintiffs' and Arellano's motions to exclude the expert testimony of Rodriguez are also moot.

Further, the Gonzales Plaintiffs' Motion to Exclude Expert Testimony of Mass-Designated Witnesses is moot because it is directed at Serrato's "mass-designated witnesses," and again, Serrato is no longer a party to the suit. (*See* Dkt. 294). The Court will now turn to the substance of the remaining motions to exclude, which pertain to experts designated by Gutierrez and the City who are proceeding to trial. The Court begins with the motions pertaining to the City's non-retained experts and then turns to the motions regarding the parties' retained experts.

### A. Joseph Chacon

Joseph Chacon ("Chacon") was the APD Chief of Police when the IA investigation of this incident concluded. Chacon determined that Gutierrez and Serrato did not violate APD policies during this incident and decided that the officers would not be disciplined as a result of this incident.

---

the City to have separately designated Henderson. (Dkt. 164, at 9). The City did not file a response in opposition to the Gonzales Plaintiffs' motion to exclude. As such, to the extent that the City's reservation was a proper cross-designation of Henderson, the Court finds that the City is unopposed to excluding her as an expert and grants the Motion to Exclude as unopposed.

[5] In contrast to the Gonzales Plaintiffs, Arellano believes that the City has properly cross-designated all retained experts. (Dkt. 179, at 6). The City also did not file a response in opposition to Arellano or the Gonzales Plaintiffs' motions to exclude Rodriguez. As such, to the extent that the City's reservation was a proper cross-designation of Henderson, the Court again finds that the City is unopposed to excluding Rodriguez as an expert and grants the Motion to Exclude as unopposed.

(Dkt. 216, at 2). The City designated Chacon as a non-retained expert. (City Designation, Dkt. 113, at 2–3). The City's designation of Chacon in full states: "Chief Chacon may testify regarding the policies, practices, training and investigations of the Austin Police Department relating to officer-involved shootings and responses to resistance and may offer opinions based on his education, training and experience." (*Id.*). The City states that Chacon's testimony "will be limited to identifying and describing APD's policies and practices regarding training, investigation and the use of force and whether the Defendant officers' conduct comported with those policies and practices." (Dkt. 216, at 6).

The Gonzales Plaintiffs do not dispute that Chacon can testify as a *fact* witness in this case as to his own actions and the reasons he took them, which are all within his personal knowledge. However, the Gonzales Plaintiffs move to exclude Chacon from providing *expert* testimony for two reasons. (Dkt. 162, at 1).

First, the Gonzales Plaintiffs argue that the City failed to provide a meaningful disclosure of Chacon's expected expert opinions even under the more relaxed disclosure requirements of Federal Rule of Civil Procedure 26(a)(2). They contend that the brief designation only identified the subject matter to which Chacon was going to testify, not the opinions he intended to give nor the facts upon which those opinions are based. (*Id.* at 7–9). They argue that fundamental fairness requires a more robust disclosure in this case because the City had not identified any written documents to reflect why he chose not to discipline Gutierrez or Serrato. (*Id.* at 5–7). The Gonzales Plaintiffs ask the Court to exclude his expert testimony under Rule 37(c)(1) because the City's failure to disclose is neither substantially justified nor harmless. (*Id.* at 9–13). In particular, they argue that the inadequate disclosure prejudiced them by depriving them of a fair opportunity to test Chacon's expert opinions at his deposition. (*Id.* at 10–11). Second, the Gonzales Plaintiffs argue that even if Chacon's disclosure did comply with Rule 26, Chacon's expert opinions are inadmissible under Federal Rule

of Evidence 702 and the *Daubert* standard because his opinions are unreliable and not based on sufficient facts and data. (*Id.*).[6]

The City argues that its designation of Chacon as a non-retained expert complied with Rule 26's disclosure requirements. (Dkt. 216, at 2-4). Even if the disclosure was deficient, the City argues that the Gonzales Plaintiffs were not prejudiced because they have long known that it was Chacon's opinion that Gutierrez and Serrato did not violate APD policy and had the ability to question Chacon about his decision not to discipline the officers, and other opinions about APD training and APD officer-involved shootings, at his deposition. (*Id.* at 5–6). The City requests that it be allowed to amend or supplement its non-retained expert designations if the Court finds them deficient. (*Id.* at 6). Last, the City argues that Chacon's opinions are admissible. They state that his decision not to discipline the officers was based on sufficient facts—his review of the entire IA investigative file, portions of the Special Investigations Unit's criminal investigation, and the opinions of his assistant chiefs. (*Id.* at 8 (citing Chacon Dep., Dkt. 216-2, at 63:11–66:8; 73:7–77:6)).

The Court finds that the City's designation of Chacon as a non-retained expert does not comply with the requirements of Rule 26. The Rule requires that a non-retained expert disclose both "the subject matter on which the witness is expected to present evidence" and "a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C). "Rule 26(a)(2)(C) is intended to ensure that an opposing party has some notice of what the nonretained expert will testify about; therefore, the disclosure must, at the very least, state opinions, not merely topics of testimony and contain a summary of the facts upon which the opinions are based." *Manson*

---

[6] In their reply, the Gonzales Plaintiffs assert, for the first time, that Chacon may be improperly designated as a non-retained expert under Rule 26(a)(2)(C) and that he instead should be required to submit an expert report under Rule 26(a)(2)(B). (Dkt. 227, at 2–3). The Court does not consider this argument because arguments raised for the first time in a reply brief are waived. *Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010); *Calvasina v. Wal-Mart Real Estate Bus. Tr.*, 899 F. Supp. 2d 590, 608 (W.D. Tex. 2012) (citing *United States v. Jackson*, 426 F.3d 301, 304 n. 2 (5th Cir. 2005)).

*v. B&S Trucking of Jackson, LLC*, No. SA-21-CV-01181-XR, 2023 WL 3170494 (W.D. Tex. May 1, 2023) (cleaned up). Here, the City's designation disclosed the subject matter of Chacon's testimony but did not disclose a summary of the facts and opinions that would make up Chacon's expert testimony. Accordingly, the disclosure is deficient.

When a party fails to comply timely with Rule 26(a), "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The City has made no argument that the failure to disclose was substantially justified, so the Court turns to whether the deficiencies in the disclosure were harmless. Courts look to four factors: "(1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose." *Tex. A&M Research Found. v. Magna Transp., Inc.*, 338 F.3d 394, 402 (5th Cir. 2003).

The City has offered no information in its response indicating the importance of Chacon's expert testimony. The City has not explained why Chacon needs to testify as an expert, rather than as a fact witness, to identify APD's policies and explain why he made the decision not to discipline Gutierrez and Serrato. By providing few details about Chacon's proposed expert testimony, the City itself has suggested that his expert testimony is unimportant to its case. *See Robles v. Texas Tech Univ. Health Scis. Ctr.*, No. EP-14-CV-00321-FM, 2015 WL 12658488, at *3 (W.D. Tex. July 20, 2015). Even assuming that the expert testimony is important to the City's case, the importance of the testimony cannot alone justify the City's failure to timely comply with its disclosure obligations. *See Geiserman v. MacDonald,* 893 F.2d 787, 792 (5th Cir. 1990) ("The importance of such proposed testimony cannot singularly override the enforcement of local rules and scheduling orders."). The City has also offered no explanation for its failure to disclose the required information despite the Gonzales Plaintiffs' repeated requests that Defendant do so. The Gonzales Plaintiffs had to file a

motion to compel because the City did not timely answer interrogatories and requests for production related to Chacon's decision not to discipline the officers, (Dkt. 121), which the Court later granted, (Dkt. 155). Those two factors therefore weigh in favor of exclusion. *See Cont'l Cas. Co. v. F–Star Prop. Mgmt., Inc.*, No. 10–CV–102, 2011 WL 2887457, at \*7 (W.D. Tex. July 15, 2011) (finding that defendant's failure to indicate the importance of non-retained experts' testimony or explain its non-disclosure of the required information weighs in favor of exclusion).

The City argues that the Gonzales Plaintiffs have not been prejudiced because they have long known that it was Chacon's opinion that Gutierrez and Serrato did not violate APD policy. (Dkt. 216, at 5). In support of this proposition, the City cites the public press release that the City issued on January 26, 2023, which stated that the City would not discipline the officers because they had "acted according to their training and APD policy." (Dkt. 244-9). But the press release did not give the Gonzales Plaintiffs fair notice of Chacon's opinions because it contains no disclosure of what Chacon will testify to as his opinion at trial nor the basis for Chacon's decision. At his deposition, Chacon admitted that he never disclosed publicly the basis for his decision not to impose discipline in his press release or otherwise. (Chacon Dep., Dkt. 216-2, at 85:13–86:17, 146:9–20).

The City also argues that there is no prejudice because the Gonzales Plaintiffs had the ability to question Chacon about his decision not to discipline the officers, and other opinions about APD training and APD officer-involved shootings, at his deposition. (Dkt. 216, at 5–6). The City faults the Gonzales Plaintiffs for not postponing Chacon's deposition nor moving to compel a more detailed designation prior to questioning him. (*Id.*). It is true that the Gonzales Plaintiffs had the opportunity at Chacon's deposition to question him about his opinion that the officers did not violate APD policy and the evidence he relied upon in making that decision. (Chacon Dep., Dkt. 216-2, at 109:5–113:12, 136:6–18, 146:23–149:6). They also had the opportunity to question Chacon

about APD training and other APD officer-involved shootings and use of force incidents. (*See generally id.* at 196–363). However, the Gonzales Plaintiffs had "no obligation to remind [the City] to comply with the Federal Rules." *Carr v. Montgomery Cnty., Tex.*, No. CIV.A. H-13-2795, 2015 WL 5838862, at *4 (S.D. Tex. Oct. 7, 2015). The Fifth Circuit has noted that a delay of even a few weeks in disclosing expert testimony disrupts the court's schedule and the opponent's preparation and can be prejudicial. *See Geiserman,* 893 F.2d at 790. A proper expert designation allows opposing counsel to anticipate the expert's testimony and make decisions about how to approach that expert. *See Cont'l Cas. Co.*, 2011 WL 2887457, at *7 (noting that a party's failure to provide a proper summary of facts and opinions is prejudicial because opposing counsel cannot determine whether to depose that witness or decide what rebuttal evidence to offer). In other words, disclosures enable fair depositions; depositions do not cure failures to disclose.

By failing to provide proper disclosures for Chacon through the close of fact discovery, the rebuttal report period, and his deposition, the City deprived the Gonzales Plaintiffs of the opportunity to use its disclosure for any of these purposes. Because the disclosure did not explain what Chacon's opinions were and the bases for those decisions, the Gonzales Plaintiffs could not meaningfully prepare for their deposition of Chacon, which blunted the usefulness of the deposition and hindered their overall preparation for trial. As such, the prejudice factor weighs in favor of exclusion. *See Liberty Ins. Corp. v. Omni Constr. Co., Inc.*, No. 4:21-CV-02119, 2022 WL 18402560, at *4 (S.D. Tex. June 15, 2022) (finding prejudice for failure to meet Rule 26(a)(2)(C) disclosure requirements where subject-matter-only disclosure precluded plaintiff from preparing for expert depositions and trial).

In order to cure the deficient expert designation, the Court would need to give the City the opportunity to supplement its designation, which in turn could result in a second deposition of Chacon, rebuttal expert reports, and subsequent renewed motions to exclude. The Court has already

extended the trial date in this consolidated action several times. With an anticipated trial date approaching in less than three months, allowing the City to supplement its designation would likely require postponing the trial date once again. Such a cure is untenable because it would cause further delay and prejudice to the Gonzales Plaintiffs. *See Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 571 (5th Cir. 1996) (noting that Rule 26(a) requires complete initial disclosures and that supplemental disclosures are "not intended to provide an extension of the deadline by which a party must deliver the lion's share of its expert information"). Further, there is no reason to believe that a continuance would cure the prejudice, because the City has offered "no reason to believe a continuance would . . . cure [its] dilatory behavior." *Barrett v. Atl. Richfield Co.*, 95 F.3d 375, 381 (5th Cir. 1996). The Court declines to further prejudice the Gonzales Plaintiffs by granting a continuance to allow the City to amend its disclosures. As such, this factor also weighs in favor of exclusion.

The City's designation of Chacon as an expert witness did not comply with even the relaxed disclosure requirements of 26(a)(2)(C). Having weighed all four factors, the Court concludes that the City has not shown that its failure to disclose was harmless or substantially justified. Therefore, Chacon's expert testimony is excluded pursuant to Rule 37(c)(1). The Gonzales Plaintiffs' Motion to Exclude Expert Testimony of Joseph Chacon is granted. This order, however, does not affect Chacon's ability to serve as a fact witness in this case.

### B. Brian Manley

The Gonzales Plaintiffs' motion to exclude Brian Manley ("Manley") is similar to their motion to exclude Chacon. Manley was the APD Chief of Police on January 5, 2021, when the shootings in this case took place. He filed for retirement about a month after the incident and was not otherwise involved in the investigation of the incident. (*See* Dkt. 181, at 6, 17). The City designated Manley as a non-retained expert. (City Designation, Dkt. 113, at 2). The City's designation of Manley in full states: "Chief Manley may testify regarding the policies, practices,

training and investigations of the Austin Police Department relating to officer-involved shootings and responses to resistance and may offer opinions based on his education, training and experience." (*Id.*).

The Gonzales Plaintiffs again do not dispute that Manley can be an important *fact* witness in this case, but they similarly move to exclude him from providing *expert* testimony because the City failed to disclose his expert opinions under Rule 26 and because his expert opinions are unreliable under *Daubert*. (*See* Dkt. 181). The City did not file a response in opposition to this motion to exclude, so the Court understands the City to be unopposed to the exclusion of Manley's expert testimony. *See* W.D. Tex. Loc. R. CV-7(d)(2). ("If there is no response filed within the time period prescribed by this rule, the court may grant the motion as unopposed."). It is also unclear what expert testimony Manley could provide in this case given that he retired so soon after the incident occurred. Further, for the same reasons listed above as to Chacon's designation, the Court finds that the City's disclosure of Manley did not comply with Rule 26's requirements for non-retained experts. The City has also not shown that the failure to comply with the disclosure requirements was substantially justified or harmless. Accordingly, the Court grants the Gonzales Plaintiffs' Motion to Exclude Expert Testimony of Brian Manley and excludes his expert testimony.

### C. Arthur Chancellor

#### 1. Background of Chancellor's Experience and Proposed Testimony

Arthur Chancellor ("Chancellor") was designated as a retained expert by the Gonzales Plaintiffs to provide testimony based on his expertise in homicide investigations and crime scene reconstructions. (Gonzales Plaintiffs' Designation, Dkt. 105, at 3). Chancellor has more than fifty years of law enforcement experience, with forty-three years spent as a senior crime analyst or criminal investigator and detective. Chancellor earned an undergraduate degree in criminal justice and a master's degree in criminal justice administration. He also graduated from the FBI National

Academy and has participated in training courses in homicide and crime scene examination. From 1974 through 2001, Chancellor served with the US Army Military Police, where he investigated homicides that occurred on U.S. military bases. From 2004 through 2008 he created and served as the first director of the Mississippi Bureau of Investigations Cold Case Unit. He then he re-joined the Army Criminal Investigation Division as a civilian employee, from 2011 through 2022 as a Supervisory Special Agent where he typically reviewed 500 case files per year, all involving deaths or serious sex crimes. Chancellor represents that throughout his career he has conducted several hundred criminal felony investigations and has reviewed over 10,000 felony investigation files. (*See* Chancellor Report, Dkt. 143-1, ¶¶ 12–17).

Chancellor is the co-author of the textbook "Death Investigations," which lays out the "scientific method of homicide investigation" and shows how this method can be used to conduct crime scene reconstructions that advance or solve homicide investigation cases. He represents that his methodology is generally accepted by others with expertise in conducting homicide investigations. (*Id.* ¶¶ 64–77).

In his 118-page expert report, Chancellor uses his expertise to (1) assess APD's criminal homicide investigation of the shootings in this case, (2) consider the depositions and other discovery from this case, and (3) use the evidence of the case to conduct a crime scene reconstruction of the events using the "scientific method of homicide investigation." (Dkt. 178, at 10–11). As relevant to this case moving forward, Chancellor gives his assessment of the undisputed facts about the first shooting involving Gutierrez, which he describes as those facts that are established by the evidence. (*Id.* ¶¶ 192– 207). He then also includes seven unresolved "open fact questions," that are not conclusively established by the evidence but important to the investigation, and provides possible answers to those questions. (*Id.* ¶¶ 208–235). Based on the established facts and the open fact questions, Chancellor articulates eight hypothetical scenarios of what may have happened during the

first shooting, each based on the established facts plus additional factual detail regarding hypothetical

ways in which the open fact questions might be resolved in light of the evidence. In the end, he

gives his opinion as to the likelihood of each hypothetical scenario, giving each scenario a degree-of-

confidence rating such as impossible, plausible, highly likely, etc. (*Id.* ¶¶ 236–262). Chancellor,

however, does not conclusively endorse any of the other seven scenarios as most likely; he just finds

that they range in plausibility from possible to highly likely. (*See id.* ¶¶ 261.2–262).

2. Admissibility of Chancellor's Opinions

Gutierrez does not challenge Chancellor's qualifications but instead challenges the reliability

of his opinions. Gutierrez largely takes issue with Chancellor's eight crime scene hypotheticals and

his opinion as to the likelihood of each hypothetical. (Dkt. 143, at 7). Gutierrez makes the following

objections about Chancellor's analysis: (1) Chancellor's testimony is not helpful to the jury because it

is based on subjective evaluations of the facts, not a technical area of expertise; (2) Chancellor's

opinions are unreliable because there is too big of an analytical gap between the facts and his

conclusions; (3) Chancellor's assessment of the likelihood of each scenario will be confusing to the

jury because it is too similar to the preponderance of the evidence standard; and (4) Chancellor's

testimony, at times, improperly engages in guesswork about Gutierrez' state of mind. (*See id.* at 7–

14). In summary, Gutierrez challenges the entire portion of Chancellor's report analyzing the first

shooting. (*Id.* at 7–8 (citing Chancellor Report, Dkt. 143-1, ¶¶ 192–262)). The Gonzales Plaintiffs

argue that Chancellor's opinions are admissible because they are based on a reliable methodology

and are adequately explained. (*See* Dkt. 178).

To begin, the Court finds that Chancellor is qualified to give his expert opinion based on his

significant law enforcement experience and his experience specifically in conducting and reviewing

criminal investigations. Moreover, his expert testimony is relevant to this case because Chancellor

applies his expertise in crime scene reconstruction to offer opinions about what may have happened

during the shootings in this case. Given the significant fact disputes about specifically what took place during Gutierrez' shooting of Gonzales and Arellano, Chancellor's testimony could help the jury sort through the disputed evidence and testimony that will be presented at trial.

Gutierrez argues that Chancellor's opinions do not assist the jury because his analysis offers "subjective observations and comparisons of facts based on his subjective evaluation of the facts that are found in the record." (Dkt. 143, at 8–9). However, Chancellor has explained an acceptable methodology he used to evaluate the facts; to the extent Gutierrez believes his subjective views infected his analysis, this is an appropriate topic for Gutierrez to press via cross-examination at trial. In other words, Gutierrez raises an argument that goes to the persuasiveness of the testimony and weight a jury should afford to it.

Gutierrez also alleges that "[t]he facts of the case do not present scientific or technically complicated matters that are beyond the realm of knowledge normally possessed by lay jurors." (*Id.* at 9). But it is common for litigants to use law enforcement investigations experts to provide testimony related to crime scene reconstruction work in cases that involve homicides. *See, e.g.*, *Grant v. City of Houston*, 625 F. App'x 670, 677–78 (5th Cir. 2015) (discussing the testimony of opposing crime scene reconstruction experts at trial). The Supreme Court has recognized that a "hard science" methodology is not applicable or necessary in every case. *Kumho Tire*, 526 U.S. at 150. The relevant inquiry is whether the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. Courts have expressly acknowledged that law enforcement testimony "is not the type of testimony that is readily subject to peer review." *Carr*, 2015 WL 5838862, at *7. In fact, an expert may "draw a conclusion from a set of observations based on extensive and specialized experience." *Pipitone*, 288 F.3d at 247. The Court is satisfied that Chancellor has met this standard. Gutierrez further challenges Chancellor's analysis of the open fact questions in this case and argues that the jury can resolve these disputes without

Chancellor's analysis on each fact dispute. (Dkt. 143, at 9). However, "a party may reasonably choose to rely on a witness, such as an expert, to synthesize documentary evidence in order to streamline the presentation of information." *Hammers v. Mayea-Chang*, No. 2:19-CV-00181-JRG, 2019 WL 6728446, at *7 (E.D. Tex. Dec. 11, 2019). The Court concludes that Chancellor's testimony would be helpful to the jury.

The Court also agrees with the Gonzales Plaintiffs that Chancellor's expert opinions are reliable. In his report, Chancellor adequately describes background principles about how criminal investigations are conducted, how evidence is evaluated, and common mistakes in homicide investigations. (Chancellor Report, Dkt. 143-1, ¶¶ 22–31, 78–87). He then describes the methodology he will employ to conduct his crime scene reconstruction: the scientific method as applied to homicide investigations. (*Id.* ¶¶ 64–77). His methodology section is well-cited to authoritative texts and sources. Chancellor's analysis of APD's investigation and the first shooting then apply these principles in analyses sections that explain his reasoning and the facts and sources on which he relies. (*See generally id.* ¶¶ 88–161, 191–262).

Gutierrez argues that Chancellor's analysis of the eight hypothetical scenarios is not reliable because the analysis is "largely based on guesswork and unsupported factual inferences" and "lack[s] substantial evidence that bridges the gap between the facts or set of facts on which these theories rely and Mr. Chancellor's factual conclusions." (Dkt. 143, at 14). Gutierrez devotes a few pages of his brief challenging Chancellor's opinions on each factual hypothetical and arguing why each of his conclusions about the likelihood of each scenario are not adequately explained. (*See id.* at 9–14). The Court disagrees. Chancellor's description of the undisputed facts and his answers to the open fact questions are well-supported by citations to the record. (*See* Chancellor Report, Dkt. 143-1, ¶¶ 191–235). This analysis then supports his conclusions on the likelihood of each hypothetical scenario. (*See id.* ¶¶ 238–262). As for Gutierrez' specific criticisms of Chancellor's conclusions, whether an expert

sufficiently considered all available evidence "goes to the weight, not admissibility, of his opinion testimony." *See Orthoflex, Inc. v. ThermoTek, Inc.*, 986 F. Supp. 2d 776, 802 (N.D. Tex. 2013) (citing *Daubert*, 509 U.S. at 596). The specific questions that Gutierrez raises regarding the strength of Chancellor's conclusions are better suited for cross-examination, not exclusion. *See Pipitone*, 288 F.3d at 250 ("[A]s *Daubert* makes clear, vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.") (cleaned up). The Court finds that Chancellor's testimony is reliable both because it is the product of reliable methodology and because it is based on sufficient facts and data.

Gutierrez next contends that Chancellor's degree-of-confidence terminology for expressing his opinions will be confusing to the jury and that the jury will improperly conflate his terminology with the preponderance of the evidence standard. (Dkt. 143, at 8). In his report, Chancellor explains the definitions of his terminology—what makes an answer to an open fact question or one of his scenarios impossible, possible, or plausible. (Chancellor Report, Dkt. 143-1, ¶¶ 74–76). At no point in the report does Chancellor state that any fact or factual scenario is "more likely than not." Accordingly, the Court does not find that Chancellor's testimony would confuse the jury in conflating his degree-of-confidence opinions with the preponderance of the evidence standard. The Court will provide detailed instructions to the jury to explain the preponderance of the evidence standard. The parties will have sufficient opportunity to offer argument as to how to draft those instructions, and the Court is confident that after being given those instructions, the jury will be able to correctly apply the preponderance standard considering all the evidence presented at trial.

Last, Gutierrez argues that, at times in his report, Chancellor improperly questioned Gutierrez' credibility or engaged in speculation as to his state of mind. (*See* Dkt. 143, at 6–7, 12). As an example of an alleged credibility assessment, Gutierrez points to Chancellor's conclusion that it is

likely that Gutierrez "racked a round" before the first shooting. Gutierrez argues that this conclusion improperly questions his credibility since he has stated that he did not rack a round before the confrontation with Gonzales. (*See id.* at 5–6). Gutierrez further argues that "if the purpose of Mr. Chancellor's testimony is to show inconsistencies in Gutierrez' testimony that would have some bearing on his credibility and truthfulness, that is a matter for the jury." (*Id.* at 9).

This argument is without merit. Where courts have taken issue with expert testimony concerning witness credibility, it is where the expert opines on the witness's character or capacity for truth. *See, e.g., Joseph v. Signal Int'l L.L.C.*, 2015 WL 12766134, at *14 (E.D. Tex. Feb. 12, 2015); *Meganathan v. Signal Int'l L.L.C.*, 2015 WL 11109846, at *14 (E.D. Tex. June 26, 2015). Here, Chancellor is not opining on Gutierrez' character or capacity for truth; he is simply stating where, in his opinion, the evidence conflicts with Gutierrez' account of the events. Chancellor's interpretation of the evidence may be different from Gutierrez but that does not render Chancellor's testimony improper. *See Goodman v. Harris County*, 571 F.3d 388, 400 (5th Cir. 2009) (finding proper expert testimony which did not state that an officer lied but instead simply pointed out inconsistencies in the officer's account).

The Court finds that Chancellor may proffer his expert testimony. He is qualified from his significant experience in law enforcement. His expert report is the result of a reliable methodology, the scientific method of crime scene reconstruction, and he has amassed expertise via his professional experience, which will be helpful to the jury. His conclusions are sufficiently supported by the record and may assist the jury in narrowing down the disputed fact issues in this case. Further, his testimony will not confuse the jury, nor does it contain improper testimony on witness credibility. Accordingly, the Court denies Gutierrez' Motion to Exclude Testimony of Arthur S. Chancellor.

### D. Keith Howse

Arellano has designated Keith Howse ("Howse") as a retained expert in "police conduct and police practices." (Arellano Designation, Dkt. 104, at 2–4). Howse earned an associate degree of applied sciences in police science and a bachelor's degree in criminology and criminal justice. He also is a trained attorney. Howse had a twenty-year career in law enforcement working for the Baylor Department of Public Safety, rising from public service officer to captain of police to Director of Public Safety and Assistant Chief of Police. (Howse Report, Dkt. 203-1, at 2, 25–26). In these roles, he helped create the policy framework for the Baylor Health Care System police force, and as a supervisor he has had experience evaluating several officer-involved shootings. (Dkt. 203, at 8). In his 23-page report, Howse primarily offers opinions on the conduct of Gutierrez and Serrato during the shootings. (*See* Howse Report, Dkt. 203-1, at 8–18). He also provides opinions based on the City's subsequent investigations of the shootings. (*See id.* at 18–21).

The City does not question Howse's qualifications or the bulk of his proposed testimony. Instead, it seeks to exclude only a limited portion of Howse's testimony, arguing that certain sentences in the report improperly offer legal opinions and speculation about individuals' states of mind. (Dkt. 156, at 3–4). Arellano responded in opposition to the exclusion of these portions of Howse's report, (Dkt. 203), and the City replied, (Dkt. 228).

In general, while expert testimony may "embrace[] an ultimate issue," Fed. R. Evid. 704, experts may not instruct the jury on the law governing the claims in a case, *see Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997). However, the Fifth Circuit has observed that experts "may testify as to legal matters when those matters involve questions of fact." *Id.* at 672. In addition, it is impermissible for experts to opine on a party's state of mind. *Marlin v. Moody Nat. Bank, N.A.*, 248 Fed. App'x 534, 541 (5th Cir. 2007). That is because an expert is in no "better position than the jury

to draw conclusions about a defendant's state of mind." *Sanchez v. Gomez*, No. 17-CV-133-PRM, 2020 WL 3316990, at *11 (W.D. Tex. June 17, 2020) (quoting *Marlin*, 248 F. App'x at 541).

First, the City argues that Howse should not be able to testify that the officers' actions were not reasonable because this is an improper legal conclusion. (Dkt. 156 at 3–4). The City takes issue with one specific sentence in Howse's report: "I do not concur with the OPO assessment that Officer Serrato's use of deadly force against Mr. Gonzales, Jr. was reasonable." (Howse Report, Dkt. 203-1, at 21). But there are also other instances in Howse's report where he opines on the reasonableness of the officers' conduct. (*See, e.g.*, *id.* at 9, 10, 13, 17, 22).

The Fifth Circuit has held that an expert cannot offer legal conclusions on whether an officer's use of force was reasonable under the Fourth Amendment. *United States v. Williams*, 343 F.3d 423, 435 (5th Cir. 2003). But courts have allowed expert opinions, including police practice expert opinions, on the general reasonableness of an action. *See, e.g.*, *Garcia v. Mendeke*, No. DR:15-CV-070-AM-CW, 2016 WL 8739854, at *4 (W.D. Tex. Sept. 30, 2016); *Scott v. White*, No. 1:16-cv-1287-RP, 2019 WL 122055, *7 (W.D. Tex. Jan. 7, 2019); *see also Kopf v. Skyrm*, 993 F.2d 374, 378 (4th Cir. 1993) (reversing exclusion of expert regarding what a reasonable officer would have done). That is because many police departments, including APD, explicitly incorporate an "objectively reasonable" standard into their own use of force policies. (*See* Dkt. 203, at 12). The term "reasonable" is relevant because that is part of the minimum police standard widely accepted across the country. (*Id.*).

Here, Howse testified at his deposition that "I do not offer or intend to offer any legal opinions." (Howse Dep., Dkt. 203-2, at 17:12–13). He has not stated an opinion about whether the officers' uses of force comply with the Fourth Amendment. Rather, Arellano argues he will only testify as to whether the officers' conduct comported with APD policy and will not mention the Fourth Amendment. (Dkt. 203, at 12, 14). The Court is satisfied that Howse is not opining on the

ultimate issue of whether Gutierrez' conduct violated the Fourth Amendment. Rather, he thoroughly develops his analysis in his report to explain why, in his opinion, he believes the officers did not act reasonably. As such, he may testify to the reasonableness of Gutierrez' actions. *See Estevis v. City of Laredo*, No. 5:22-CV-22, 2023 WL 9312081, at *5 (S.D. Tex. Dec. 28, 2023); *see also United States v. Speer*, 30 F.3d 605, 610 (5th Cir. 1994) (finding that opinions that bordered on legal conclusions were admissible because they were presented with "an analysis of facts which would tend to support a jury finding on the ultimate issue.").

Next, the City challenges Howse's use of the terms "ratification" and "deliberate indifference." (Dkt. 156, at 4). Howse uses both terms in one sentence in his report:

> Because neither [the OPO nor CPRC] report's findings and recommendations were acted upon by the APD executive leadership, specifically Chief Chacon, there is an appearance of deliberate indifference to the use of deadly force by APD officers because there appears to be formal ratification of Officer Gutierrez's and Officer Serrato's actions by APD leadership.

(Howse Report, Dkt. 203-1, at 21). The City argues that this opinion contains both improper legal conclusions and improper opinions regarding individuals' states of mind. (Dkt. 156, at 4; Dkt. 228, at 3). Arellano defends the opinion, stressing that Howse only states that there is an "*appearance* of deliberate indifference" and there "*appears* to be formal ratification." She argues that these opinions are proper because they are conclusions based on objective facts—not what the police chief actually knew—which are within Howse's expertise as a former police supervisor. (Dkt. 203, at 18).

For Plaintiffs to succeed on their *Monell* claims, they will have to prove that the City adopted an unconstitutional policy or practice and that in adopting this policy, the City was deliberately indifferent to the risk that a violation of a particular constitutional or statutory right will follow from the decision. *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010). Ratification is also a specific theory of *Monell* liability that Plaintiffs pleaded in this case. (*See* Dkt. 246, at 43); *see also Peterson v. City*

*of Fort Worth, Texas*, 588 F.3d 838, 847 (5th Cir. 2009). Thus, Howse's opinions touch upon ultimate issues which the jury may be specifically asked to consider.

Arellano's defense of the opinions is ultimately unpersuasive. While the Court appreciates that Howse has attempted to couch his conclusions in softer terms to not state an improper legal conclusion, his use of these specific terms touches too close to the law that the jury will consider. These phrases are primarily legal terms, not terms relevant to a professional standard of care, in the way that reasonableness is. Further, in contrast to his use of the term "reasonable," here, he uses the terms "deliberate indifference" and "ratification" without much analysis explaining why he thinks the chief's decision not to adopt the City oversight recommendations amounted to deliberate indifference or ratification.

As such, Howse may not testify that "there is an appearance of deliberate indifference to the use of deadly force by APD officers because there appears to be formal ratification of Officer Gutierrez' and Officer Serrato's actions by APD leadership." However, this order does not prohibit Howse from using alternative terminology to explain the substance of his opinions. This order also does not prohibit the City from filing objections at trial if they believe that any alternative terminology strays into an impermissible legal conclusion.

Last, the City argues that Howse should be excluded from testifying that Gutierrez "recklessly" fired his weapon into Gonzales and Arellano's car because that opinion is improperly speculating on Gutierrez' state of mind. (Dkt. 156, at 4). The specific sentence that the City takes issue with is one where Howse is quoting the OPO recommendation memorandum in which it found that "Officer Gutierrez recklessly fired his weapon into a car, failing to verify whether anyone else was in the car." (Howse Report, Dkt. 203-1, at 18). Certainly, it is proper for Howse to reference and restate terms ingrained in the City's own documents, which are evidence in this case.

Howse does twice elsewhere use the term "recklessly" to describe an officers' actions, (*id.* at 11, 17), but the Court does not find the use of the term "recklessly" in these contexts to be inadmissible opinions about anyone's state of mind. Howse repeatedly stated in his deposition that he is not opining on anyone's mental state. (Howse Dep., Dkt. 203-2, at 75:12–13, 82:11–23, 153:19–20). Rather, his use of the term reflects his opinion on the officers' *actions,* not their mental state, and he sufficiently explains the basis for this opinion by citing evidence in the record. On this issue, the City is free to attack Howse's choice of evidence or his interpretation of it, but only via cross-examination, not exclusion of Howse's opinion. *See Pipitone*, 288 F.3d at 250.

In summary, the Court finds that Howse is not excluded from testifying using the term "reasonable" or "reckless" because Howse's use of both terms, as stated in his report, do not amount to improper legal conclusions nor improper testimony on an individual's state of mind. However, Howse is prohibited from testifying using the terms "deliberate indifference" and "ratification" as he uses those terms in his report but may use appropriate alternative phrases. Accordingly, the City's Motion to Exclude Expert Opinions and Testimony of Keith A. Howse is granted in part and denied in part.

### E. Craig Miller

#### 1. Background of Miller's Experience and Proposed Testimony

The City designated Craig Miller ("Miller") as a retained expert in the fields of police conduct, police practices, and police administration. (City Designation, Dkt. 113, at 2). Miller earned a bachelor's degree in criminal justice. He is the former Chief of Police of the Dallas Independent School District, a role in which he served for 8 years. He also served in various leadership roles, including Deputy Chief, in his 29-year career with the Dallas Police Department. In this capacity, Miller was the homicide unit commander who oversaw 750 murder investigations and 75 officer-involved shootings, death in custody incidents, and murder-for-hire investigations. Since 2012,

Miller has also been a police practices and use of force expert in numerous civil and criminal cases. (*See* Miller CV, Dkt. 113-2; Miller Report, Dkt. 208-1, at 1–2).

Miller completed his original expert report for the City on March 18, 2024. (Miller Report, Dkt. 208, at 1). In the 16-page report, he provides four distinct opinions across eight pages of analysis. (*Id.* at 9–16). His four enumerated opinions are: (1) "Officer Gutierrez and Officer Serrato were provided exceptional training by the Austin Police Department regarding use of deadly force"; (2) "APD has an outstanding policy with regards to use of force"; (3) "APD completed a very comprehensive criminal and administrative investigation into the actions of Officers Gutierrez and Serrato following the death of Mr. Gonzales"; and (4) APD's policy on off-duty law enforcement actions, General Order 364 ("GO 364") "was in place on January 5, 2021, when Officer Gutierrez shot Mr. Gonzales while he was off-duty" and "is based off the best practices Lexipol model that provide guidelines for departments who use it." (*See id.*). Miller also states the following conclusion, though it is not enumerated as a specific opinion: "It is my opinion that the force used by Officer Gutierrez and Officer Serrato to control Mr. Gonzales was in line with the training that they received from the Austin Police Department." (*Id.* at 14). Miller's original report stated that he reviewed certain pleadings and discovery responses as well as specific ranges from the City's document production identified by Bates label. (*Id.* at 3–5). The report did not indicate that Miller had reviewed any deposition transcripts from the witnesses in this case nor any materials from Plaintiffs' or the other parties' experts.

The parties deposed Miller on June 5, 2024. (Dkt. 208, at 11). By that time, over twenty depositions had been taken in this matter, and Miller had received fifteen of them by the time he was deposed, but he testified he had not reviewed any of those transcripts and was not prepared to testify about them. (Miller Dep., Dkt. 211-1, at 12:23–13:24, 16:1–4, 22:5– 9, 241:11–25, 242:8–16, 243:11–14). Miller did, however, choose to read Plaintiffs' expert reports before his deposition. (*Id.*

at 13:19–14:2). In fact, contrary to his original expert report, Miller testified that he did read and consider Plaintiffs' experts' reports before writing his original report, but he had no response to the expert reports. (*Id.* at 14:20–15:11, 243:15–244:1).

At his deposition, Miller seemed to retract his opinion, as stated in his original report, that the officers used force "in line with" APD training and procedure. Miller expressly agreed that he does not "intend to offer an opinion about whether or not one version of the events or another version of the events is either true or more likely to be true." (*Id.* at 36:10–22; *see also id.* at 42:24–43:14, 44:9–19). Miller also agreed that he is "not rendering an opinion in this case regarding whether or not either officers' use of force was objectively reasonable," consistent with *Graham v. Connor*, consistent with Texas Penal Code Chapter 9, or "consistent or inconsistent with generally accepted police practices." (*Id.* at 38:17–21, 147:14–19, 255:2–17, 256:1–257:5, 257:24–258:4). Miller elaborated that "I'm not really opining on the officer[s'] force," only the City's "ability to train the officers, [and] conduct . . . thorough criminal administrative investigation." (*Id.* at 50:16–23). Miller agreed that with the proposition that "your opinion is that [the officers] were trained on all the right things that they should have followed in this situation, but you're not making an assessment of whether or not they did follow that training." (*Id.* at 256:10–15; *see also id.* at 315:13–316:3).

On June 25, 2024, the City of Austin disclosed a supplemental report signed by Miller. (Supp. Report, Dkt. 208-4). The supplemental report stated "Included in this Supplemental Report are documents that were originally considered but not listed in the items that I reviewed. Also, I am including documents that were provided to me after I submitted my original Expert Report on March 18, 2024." (*Id.* at 1). Miller then lists 28 materials, including reports from Plaintiffs' experts and deposition transcripts from the parties and experts. The supplemental report concludes:

> I was supplied the APD IA File (277 pages) before I submitted my
> original Expert Report. I then used and included the IA investigation
> when I prepared my original Expert Report. I did review and consider
> the items listed above, but they do not alter the language from my
> original Expert Report. After my review of the above listed documents
> my original Expert Report (March 18, 2024) will stand as originally
> submitted with no changes.

(*Id.* at 2).

### 2. Admissibility of Miller's Expert Opinions

Both Arellano and the Gonzales Plaintiffs have challenged the admissibility of Miller's expert

opinions. Arellano has only moved to exclude portions of Miller's proposed testimony. (Dkt. 208).

She first argues that Miller should not be permitted testify about the facts of the shooting, including

whether the officers' conduct comported to generally accepted police practices, because his review

of the evidence on these matters was allegedly incomplete and because he disclaimed any such

opinions during his deposition. She asserts that a court order limiting this testimony is necessary

because even though he disclaimed opinions on these matters during his deposition, he then also

stated in his supplemental report that his original expert report "will stand" with no changes. (*Id.* at

1). Second, Arellano argues that Miller should not be permitted to give an opinion as to whether the

City adequately investigated the shooting because his opinion as listed in the original report is

unreliable. (*Id.* at 17). Third, Arellano contends that Miller's disclosure of new bases for his opinions

in the supplemental report is untimely and should be struck. Instead, Arellano requests that the

Court limit Miller to the opinions and bases that he provided in his deposition testimony. (*Id.* at 14–

17, 20). Arellano does not challenge Miller's proposed opinions about the quality of APD's training

or its use of force and off-duty law enforcement policies. (*See* Dkt. 259, at 3).

The Gonzales Plaintiffs similarly argue that Miller's opinions about the officers' use of force

and the thoroughness of the investigation should be excluded as unreliable. (Dkt. 211, at 5–9, 22–

28). But they go a step further by arguing that the rest of Miller's testimony should also be excluded.

They contend that Miller's opinions about the quality of APD's training and its policies are unreliable because they are not based on an objective methodology or sufficient facts and data. (*See id.* at 9–22, 28–30).

### a. Opinions About Use of Force

The Court begins with the the issue of Miller's proposed testimony regarding the officers' use of force. The expert report plainly can be read to offer an opinion that the officers' use of force was reasonable even if Miller later stated multiple times in his deposition that he was not opining on the officers' use of force. The supplemental report further muddies the waters by stating that Miller intends for his original report to stand with no changes. In their responses to the motions to exclude, the City clarifies that "Miller will not testify regarding the officers' use of force." (Dkt. 255, at 3; Dkt. 256, at 3). To provide clarity on this issue given the conflicting statements Miller made in his reports and in his deposition—and in light of the City's concession—the Court orders that Miller shall not provide expert testimony on the officers' use of force. Accordingly, the Court grants Arellano and the Gonzales' Plaintiffs' motions to exclude as they pertain to Miller's opinions on the officers' uses of force.

### b. Opinions About APD's Investigations

Next, the Court considers the reliability of Miller's opinions on the thoroughness of the APD investigation. Miller's third enumerated opinion is that "APD conducted a very thorough criminal and administrative investigation into the actions of Officer Gutierrez and Officer Serrato." (Miller Report, Dkt. 208-1, at 14). The report's entire discussion of this opinion is listed in the following three paragraphs:

> 36. It is my professional opinion that APD completed a very comprehensive criminal and administrative investigation into the actions of Officers Gutierrez and Serrato following the death of Mr. Gonzales. Immediately after the shooting, the APD Special Investigations Unit (SIU) responded to the scene and started a criminal investigation into the actions of the involved officers.

> 37. This case was referred to a Travis County Grand Jury to determine if there was any criminal misconduct by Officer Gutierrez or Officer Serrato in the shooting death of Mr. Gonzales. On December 27, 2022, the Grand Jury returned a "No Bill" decision for both officers.
>
> 38. On January 5, 2021, APD Assistant Chief Henderson directed the Internal Affairs Division to conduct an administrative inquiry to determine if any violation of departmental policy, Civil Service Rules, or State Law had occurred. In conducting the administrative review, the focus of the investigation was to determine if policy 200.4 Response to Resistance – Deadly Force Application had been violated. Following the Internal Affairs investigation, it was determined that Officer Gutierrez and Officer Serrato had committed no infractions.

(*Id.* at 14–15).

Plaintiffs argue that this opinion is unreliable because there is no methodology listed as a basis for this conclusion nor is there any disclosed facts or data to support the opinion. Plaintiffs also assert that there is not an adequate fit between the evidence and the opinion because Miller did not review or engage in key evidence that may have changed his opinion—evidence that, in Plaintiffs' opinion, reveals that the City did not conduct a thorough investigation. (*See* Dkt. 208, at 17–20; Dkt. 211, at 22–28). In response, the City accuses Plaintiffs of cherry-picking evidence that Miller did not consider. It argues that if Plaintiffs believe that Miller did not consider particular pieces of evidence, then those issues are ripe for cross-examination, not a basis for exclusion. (*See* Dkt. 256, at 4–5).

The Court finds that Miller's opinions about the thoroughness of APD's investigation are unreliable. "[A] district court, while acting as a gatekeeper for expert evidence, must evaluate whether there is an adequate 'fit' between the data and the opinion proffered." *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). Miller states no methodology or basis for his opinion that the APD investigation was thorough. His conclusion is also conclusory. The only facts he discloses to support this conclusion is that (1) SIU arrived on the scene to start an investigation; (2) the Travis County grand jury returned a no-bill for both officers; (3) IA also conducted an

investigation to determine if the City's deadly force policy had been violated; and (4) the IA investigation ended in a decision not to discipline. (*See* Miller Report, Dkt. 208-1, at 14–15). Merely pointing out that SIU and IA investigations occurred and how they concluded is not evidence of the thoroughness of the investigation. "If an opinion is fundamentally unsupported, then it offers no expert assistance to the jury." *Edmonds v. Illinois Cent. Gulf R. Co.*, 910 F.2d 1284, 1287 (5th Cir. 1990).

The City points to the fact that at his deposition, Miller stated that in formulating his opinion about the thoroughness of the APD investigation, he reviewed the entire SIU and IA files. (*See* Miller Dep., Dkt. 211-1, at 25:22–26:4, 33:18–21, 151:9–152:7, 244:2–5). Miller also testified that his opinion came from his experience as the head of the Special Investigations Unit for the Dallas Police Department. (*Id.* at 151:9–152:17). However, this testimony does not make up for the deficiencies of his report. In neither the report nor the cited deposition testimony did Miller adequately explain why he thinks the APD investigations were thorough or provide specific reasons for this conclusion. Because Miller's opinion "simply lacks the foundation and reliability necessary to support expert testimony," *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987), it must be excluded as unreliable.

Further, Miller's failure to provide the basis of his opinion violates the disclosure requirements for retained experts which requires expert reports to contain "a complete statement of all opinions the witness will express and the *basis and reasons* for them;" and "the facts or data considered by the witness in forming them." *See* Fed. R. Civ. P. 26(a)(2)(B)(i)–(ii). As stated above, in deciding whether testimony should be excluded due to Rule 26 violations, courts consider "(1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose." *Tex. A&M Research Found.*, 338 F.3d at 402 (5th Cir. 2003). The failure to

disclose prejudiced Plaintiffs here particularly because Miller later disclosed new bases for his opinions in his supplemental report. Plaintiffs were unable to inquire about these bases at his deposition and still cannot know how Miller intends to analyze contrary evidence about the investigation at trial since he was unfamiliar with much of this evidence during his deposition. (*See* Dkt. 259, at 6–7). Further, the City has not adequately explained their failure to disclose and there is no time for a continuance to cure the deficiencies given the late stage of this litigation. Miller's opinion on the investigation is clearly important to the City because Plaintiffs argue that APD's allegedly insufficient investigation into the shootings support their *Monell* claim. However, the importance of the testimony cannot alone justify the City's failure to timely comply with its disclosure obligations. *See Geiserman,* 893 F.2d at 792. As such, Miller's failure to properly disclose his opinion and the basis for it is not harmless nor substantially justified and therefore must also be excluded under Rule 37(c). *See Witt v. Chesapeake Exploration, L.L.C.*, No. 2:10-cv-22-TJW, 2011 WL 2790174, at *2–3 (E.D. Tex. July 14, 2011) (granting motion to exclude expert testimony to prevent expert from prejudicing defendant by testifying based on data that was not disclosed in his report).

Miller is prohibited from offering an expert opinion about the thoroughness of the APD investigations. Accordingly, the Court grants Arellano and the Gonzales' Plaintiffs' motions to exclude as they pertain to Miller's opinions on the APD investigations in this case.

### c. Opinions on APD's Training

The Court now turns to Miller's remaining opinions and the Gonzales Plaintiffs' request to exclude those opinions. Miller's first enumerated opinion in the report is, "Officer Gutierrez and Officer Serrato were provided exceptional training by the Austin Police Department regarding use of deadly force." (Miller Report, Dkt. 208-1, at 10). In the report, he states that this opinion is based on his experience as an expert witness and his training from the Law Enforcement Management Institute Police Chief training courses. He explains that, in his opinion, "[c]ompared to other

agencies, particularly in the areas of use of force and arrest procedures, APD is very thorough to ensure officers are well trained" because APD "put[s] recruits through as many realistic arrest situations as they can in the exercises they conduct." Miller also states that his opinion on APD's training is based on the fact that APD Academy currently puts officers through 32 weeks of training, which he states is more than twice the amount that the Texas Commission on Law Enforcement requires. (*Id.*). He further opines that APD Academy is "one of the finest police training academies in the United States" because "[e]ach recruit is supplied training in the areas of making arrests, use of force and the use of deadly force" and "tested on the material and required to score at least 80% on the exam." (*Id.* at 12). Miller then states that Gutierrez and Serrato attended APD Academy and completed the required training related to use of force and deadly force. He also lists the training courses that Gutierrez and Serrato participated in and concludes that APD Academy "comprehensibly taught the Texas Penal Code Chapter 9" to the officers. (*Id.* at 10–12).

In his deposition, Miller elaborated on the bases for his opinions on APD's training. He testified that he has compared Austin's Training Academy and training in general to other police departments in Texas, (*see* Miller Dep., Dkt. 211-1, at 57:16–58:12, 63:20–64:3, 69:4–11, 80:18–24), and finds APD training to be "exceptional as compared to other departments in the State of Texas," (*id.* at 53:18–25). He also testified that in forming his opinion he relied upon personal visits to the APD Training Academy, where he observed training exercises and spoke to APD training staff regarding the training. (*Id.* at 52:8–53:5, 81:6–23, 115:2–117:11). Miller further explained his opinion that APD's training is "progressive" by putting its officers through various simulations attempting to mimic real-life situations including making split-second decisions. (*Id.* at 82:18–83:16, 114:22–115:24, 145:1–22).

The Gonzales Plaintiffs argue that Miller's opinion that APD provides exceptional training is unreliable because his opinion is based entirely on the number of training hours that APD requires

and because he does not provide a sufficient analysis of APD training materials. They also assert that

his opinion is unreliable because he was unaware of how APD training has changed over time and

unaware of the criticisms that APD has received regarding its training. The Gonzales Plaintiffs also

specifically question whether Miller's comparison of APD's training hours to other police

departments is correct and adequately supports his opinion. (*See* Dkt. 211, at 12–18).

The Court is satisfied that Miller's expert opinions on APD training are reliable and based on

sufficient facts and data. Miller's testimony is based on a sound methodology. Courts have expressly

acknowledged that law enforcement testimony "is not the type of testimony that is readily subject to

peer review." *Carr*, 2015 WL 5838862, at *7. In fact, an expert may "draw a conclusion from a set of

observations based on extensive and specialized experience." *Pipitone*, 288 F.3d at 247. Miller's

opinion relies on his extensive personal experiences in law enforcement experience and there is no

indication that he fails to employ the same level of rigor as other law enforcement officers. *See*

*Kumho Tire*, 526 U.S. at 150. Further, Miller has adequately explained the bases for his opinions: his

personal observations of APD Academy, the comparison of that training to other police

departments he has worked with, and the number of training hours that APD requires. As explained

above, whether an expert has sufficiently considered all available evidence "goes to the weight, not

admissibility, of his opinion testimony." *See Orthoflex, Inc.*, 986 F. Supp. 2d at 802. The specific

questions that the Gonzales Plaintiffs raise about the strength of Miller's conclusions are better

suited for cross-examination, not exclusion. *See Pipitone*, 288 F.3d at 250. As such, the Court does not

exclude Miller's opinion on APD's training.

### d. Opinions on APD Written Policies

Finally, the Court turns to Miller's remaining expert opinions on APD's use of force policies

and its off-duty law enforcement actions policy. In the report, Miller states that the "APD General

Orders manual contains more than 700 pages and is very thorough and complete." As such, "[i]t is

my opinion that the APD General Orders are very progressive and based upon national standards."
(Miller Report, Dkt. 208-1, at 12). He follows this statement with two specific opinions. Miller's
second enumerated opinion in the report is: "APD has an outstanding policy with regards to use of
force" because this policy is "consistent with the nationally recognized Lexipol guidelines." (*Id.* at
12, 14). Miller's fourth enumerated opinion is that APD's policy on off-duty law enforcement
actions, GO 364 "was in place on January 5, 2021, when Officer Gutierrez shot Mr. Gonzales while
he was off-duty" and "is based off the best practices Lexipol model that provide guidelines for
departments who use it." (*Id.* at 15).

In his deposition, Miller elaborated that Lexipol bases its model use of force policies on the
*Graham v. Conner* objective reasonableness standard, and then APD and other police agencies expand
the Lexipol model policy by including their own language into the policy depending on the agency's
needs. (Miller Dep., Dkt. 211-1, at 97:12–98:11, 103:7–104:18). He testified that he believes the
Lexipol model policies are nationally accepted based on his work with other police chiefs nationwide
and his consideration and research of the Lexipol policies when he worked in various police
departments. (*Id.* at 95:10–96:6, 98:2–100:18).

The Gonzales Plaintiffs argue that these opinions are unreliable because they rely on
insufficient facts and data. Specifically, they take issue with Miller's conclusion that APD policies are
sufficient because they are based on the Lexipol policies. They point out that Miller was unaware of
the many criticisms of Lexipol policies and could not answer questions about what makes Lexipol a
good source of policies or how Lexipol changes its policies. They also argue Miller's methodology is
flawed because he used no metrics to support his characterization of APD's use of force policy as
"outstanding." (Dkt. 211, at 18–22, 28).

The Court again finds that Miller's opinions about APD's written policies are sufficiently
reliable to be admitted at trial. His opinions are based on his personal law enforcement experience

and his work with other police departments. The Gonzales Plaintiffs may wish that Miller had a more robust analysis to support his conclusions that APD's policies are "outstanding," but those challenges are better suited to cross-examination, rather than as a basis for exclusion. Miller may offer his expert opinions on APD's written policies at trial.

### e. Conclusion

Miller is prohibited from giving expert testimony on the officers' use of force and how that use of force comports with APD policy or training. He is also prohibited from offering an expert opinion about the thoroughness of the APD investigations into the shootings because his opinion is unreliable and because he failed to adequately disclose his opinion under Rule 26.[7] However, Miller's opinions about APD's training and its policies are not excluded. Accordingly, the Court grants in part and denies in part Arellano and the Gonzales Plaintiffs' motions to exclude the expert testimony of Miller.

## IV. CONCLUSION

For these reasons, **IT IS ORDERED** that the Gonzales Plaintiffs' Motion to Exclude Expert Testimony of Robin Henderson, (Dkts. 164, 196); Arellano's Motion to Partially Exclude Expert Testimony of Albert Rodriguez, (Dkt. 179); the Gonzales Plaintiffs' Motion to Exclude Expert Testimony of Albert Rodriguez, (Dkts. 190, 198); and the Gonzales Plaintiffs' Motion to Exclude Expert Testimony of Mass-Designated Witnesses, (Dkt. 294), are **MOOT**.

**IT IS FURTHER ORDERED** that the Gonzales Plaintiffs' Motion to Exclude Expert Testimony of Joseph Chacon, (Dkts. 145, 162), is **GRANTED**. Chacon shall not be permitted to testify as an expert a trial. This ruling does not preclude him from testifying as a fact witness.

---

[7] Because the Court finds that Miller's opinions on use of force and the thoroughness of the APD investigations should be excluded on other grounds, the Court does not reach Arellano's arguments concerning whether Miller's supplemental report should be excluded as untimely.

**IT IS FURTHER ORDERED** that the Gonzales Plaintiffs' Motion to Exclude Expert Testimony of Brian Manley, (Dkts. 181, 197), is **GRANTED**. Manley shall not be permitted to testify as an expert a trial. This ruling does not preclude him from testifying as a fact witness.

**IT IS FURTHER ORDERED** that Gutierrez' Motion to Exclude Testimony of Arthur S. Chancellor, (Dkt. 143), is **DENIED**. Chancellor may provide his proposed expert testimony at trial.

**IT IS FURTHER ORDERED** that the City's Motion to Exclude Expert Opinions and Testimony of Keith A. Howse, (Dkt. 156), is **GRANTED IN PART AND DENIED IN PART**. Howse's expert testimony may be admitted at trial, with the limitations noted in this order.

**IT IS FINALLY ORDERED** that Arellano's Motion to Partially Exclude Expert Testimony of Criag Miller, (Dkt. 208), and the Gonzales Plaintiffs' Motion to Exclude Expert Testimony of Craig Miller, (Dkt. 211), are **GRANTED IN PART AND DENIED IN PART**. Miller may provide his proposed expert testimony at trial, with the limitations noted in this order. Any other relief requested in the motions is denied.

**SIGNED** on March 27, 2025.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE